UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **Winmar Construction, Inc.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No.: 1:24-cv-00968-JEB** |
| ) | |
| **Iron Kingdom, Inc. and** ) | |
| **Angela Marie Richie, Personally** ) | |
| **And as a Partner in Gordon Rees Scully** ) | |
| **Mansukhani, LLP, also known as** ) | |
| **Gordon & Rees, LLP,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## AMENDED COMPLAINT

Plaintiff Winmar Construction Inc. ("Plaintiff" or "Winmar"), a District of Columbia corporation with its headquarters in Virginia, by and through counsel, alleges the following against Defendants Iron Kingdom, Inc. ("Iron Kingdom") and Angela Marie Richie ("Richie"):

## NATURE OF THE ACTION

1. Plaintiff Winmar entered into a Subcontract (the "DC Hotel Subcontract"), **Exhibit 1** hereto, with Defendant Iron Kingdom to perform structural steel work on a commercial hotel construction project located at 1337 Connecticut Avenue, N.W., Washington, D.C. 20036 (the "DC Hotel Project").

1

2.      The DC Hotel Subcontract states that, "This Subcontract Agreement shall be governed by the laws of Washington DC. Any claim arising out of or relating to this Agreement shall be settled in the District of Columbia."

3.      Winmar also entered into a second Subcontract (the "AmEx Project Subcontract"), **Exhibit 2** hereto, with Iron Kingdom to perform structural steel work on a commercial construction project to build an American Express Centurion Lounge located within Ronald Reagan Airport in Arlington, Virginia (the "AmEx Project").[1]

4.      Paragraph 37 of the AmEx Project Subcontract states that, "This Subcontract Agreement shall be governed by the laws of Washington DC. Any claim arising out of or relating to this Agreement shall be settled in the District of Columbia."

5.      With respect to the DC Hotel Project, because of Iron Kingdom's numerous defective shop drawings, manpower deficiencies causing delays to the Project, and out-of-sequence work by other subcontractors on the Project—all costing Winmar both significant delays and increased expenses not recoverable from the Owner, and all of which constitute breaches of the Subcontract by Iron Kingdom it was given ample opportunities to remedy—Winmar terminated the DC Hotel

---

[1] The DC Hotel Project an the AmEx Project are collectively referred to at the "Projects."

2

Subcontract with Iron Kingdom in accordance with the terms of the default provisions of that Subcontract.

6. Winmar had many of the same problems with Iron Kingdom on the AmEx Project, including Iron Kingdom submitting numerous improper and unsupported change orders, which were rejected by Winmar (and the Owner) in accordance with the AmEx Subcontract.

7. In response, Iron Kingdom, which was never properly licensed to perform the work on either Project, was paid more than it was entitled to be paid by Winmar filed false mechanic's liens on both Projects.

8. Specifically, Defendant Richie filed a false mechanic's lien for Defendant Iron Kingdom with the District of Columbia's Recorder of Deeds Office seeking to collect $448,402.00 from Winmar, despite the fact that Defendants knew Iron Kingdom was not properly licensed and despite the fact that, even if Iron Kingdom were properly licensed, it was paid everything that Winmar received from the DC Hotel Project's Owner for Iron Kingdom's work and, thus, was not entitled to be paid any more money under the pay-if-paid provision of the Subcontract.

9. Defendant Richie also filed a false mechanic's lien for Defendant Iron Kingdom with the Arlington County, Virginia Clerk of Court seeking to collect $113,662.11 from Winmar, despite the fact that Defendants knew Iron Kingdom was not properly licensed and despite the fact that, even if Iron Kingdom were properly

licensed, it was paid everything that Winmar received from the AmEx Project's Owner and, thus, was not entitled to be paid any more money under the pay-if-paid provision of the Subcontract.

10.   Knowing that filing of mechanics liens would effectively stop or severely interfere with the funding of both Projects unless Winmar paid Iron Kingdom the extortionate sums being sought under the false liens, Defendants filed the false mechanics lien—false liens that are resulting in ongoing, enormous damages to Winmar and others.

11.   Indeed, the false liens were filed by Defendants to harass and extort money from Winmar, in violation of, *inter alia*, 18 U.S.C. §§ 1961 *et. seq*. (the Racketeer Influenced and Corrupt Organizations Act, hereinafter "RICO"); D.C. Code § 50–1215 (False statements as to liens; violations of law chapter );[2] Virginia Code § 18.2-213.2 (Filing false lien or encumbrance against another)[3]; and a number of state-law based causes of action.

---

[2] D.C. Code § 50–1215 (False statements as to liens; violations of law chapter) states,

> Any person intentionally making a false statement with respect to liens in an application for a certificate, or willfully violating any of the provisions of this chapter, shall upon conviction be punished by a fine of not more than the amount set forth in § 22-3571.01 or be imprisoned for not more than 1 year, or both. Prosecutions for violations of this chapter shall be by the Corporation Counsel of the District of Columbia or any of his assistants, in the name of the District of Columbia.

[3] Virginia Code § 18.2-213.2 (Filing false lien or encumbrance against another) states,

## PARTIES

12.    Plaintiff Winmar Construction, Inc. ("Plaintiff" or "Winmar") is a District of Columbia corporation having its headquarters at 2100 Reston Parkway, Suite 104, Reston, VA 20191.

13.    Defendant Iron Kingdom, Inc. ("Iron Kingdom") is a Maryland corporation having its headquarters at 9220 Edgeworth Drive, Capitol Heights, Maryland 20743.

14.    Defendant Angela Marie Richie ("Richie"), who is being sued personally and in her capacity as a "Partner"[4] in the law firm of Gordon Rees Scully Mansukhani, LLP, also known as Gordon & Rees, LLP ("Gordon Rees") a California limited partnership having its headquarters at 315 Pacific Avenue, San Francisco, California 94111.  Richie's office address is 325 W. Main Street, Waterfront Plaza - West Tower, Suite 2300, Louisville, Kentucky 40202, and her home address at 1832 Rivers Landing Drive, Prospect, KY 40059-8071.

---

Any person who maliciously files a lien or encumbrance in a public record against the real or personal property of another knowing that such lien or encumbrance is false is guilty of a Class 5 felony. The court in its conviction order or in a separate order, shall direct the clerk of any jurisdiction in which a false lien or encumbrance has been filed to release from record such lien or encumbrance specifically described in the conviction order or separate order, including any notice or memorandum of lien. Such lien or encumbrance shall be deemed invalid and shall be treated as if it was never filed.

[4] *See* Richie's biography on the Gorden Rees law firm website, accessed April 4, 2024, indicating that she is a "Partner": https://www.grsm.com/lawyers/a/angela-marie-richie.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, federal question jurisdiction for this civil action brought pursuant to 18 U.S.C. §§ 1961 et. seq. (the Racketeer Influenced and Corrupt Organizations Act, hereinafter "RICO").

16.     Pursuant to 28 U.S.C. § 1367, this Court also has supplemental jurisdiction over "all other claims" forming part of the same case or controversy derived from a common nucleus of operative fact, as well as any additional parties to those claims.

17.     Pursuant to D.C. Code § 13–422 (Personal jurisdiction based upon enduring relationship) and § 13–423 (Personal jurisdiction based upon conduct), this Court has personal jurisdiction over Defendant Iron Kingdom, which is registered to do business in the District of Columbia, does business in the District of Columbia on a regular and continuous basis, and performed work in the District of Columbia on the Project pursuant to the Subcontract with Plaintiff Winmar.

18.     Pursuant to D.C. Code §13–423 (Personal jurisdiction based upon conduct), this Court has personal jurisdiction over Defendant Richie, a "Partner" in Gordon Rees, which maintains an office in the District of Columbia, because she performed legal services in the District of Columbia for Defendant Iron Kingdom when she filed the false and illegal lien at issue in this lawsuit.

6

19.     Venue is proper in this Court because the Project at issue in this lawsuit is in the District of Columbia, and because both Subcontracts between Winmar and Iron Kingdom, ¶ 37 (**Exhibit 1**), state, "This Subcontract Agreement ["Subcontract"] shall be governed by the laws of Washington DC.  Any claim arising out of or relating to this Agreement shall be settled in the District of Columbia."

20.     Likewise, both Subcontracts ¶ 10 (Disputes), further state that, "In the event of a dispute, claim or disagreement of any kind relating to this agreement, Subcontractor shall avail itself of a dispute resolution process with Contractor; for any claim not resolved by this process the method of binding dispute resolution shall be litigation in the courts of the District of Columbia."

## **FACTS**

21.     A true and correct copy of the DC Hotel Subcontract Agreement between Winmar and Iron Kingdom dated October 14, 2022 (the "DC Hotel Subcontract") is attached to this Complaint as **Exhibit 1**.

22.     A true and correct copy of the AmEx Project Subcontract Agreement between Winmar and Iron Kingdom dated March 3, 2022 (the "AmEx Project Subcontract") is attached to this Complaint as **Exhibit 2.**

23.     A true and correct copy of a mechanic's lien dated February 19, 2024, filed with the District of Columbia's Recorder of Deeds by Iron Kingdom, by and

through Defendant Richie who is not licensed to practice law in the District of Columbia, is attached hereto as **Exhibit 3**.

24.     A true and correct copy of a mechanic's lien dated February 23, 2024, filed with the Arlington County, Virginia Clerk of Court, by and through Defendant Richie who is not licensed to practice law in the Commonwealth of Virginia, is attached hereto as **Exhibit 4**.

25.     Iron Kingdom was not licensed, and knew it was not licensed as required by District of Columbia to perform structural steel work it performed on the DC Hotel Project before being terminated by Winmar on November 29, 2023.

26.     Iron Kingdom was not licensed, and knew it was not licensed as required by the Commonwealth of Virginia to perform the structural steel work it performed on the AmEx Project in Virginia.

27.     Under settled District of Columbia law, when a contractor fails to have the necessary licenses, the contractor must return all money paid for work performed while not licensed in accordance with D.C. Code § 47-2851.02 (License Required).[5]

---

[5] D.C. Code § 47-2851.02(a) (License Required), states, "A person which is required under law to obtain a license issued in the form of an endorsement to engage in a business in the District of Columbia shall not engage in such business in the District of Columbia without having first obtained a basic business license and any necessary endorsements in accordance with this subchapter."

28.    Contracts entered into by businesses not holding licenses required by District of Columbia law, are void and unenforceable, and the appropriate remedy is the return of money paid.

29.    Iron Kingdom knowingly performed work on the DC Hotel Project without the appropriate license—a crime in the District of Columbia.

30.    In the District of Columbia, it is a crime punishable by up to a year in prison to file a false lien.  D.C. Code § 41-204 (False statements):  "(a) Whoever intentionally makes a false statement with respect to a financing statement or other paper filed with the Recorder of Deeds . . . shall be fined not more than $500 or imprisoned not more than 1 year, or both."

31.    On April 5, 2024, Winmar was informed by the District of Columbia's Department of Licensing and Consumer Protection's Consumer Protection Unit as follows:

> Please know that Iron Kingdom does have both a Home Improvement Contractor's license (HIC) and a Home Improvement Salesman license (HIS) **but needed a General Contractor's license at the time they contracted to take this job and because they did not have one, I will be citing and fining them for unlicensed activity.**  I'd also like for you to know that they recently applied for their GC license and its pending approval now.

(Emphasis added.)

32.    On April 7, 2024, this information from the District of Columbia was conveyed to Defendant Richie.  Nevertheless, Defendants' persist in seeking to

recover from Winmar the extortionate amount set forth in the false lien filed in the District of Columbia—and have repeatedly refused to release their false lien continuing to cause Winmar substantial damages.

33. Likewise, Iron Kingdom violated Virginia law by knowingly not being properly licensed when it performed structural steel work on the AmEx Project at DCA Ronald Reagan Airport.

34. Specifically, Virginia Code § 54.1-1115 (Prohibited acts) prohibits and makes doing the following a crime:

> Contracting for, or bidding upon the construction, removal, repair or improvements to or upon real property owned, controlled or leased by another person without a license or certificate, or without the proper class of license as defined in § 54.1-1100 for the value of work to be performed.

That section further states,

> Any person who undertakes work without (i) any valid Virginia contractor's license or certificate when a license or certificate is required by this chapter or (ii) the proper class of license as defined in § 54.1-1100 for the work undertaken, shall be fined an amount not to exceed $500 per day for each day that such person is in violation, in addition to the authorized penalties for the commission of a Class 1 misdemeanor. Any violation of clause (i) of this subsection shall also constitute a prohibited practice in accordance with § 59.1-200, provided that the violation involves a consumer transaction as defined in the Virginia Consumer Protection Act (§ 59.1-196 et seq.), and shall be subject to any and all of the enforcement provisions of the Virginia Consumer Protection Act.

> A construction contract entered into by a person undertaking work without a valid Virginia contractor's license shall not be enforceable by the unlicensed contractor undertaking the work unless the unlicensed contractor (i) gives substantial performance within the terms of the contract in good faith and (ii) did not have actual knowledge that a license or certificate was required by this chapter to perform the work for which he seeks to recover payment.

35.    Consequently, Iron Kingdom and is not entitled to recover any money from Winmar on either of the Projects—and, thus, Defendants were not entitled to file a mechanics lien (false or not) seeking to recover money for work allegedly performed by Iron Kingdom while knowingly not being properly licensed in accordance with District of Columbia and Virginia law.

36.    Defendants' seeking to recover money from Winmar through the filing of false liens with the Arlington County, Virginia Clerk of Court violates Virginia Code § 54.1-1115, and with the District of Columbia Recorder of Deeds violates D.C. Code § 41-204, constitute criminal acts by Defendants in the District of Columbia and Virginia.

37.    Moreover, Paragraph 2 of both Subcontract Agreements between Winmar and Iron Kingdom, **Exhibits 1 and 2**, contain pay-if-paid provisions. Those identical provisions state that, "Contractor's [Winmar's] receipt of payment by the Owner shall be a condition precedent to the obligation of Contractor to make any payment to the Subcontractor."

11

38.     District of Columbia law applies to both Subcontracts, *see, Id.* ¶ 37 (The Contract is "governed by the laws of Washington, D.C.").

39.     For both Projects, Winmar turned over to Iron Kingdom all money it received from the Owners of the two Projects for work performed by Iron Kingdom on the Projects. Thus, Iron Kingdom has been paid all that it is entitled to be paid under the Subcontracts.

40.     Under Paragraph 20 of the Subcontracts, **Exhibits 1 and 2**, it states, "[T]he Contractor shall have no direct liability [to Subcontractor]. . . . ," meaning Winmar can have no direct liability to Iron Kingdom under the Subcontracts.

41.     Because Iron Kingdom (i) was not licensed for the structural steel work it performed on the Projects, (ii) is not entitled to recover anything from Winmar (or the Owner), and (iii) has been paid everything that Winmar received from the Owners for Iron Kingdom's work on the two Projects, both of the mechanic's liens filed by Defendants are false liens as they seek amounts for which Iron Kingdom is not legally entitled.

42.     Winmar, directly and through counsel, repeatedly demanded that Defendants release the mechanic's liens.

43.     Despite Defendants' knowing that Iron Kingdom was not properly licensed to perform the structural steel work on the Projects, and thus was not entitled to recover any money from Winmar, Defendants have intentionally refused to

12

release the false liens filed in violation of District of Columbia and Virginia laws imposing criminal penalties, with the intent of interfering with Winmar's business relations, and seeking to extort and recover money from Winmar that Defendants are fully aware is not owed to Iron Kingdom.

## KEY SUBCONTRACT PROVISIONS[6]

44.     Both Subcontracts contain the following provision under the heading TIME IS OF THE ESSENCE, stating in pertinent part,

> This is a time is of the essence Subcontract. The times and dates specified in this agreement are vital and mandatory to the Prime Contract. The Subcontractor shall proceed with work at such time and in such sequence as the Contractor may direct including overtime performance as may be necessary and as required by Schedule of Progress which may be subject to change as working conditions require. . . .   Payments due may be withheld to insure timely progress and completion of work. **The Subcontractor shall be liable for all losses and damages incurred by the Contractor (including consequential damages) due to inexcusable delay of the Subcontractor in the performance of the work, including delay costs not reimbursable from the Owner due to inexcusable incurred delays of the Subcontractor.**

45.     The Recitals of both Subcontracts include the following, "The Subcontractor warrants that it is familiar with the Work and is **capable of**

---

[6] The Subcontracts, which are largely identical, are attached hereto as Exhibits 1 and 2.  All emphasis herein is added.

**performance by reason of experience and expertise** and is **duly licensed to perform the Work** and is able to address and staff the Work with qualified personnel at the times required."

46.    Both Subcontracts, ¶ 1, The Work to be Performed Under This Subcontract, state,

> All work shall be performed as described in the Scope of Work in **strict accordance with all Contract Documents (including, but not limited to, Prime, Special and Supplemental Conditions), and all subsequently and duly issued modifications thereto,** and Subcontractor shall perform all labor, supervision, plant equipment, supplies and materials necessary to complete the work and such incidental work as may be reasonably required to allow **complete installation of all functioning components of the work for the Project whether specifically described or not**.

47.    Both Subcontracts, ¶ 3, Performance and Progress, state,

> If the Subcontractor shall fail to properly perform its Work in a timely manner as a result of which the completion of the Project is delayed, **Subcontractor shall reimburse Contractor all liquidated damages or other delay damages suffered by the Contractor**.

48.    Both Subcontracts, ¶ 4, Workmanship, state,

> The Subcontractor warrants that all of its work shall be in strict conformity to all Contract Documents, building codes, applicable laws, ordinances and regulations, performed in a **first class workmanlike manner and that all of the Work will be free of defects in materials, workmanship or design**. . . .

14

**Subcontractor agrees to immediately remove and replace any work or component which is determined non-conforming or defective.**

49.     Both Subcontracts, ¶ 19, Contract Interpretation, state,

The Contractor interpretation of contract requirements shall be binding upon Subcontractor and complied with, except that Subcontractor shall have the right to claim adjustment of the contract because of said interpretation, if claim in writing is made within forty-eight (48) hours after ruling and direction.

50.     Both Subcontracts, ¶ 24, Responsibility for Work in Place, state,

**The Subcontractor shall check all work performed by others necessary to "receive" the Subcontractor's work. Failure to give notice of any discrepancy shall relieve the Contractor of any responsibility therefore. The Subcontractor shall be responsible for all field measurements and shall check elevations and grades to insure proper fitting of its work. It shall not be incumbent upon the Contractor to discover any mistakes, errors, omissions or deviations from the contract requirements in the subcontract drawings, and the Owner's final approval of drawings made by the Subcontractor shall not relieve the Subcontractor from responsibility for unauthorized changes, deviations or omissions or for errors of any sort in its drawings.**

51.     Both Subcontracts, ¶ 25, Licenses and Fees, state, "Subcontractor shall be responsible for all taxes, permits, **licenses** and fees necessary to perform its work,

15

including any increase therein, if any, during the life of the Subcontract." (Emphasis

added.)

52.     Both Subcontracts, ¶ 36, Warranty, state,

The Subcontractor warrants to the Owner, Architect and Contractor that materials and equipment furnished under this Subcontract will be of good quality and new, unless otherwise required or permitted by the Subcontract Documents, that **the Work of this Subcontract will be free from defects** not inherent in the quality required or permitted, and that the Work will conform to the requirements of the Subcontract Documents. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. . . . This warranty shall be in addition to and not in limitation of any other warranty or remedy required by law or by the Subcontract Documents. Warranty shall extend for a period of one (1) year after the issuance of Final Certificate of Completion of the Project or such longer period of time as the Contract Documents shall require. **Subcontractor agrees to correct any defect, latent or patent, arising within the warranty period, without additional cost.**

53.     Exhibit B, Scope of Work Attachment to the Subcontracts, ¶ 1.1.14,

and Exhibit E, Supplemental Provisions to the Subcontracts, Common Scope Items,

both state,

Work of Preceding Trades:  **The Subcontractor shall satisfy himself as to the acceptability of the surface to which his work is to be applied or affixed, and shall advise Contractor in writing of any unsatisfactory conditions. Commencement of work by Subcontractor shall be construed as acceptance of the preceding work.**

16

54.     Exhibit B, Scope of Work Attachment to the AmEx Subcontract, ¶ 1.5.17, states that Iron Kingdom was required to, "**Confirm all dimensions** and coordinate layout to allow clearance as required by code and other work as shown on plans."

## COUNT ONE

## RICO AGAINST BOTH DEFENDANTS

## (Violation of 18 U.S.C. Section 1962(c))

55.     Plaintiff repeats the allegations contained in paragraphs 1 through 54, *supra*, as if fully set forth in this paragraph.

56.     Defendants are each a "person" within the meaning of 18 U.S.C. Sections 1961(3) and 1964(c).

57.     At all times relevant herein in connection with the creation, electronic transmission, and filing of the false liens with the District of Columbia Recorder of Deeds and with the Arlington County, Virginia Clerk of Court, for the purpose of extorting money from Plaintiff Winmar that was not owed to Defendant Iron Kingdom, Defendants constitute an "enterprise," as defined in 18 U.S.C. Section 1961(4).

58.     Defendants together participated and/or managed the affairs of the enterprise by drafting, filing, serving, wiring, and witnessing and attesting to the truthfulness of the false and illegal mechanics liens.

17

59.     At all times relevant herein in connection with the creation, electronic transmission, and filing of the false lien with the District of Columbia Recorder of Deeds and with the Arlington County, Virginia Clerk of Court, for the purpose of extorting money from Plaintiff Winmar that was not owed to Defendant Iron Kingdom, Defendants' enterprise was engaged in, and its activities affected interstate commerce, within the meaning of 18 U.S.C. Section 1962(c).

60.     At all times relevant herein in connection with the creation, electronic transmission, and filing of the false liens with the District of Columbia Recorder of Deeds and with the Arlington County, Virginia Clerk of Court, for the purpose of extorting money from Plaintiff Winmar that was not owed to Defendant Iron Kingdom, Defendants together participated, directly or indirectly, in the conduct of the enterprise's affairs concerning the creation, electronic transmission, and filing of the false lien with the District of Columbia Recorder of Deeds and with the Arlington County, Virginia Clerk of Court—a pattern of racketeering activity within the meaning of 18 U.S.C. Section 1961(5) and in violation of 18 U.S.C. Section 1962(c).

61.     By filing the two false liens, one in the District of Columbia, and on in Virginia, Defendants committed and/or aided and abetted each other in the commission of two or more of the acts of racketeering activity within the meaning of 18 U.S.C. Section 1961(5), for the purpose of extorting money from Plaintiff Winmar that was not owed to Defendant Iron Kingdom.

18

62.     The Defendants' enterprise is an association-in-fact with a purpose, longevity and relationship among Defendants as detailed above.

63.     The Defendants have participated and/or managed or are participating in and/or managing the enterprise with respect to the drafting, filing and serving the false liens, as noted above.

64.     Despite the fact that under D.C. Code § 41-204 (False statements) and Virginia Code § 54.1-1115 (Prohibited acts), filing a false lien is a crime in both the District of Columbia and Virginia, Defendants knew and agreed to the objective of the scheme they jointly undertook to seek to recover money from Winmar that is not legally owed by Winmar to Iron Kingdom.

65.     As detailed above, Defendants engaged in a pattern of racketeering by filing the illegal and false liens.

66.     The serving and filing of the liens at issue in this case constitutes a racketeering activity because the liens are false and fraudulent, and violates 18 U.S.C. §1341 and/or § 1343 since the mails or federal wires were used to serve and/or file the false lien.

67.     The fraudulent liens are part of a scheme by Defendants to defraud Winmar to obtain money and property by false pretenses and misrepresentations.

68.     The false pretenses and misrepresentations employed by Defendants were material and accomplished with a fraudulent intent.

19

69. The actions of the aforementioned enterprise affect and/or have affected interstate commerce.

70. Winmar's business and/or property interests have been injured by Defendants' racketeering activity.

71. As a result of Defendants' pattern of racketeering activity, Winmar is entitled to an award of treble compensatory damages, plus the costs of this suit, including attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

72. As a result of Defendants' wrongful, malicious and illegal acts, Winmar is also entitled to recover from Defendants punitive damages in an amount to be determined by the trier of fact.

73. Winmar's business and/or property interests have been injured by Defendants' racketeering activity.

74. Winmar's business and properly interests will continue to be injured unless the Court issues an order requiring Defendants to release the false liens, imposing restrictions on the future activities of Defendants' RICO enterprise including restraining the filing and serving of any additional false liens without prior review by the Court and for any other further relief the Court deems just and proper.

75. As a direct and proximate result of the violation of 18 U.S.C. Section 1962(c) by Defendants caused by their creation, electronic transmission, and filing of the false liens with the District of Columbia Recorder of Deeds and the Arlington

County, Virginia Clerk of Court, for the purpose of extorting money from Plaintiff Winmar that was not owed to Defendant Iron Kingdom, Plaintiff has suffered and continues to suffer damage to its business and reputation.

76.     As a result of Defendants' extortionate misconduct, Defendants are liable to Plaintiff in an amount in excess of $600,000, as will be proven at trial.

77.     Pursuant to 18 U.S.C. Section 1964(c), Plaintiff is entitled to recover treble damages, in addition to its costs and attorneys' fees, jointly and severally from Defendants.

## COUNT TWO AGAINST BOTH DEFENDANTS
## RICO CONSPIRACY
### (Violation of 18 U.S.C. Section 1962(d))

78.     Plaintiff repeats the allegations contained in paragraphs 1 through 77, *supra*, as if fully set forth in this paragraph.

79.     At all times relevant herein, Defendants conspired to violate 18 U.S.C. Section 1962(c) by each agreeing to conduct and participate, directly and/or indirectly, in the extortionate enterprise and scheme set forth above, through the drafting, witnessing and attesting to the truthfulness of the false and illegal mechanics liens electronically served via wire, and filed with the District of Columbia Recorder of Deeds and Arlington County, Virginia Clerk of Court, for the purpose of extorting money from Plaintiff Winmar that was not owed to Defendant

Iron Kingdom, in furtherance of the conspiracy and to affect the objectives thereof all as set forth above in this Complaint.

80.    The Defendants' enterprise is an association-in-fact with a purpose, longevity and relationship among Defendants as detailed above.

81.    The Defendants have participated and/or managed or are participating in and/or managing the enterprise with respect to the drafting, filing, and serving the false liens, as noted above.

82.    Despite the fact that under D.C. Code § 41-204 (False statements) and Virginia Code § 54.1-1115 (Prohibited acts), filing a false lien is a crime in the District of Columbia and Virginia, respectively, Defendants knew of and agreed to the objective of the scheme they jointly undertook to seek to recover money from Winmar that is not legally owed by Winmar to Iron Kingdom.

83.    As detailed above, Defendants engaged in a pattern of racketeering by filing the illegal and false lien.

84.    The serving and filing of the liens at issue in this case constitute a racketeering activity because the liens are both false and fraudulent, and violate 18 U.S.C. §1341 and/or § 1343 since the mails or federal wires were used to serve and/or file the false lien.

85.    The fraudulent liens are part of a scheme by Defendants to defraud Winmar to obtain money and property by false pretenses and misrepresentations.

22

86.     The false pretenses and misrepresentations employed by Defendants were material and accomplished with a fraudulent intent.

87.     The actions of the aforementioned enterprise affect and/or have affected interstate commerce.

88.     Winmar's business and/or property interests have been injured by Defendants' racketeering activity.

89.     As a result of Defendants' pattern of racketeering activity, Winmar is entitled to an award of treble compensatory damages, plus the costs of this suit, including attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

90.     As a result of Defendants' wrongful, malicious and illegal acts, Winmar is also entitled to recover from Defendants punitive damages in an amount to be determined by the trier of fact.

91.     Winmar's business and properly interests will continue to be injured unless the Court issues an order requiring Defendants to release the false lien, imposing restrictions on the future activities of Defendants' RICO enterprise including restraining the filing and serving of any additional false liens without prior review by the Court and for any other further relief the Court deems just and proper.

92.     As a direct and proximate result of Defendants' violations of 18 U.S.C. Section 1962(d), Plaintiff has suffered damage to its property.

23

93.    As a result of the conspiracy to violate 18 U.S.C. Section 1962(c), Defendants are jointly and severally liable to Plaintiff for its past and continuing losses and injuries suffered by its business, in an amount not less than $600,000, as will be proven at trial.

94.    Pursuant to 18 U.S.C. Section 1964(c), Plaintiff is entitled to recover treble damages, in addition to its costs and attorneys' fees, jointly and severally from Defendants.

## COUNT THREE AGAINST IRON KINGDOM

## DECLARATORY JUDGMENT AND CLAIM FOR REFUND

95.    Plaintiff repeats the allegations contained in paragraphs 1 through 94, supra, as if fully set forth in this paragraph.

96.    All payments made by Winmar to Iron Kingdom for work on the Project were made at a time when Iron Kingdom was not licensed to perform structural steel work on either of the Projects.

97.    Despite not being properly licensed, Winmar paid to Iron Kingdom all amounts received by Winmar from the Owners for Iron Kingdom's work on the Projects.

98.    Under the pay-if-paid provision of the Subcontract, Winmar owes no additional money to Iron Kingdom—a fact known by Iron Kingdom.

24

99.    Despite not being owed any additional money by Winmar, and despite not being entitled to recover any money from Winmar because Iron Kingdom was not properly licensed to perform the structural steel work on the Projects,[7] Iron Kingdom filed a mechanic's lien with the District of Columbia Recorder of Deeds Office and with the Arlington County, Virginia Clerk of Court, seeking to collect approximately $600,000.00.

100.    All work performed by Iron Kingdom without having a license to perform construction services in the District of Columbia was in violation of D.C. Code § 47-2851.02.

---

[7]Contracts entered into by businesses not holding licenses required by District of Columbia law, are void and unenforceable.  It is a "well-established [rule] in the District of Columbia 'that a contract made in violation of a licensing statute that is designed to protect the public will usually be considered void and unenforceable, and [that] the party violating the statute cannot collect monies due on a quasi-contractual basis' either." *Sturdza v. U.A.E.* , 11 A.3d 251, 251-252 (D.C. App. 2011) (holding that architects who practice without a license are subject to the rule that a contract made in violation of a licensing statute designed to protect the public is unenforceable, and the party violating the statute cannot recover on a quasi-contractual basis); *see also Truitt v. Miller* , 407 A.2d 1073, 1079 (D.C. 1979); *Saul v. Rowan Heating & Air Conditioning, Inc*., 623 A.2d 619, 621 (D.C. 1993) ("This jurisdiction has held consistently that a contract entered in violation of a licensing statute or regulation directed at protecting the public is void and unenforceable."); *Saul v. Rowan Heating & Air Conditioning, Inc*. , 623 A.2d 619, 622 n.4 (D.C. 1993) ("contract determined to be void and unenforceable because of the contractor's violation of licensing statutes or regulations, the appropriate remedy is a return of the money paid"); *Rubin v. Douglas*, 59 A.2d 690, 691 (D.C. 1948) (requiring an unlicensed doctor to reimburse a patient because "[t]he public interests… are best served by requiring defendant to pay back the fruits of his illegal agreement.").

101. All work performed by Iron Kingdom without having a license to perform construction services in the Commonwealth of Virginia was a violation of Virginia Code § 54.1-1115.

102. Consequently, Iron Kingdom has no legal right to seek to recover any money from Winmar through the filing of a false liens in violation of D.C. Code § 50–1215 and Virginia Code § 54.1-1115, or otherwise, under either contractual or non-contractual claims asserted in the Complaint, and must refund all payments received from Winmar on the two Projects.

103. Winmar is entitled to a declaratory judgment against Iron Kingdom declaring that:

(a)   Because all work performed by Iron Kingdom on the Projects was done at a time when Iron Kingdom was not licensed to perform structural steel work on the Projects, and thus in violation of District of Columbia and Virginia licensing statutes, Iron Kingdom has no legal right to collect monies any from Winmar under either contractual or non-contractual claims;

(b)   Iron Kingdom's filing of the false liens violated D.C. Code § 50–1215 and Virginia Code § 54.1-1115;

(c)   The February 23, 2024, mechanic's lien filed by Iron Kingdom with the District of Columbia Recorder of Deeds Office seeking to recover $448,402.00, is a void and false lien filed in violation of D.C. Code § 50–1215;

(d)   The February 23, 2024, mechanic's lien filed by Iron Kingdom with the Arlington County, Virginia Clerk of Court seeking to recover $113,662.11, is void and a valse lien filed in violation of Virginia Code § 54.1-1115; and

26

(e)   Iron Kingdom must refund all money paid by Winmar to Iron Kingdom for work on the Projects when Iron Kingdom was not licensed to perform such structural steel work on the two commercial Projects, and thus in violation of District of Columbia and Virginia licensing statutes.

## COUNT FOUR AGAINST IRON KINGDOM

## BREACH OF CONTRACT

104.   Plaintiff repeats the allegations contained in paragraphs 1 through 103, supra, as if fully set forth in this paragraph.

105.   Iron Kingdom breached both of the Subcontracts in numerous ways including, for example:

A.   Iron Kingdom breached its representation and warranty in the Subcontract Recitals that it was, "capable of performance by reason of experience and expertise and is duly licensed to perform the Work."

B.   Iron Kingdom breached its obligation in the Subcontracts, ¶ 1, to perform all Work, "in strict accordance with all Contract Documents (including, but not limited to, Prime, Special and Supplemental Conditions)."

C.   Iron Kingdom breached its obligation in the Subcontracts, ¶ 3, to "reimburse Contractor all . . . damages suffered by the Contractor.

D.   Iron Kingdom breached its obligation in the Subcontracts, ¶ 4, to perform "all of its work shall be in strict conformity to all Contract

27

Documents . . . performed in a first class workmanlike manner and that all of the Work will be free of defects in materials, workmanship or design."

E.  Iron Kingdom breached its obligation in the Subcontracts, ¶ 4, to "immediately remove and replace any work or component which is determined non-conforming or defective."

F.  Iron Kingdom breached its obligation in the Subcontracts, ¶ 24, to "check all work performed by others necessary to 'receive' the Subcontractor's work," and to accept that fact that it is "responsible for all field measurements," including checking "elevations and grades to insure proper fitting of its work."  In blatant breach of the Subcontracts, Iron Kingdom further wrongfully sought to shift its responsibility to Winmar despite the fact that the Subcontracts specifically state, "It shall not be incumbent upon the Contractor to discover any mistakes, errors, omissions or deviations from the contract requirements in the subcontract drawings, and the Owner's final approval of drawings made by the Subcontractor shall not relieve the Subcontractor from responsibility for unauthorized changes, deviations or omissions or for errors of any sort in its drawings."

G.    Iron Kingdom has breached the Subcontracts, ¶ 36, Warranty, by failing to, "correct any defect, latent or patent, arising within the warranty period, without additional cost."

H.    Iron Kingdom has breached Exhibit B, Scope of Work Attachment to Subcontracts, ¶ 1.1.14, and Exhibit E, Supplemental Provisions to the Subcontracts, Common Scope Items, by failing to satisfy itself that the "surface to which . . . [its] work is to be applied or fixed" is acceptable, and further breached its obligation, following its commencement of Work, to recognize its full "acceptance of the preceding work" on the Project by prior trades.

I.    Iron Kingdom has breached Exhibit B, Scope of Work Attachment to Subcontracts, ¶ 1.5.17, requiring Iron Kingdom to, "Confirm all dimensions and coordinate layout to allow clearance as required by code and other work as shown on plans."

106.  Iron Kingdom's multiple breaches of the Subcontracts have caused and continue to cause Winmar significant direct and consequential damages[8], including attorney's fees and costs, which damages that continue to accrue.

---

[8] The Subcontracts provision under the heading TIME IS OF THE ESSENCE, in pertinent part, state, "The Subcontractor shall be liable for all losses and damages incurred by the Contractor (**including consequential damages**) due to inexcusable delay of the Subcontractor in the performance of the work, including delay costs not reimbursable from the Owner due to inexcusable incurred delays of the Subcontractor." (Emphasis added.)

107. As of the date of the filing of this Complaint, not including consequential and/or liquidated damages, pre-judgment interest, attorney's fees, and costs incurred to collect the full amount due to Winmar, Iron Kingdom owes Winmar not less than $600,000.00.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Winmar Construction, Inc. ("Winmar") prays that judgment be entered in its favor as follows:

(1) Count One, Judgment against both Defendants, jointly and severally, for compensatory damages, in an amount not less than $600,000 to be determined at trial, plus treble damages and attorneys' fees;

(2) Count Two, Judgment against both Defendants, jointly and severally, for compensatory damages, in an amount not less than $600,000 to be determined at trial, plus treble damages and attorneys' fees

(3) in Count Three, against Defendant Iron Kingdom, Winmar is entitled to a declaratory judgment against Iron Kingdom declaring that:

   (a) Because all work performed by Iron Kingdom on the Projects was done at a time when Iron Kingdom was not licensed to perform structural steel work on the Projects, and thus in violation of District of Columbia and Virginia licensing statutes, Iron Kingdom has no legal right to collect monies any from Winmar under either contractual or non-contractual claims;

   (b) Iron Kingdom's filing of the false liens violated D.C. Code § 50–1215 and Virginia Code § 54.1-1115;

30

(c)     The February 23, 2024, mechanic's lien filed by Iron Kingdom with the District of Columbia Recorder of Deeds Office seeking to recover $448,402.00, is a void and false lien filed in violation of D.C. Code § 50–1215;

(d)     The February 23, 2024, mechanic's lien filed by Iron Kingdom with the Arlington County, Virginia Clerk of Court seeking to recover $113,662.11, is void and a valse lien filed in violation of Virginia Code § 54.1-1115; and

(e)     Iron Kingdom must refund all money paid by Winmar to Iron Kingdom for work on the Projects when Iron Kingdom was not licensed to perform such structural steel work on the two commercial Projects, and thus in violation of District of Columbia and Virginia licensing statutes.

(4)     Count Four, Judgment against Defendant Iron Kingdom for compensatory damages in the amount of not less than $600,000 in damages suffered and to be suffered by Winmar (including actual, consequential, and any other damages), plus interest, and all costs and expenses including reasonable attorney fees incurred and to be incurred by Winmar in collecting all amounts owed to it by Iron Kingdom under the Subcontract; and

(5)     such other and further relief as the Court finds just and right, including post-judgment interest at the maximum statutory rate.

Respectfully submitted,

/s/ *Charles H. Camp*

Charles H. Camp (DC Bar No. 413575)
Law Offices of Charles H. Camp, P.C.
1055 Thomas Jefferson Street, NW, Suite M200
Washington, D.C. 20007

Tel: 202.457.7786
Fax: 202.457.7788
Email: ccamp@charlescamplaw.com

***Counsel for Plaintiff Winmar Construction, Inc.***


Date:   May 7, 2024

## JURY DEMAND

Plaintiff respectfully requests a trial by jury of all claims so triable.

Respectfully submitted,


/s/ *Charles H. Camp*
Charles H. Camp (DC Bar No. 413575)
Law Offices of Charles H. Camp, P.C.
1055 Thomas Jefferson Street, NW, Suite M200
Washington, D.C. 20007
Tel: 202.457.7786
Fax: 202.457.7788
Email: ccamp@charlescamplaw.com

***Counsel for Plaintiff Winmar Construction, Inc.***


Date:   May 7, 2024

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Amended Complaint, with Exhibits, was served via email and Federal Express this 7th day of May 2024, upon the Defendants, who have not yet appeared in this action, but who have been served with the initial Complaint and Summons by Process Server.

/s/ *Charles H. Camp*
Charles H. Camp (DC Bar No. 413575)
Law Offices of Charles H. Camp, P.C.
1055 Thomas Jefferson Street, NW, Suite M200
Washington, D.C. 20007
Tel: 202.457.7786
Fax: 202.457.7788
Email: ccamp@charlescamplaw.com

**Counsel for Plaintiff Winmar Construction, Inc.**

Date:   May 7, 2024

# EXHIBIT 1

# **ᴜᴍ winmar**
CONSTRUCTION

1

# SUBCONTRACT AGREEMENT
## MADE BETWEEN:

Iron Kingdom, Inc
9220 Edgeworth Drive
Capitol Heights, MD 20743

## AND

WINMAR CONSTRCUTION INC.
2100 Reston Parkway. Suite 104. Reston, VA 20191

THE CONTRACTOR

THE SUBCONTRACTOR Dated: - 10.14.22

---

## THE PROJECT:
Job Number: 221-020
Job Name:60 DC HOTEL
Location: 1337 Connecticut Avenue N.W.
           Washington, DC 20036

The above information must appear on all financial documents for proper processing.

## THE OWNER:
1320 Penelope, LLC
4619 41st St. NW, 2nd Floor
Washington, DC 20016

## THE ARCHITECT:
BBGM Monogram
1825 K Street NW, Suite 300
Washington, DC 20006

## THE CONTRACT SUM:
The Contractor shall pay the Subcontractor in current funds for performance of this Contract:

$1,096,976 (One million ninety six thousand nine hundred and seventy six dollars.) subject to terms and conditions herein.

## THE SCOPE OF WORK:
The scope of services shall be provided in the same manner and to the same extent as the Contractor, Winmar, is bound to the Owner in the Prime Contract, dated,9.2.22 (the "Prime Contract" or "Contract for Construction"), including the terms and conditions attached as Exhibit "D" as the same shall be applicable to the Work and this Subcontract Agreement. The provisions of the Prime Contract as set forth in Exhibits attached, are incorporated in this Subcontract agreement by reference with the same force and effect as though herein set forth in full. The Contract Sum shall include all applicable Sales, Use, Delivery, etc. taxes associated with the work herein.

---



## CONTRACT DOCUMENTS:
- Exhibit A: Drawing List
- Exhibit B: Scope Of Work
- Exhibit C: Project Schedule
- ~~Exhibit D: Building Rules and Regulations~~
- Exhibit E: Prime Provisions to the Subcontract Agreement.
- Exhibit F: Requisition Requirements for the Subcontract Agreement
- Exhibit G: Notice to Proceed
- Exhibit H: Safety Requirements

## TIME IS OF THE ESSENCE:

This is a time is of the essence Subcontract. The times and dates specified in this agreement are vital and mandatory to the Prime Contract. The Subcontractor shall proceed with work at such time and in such sequence as the Contractor may direct including overtime performance as may be necessary and as required by Schedule of Progress which may be subject to change as working conditions require. If overtime is required solely to accelerate project completion, it shall be authorized in writing and be paid for by the Contractor. Payments due may be withheld to insure timely progress and completion of work. The Subcontractor shall be liable for all losses and damages incurred by the Contractor (including consequential damages) due to inexcusable delay of the Subcontractor in the performance of the work, including delay costs not reimbursable from the Owner due to inexcusable incurred delays of the Subcontractor.

The date of **Substantial Completion** shall be: 4.10.2023

Substantial Completion is defined as the stage of a construction of the project that is sufficiently complete, in accordance with the construction contract documents and regulatory requirements, so that the Owner may use or occupy the project premises or designated portion thereof for its intended purpose.

3 Days prior to Substantial Completion, the Subcontractor shall submit a comprehensive list of items to be completed or corrected in accordance with the Contract Documents to the Contractor. The Punch List shall be issued by the Contractor, augmented by items identified by the Architect and his consultants.

The **Punch List Completion Period** is 4.20.2023 after **Substantial Completion**.

The Punch List period shall last for 10 working days from the Substantial Completion date or an extended date, as may be provided by Change Order.

The date of **Final Completion** shall be 4.22.2023

The date of Final Completion may only be extended by Change Order.

## RECITALS:

- The Contractor has a contract with the Owner for the construction of improvements to the Project in strict accordance with the terms of all Contract Documents forming a part of the Prime Contract.

- The Subcontractor has examined and is familiar with the Contract Documents comprising the Prime Contract all of which are available to the Subcontractor.

- The Subcontractor warrants that it is familiar with the Work and is capable of performance by reason of experience and expertise and is duly licensed to perform the Work and is able to address and staff the Work with qualified personnel at the times required. Subcontractor also warrants that it validly holds all federal, state, local and other governmental consents, licenses, permits or other authorizations required to permit it to perform its obligations under this Agreement and that all are current.



3

- The Contractor, Inc. is committed to achieving equal employment opportunities. No person or firm shall be discriminated against because of race, color, national origin, or gender in the award of the Contractor contracts or subcontracts. Neither party shall discriminate on the basis of race, color, national origin, or gender in the performance of this contract.

## 1. THE WORK TO BE PERFORMED UNDER THIS SUBCONTRACT:

- o All work shall be performed as described in the Scope of Work in strict accordance with all the Contract Documents (including, but not limited to, Prime, Special and Supplemental Conditions), and all subsequently and duly issued modifications thereto, and Subcontractor shall perform all labor, supervision,  plant equipment, supplies and materials necessary to complete the work and such incidental work as may be reasonably required to allow complete installation of all functioning components of the work for the Project whether specifically described or not.

- o Subcontractor shall perform and coordinate its Work with that of the Contractor and all other Subcontractors for the most efficient construction of the Project as a whole.

- o Subcontractor is bound to the Contractor in the same way and under the same terms and conditions as the Contractor is bound to the Owner by the Prime Contract. A copy of the Prime Contract is available for review upon request (except that compensation provisions may be deleted). Subcontractor agrees to conform to all provisions of the Prime Contract and assumes toward the Contractor the same rights, duties, obligations and liabilities as the Contractor has assumed to the Owner but as limited to the Scope of the Work shown herein. Any inconsistencies between the Prime Contract and this subcontract shall be governed by the Prime Contract.

## 2. PAYMENTS:

- o The contract sum, which includes all sales and use taxes, licenses, permits, bonds and inspection or other fees, shall be paid in periodic installments based on requisitions for payment made in the manner and on forms prescribed by the Contractor on or before the twentieth day of the month for work properly performed as of the twentieth of the month. Subcontractor shall be paid an amount equal to 90% of the amount of the work within fifteen (15) days after Contractor's receipt of payment. Contractor's receipt of payment by the Owner shall be a condition precedent to the obligation of Contractor to make any payment to the Subcontractor. Payment shall not constitute acceptance of any non-conforming or defective work.

- o Final Payment shall be due within fifteen (15) days after final acceptance of the Project by Owner, Architect and Contractor's receipt of its final Payment from Owner. Final Payment to the Subcontractor shall not be construed as acceptance of any non-conforming or defective work whether latent, patent, known or unknown.

- o As a condition precedent to any payment, Contractor may require proof of payment for all labor, materials and sub-sub-contracts previously performed, affidavits of payment or payroll certification, releases of mechanics liens, and adjustment of all accounts between Subcontractor and Contractor.

- o Contractor shall not pay for any work not authorized in writing.

- o Subcontractor must have in place and on file with the Contractor a current W-9 and Certificate of Insurance naming Contractor as insured prior to release of any funds on the Project.

## 3. PERFORMANCE AND PROGRESS:

- o Subcontractor agrees to schedule its work as directed by Contractor in order to coincide with the work of all other trades to ensure the orderly progress of the Project. Contractor may from time to time adjust the progress schedule as necessary to diligently prosecute the work. Subcontractor agrees to attend all progress meetings and to promptly furnish such schedules, plans, charts and critical path analyses as may be helpful in expeditiously completing the work.

- o Subcontractor agrees to furnish sufficient labor, equipment, materials and supervision including overtime necessary to ensure the completion of the work according to the progress schedule established by the Contractor.



- If the Contractor determines that the Subcontractor has failed to meet the progress schedule or fails to properly schedule or fails to properly perform the work in strict accordance with the contract documents after 24 hours' notice, Contractor may: 1) require Subcontractor to increase its forces, work overtime or take other measures to increase production or; 2) employ other forces to perform portions of the work at Subcontractor's expense. If Subcontractor shall continue after 24 hours to fail to meet the progress schedule or to properly perform the work in strict accordance with the contract documents, the Contractor may terminate this Subcontract Agreement, in which case the Contractor may take control of all tools, materials and equipment of the Subcontractor on the Project and complete the work with its own or other forces.

- If the Subcontractor shall fail to properly perform its Work in a timely manner as a result of which the completion of the Project is delayed, Subcontractor shall reimburse Contractor all liquidated damages or other delay damages suffered by the Contractor. Contractor shall have the right to reasonably and fairly apportion such delays among any subcontractor or other party responsible for such delays whether or not concurrent or consecutive.

- If the Subcontractor shall fail to make full and timely payment of all moneys due to its Subcontractors, suppliers, or creditors, the Contractor may, at its sole option, withhold funds from Subcontractor's entitlements under this Agreement or any other funds owing to Subcontractor from any or all other contracts or agreements between Subcontractor and Contractor.

- The Subcontractor shall check all work performed by others necessary to "receive" the Subcontractor's work. Failure to give notice of any discrepancy shall relieve the Contractor of any responsibility therefore. The Subcontractor shall be responsible for all field measurements and shall check elevations and grades to insure proper fitting of its work. It shall not be incumbent upon the Contractor to discover any mistakes, errors, omissions or deviations from the contract requirements in the subcontract drawings, and the Owner's final approval of drawings made by the Subcontractor shall not relieve the Subcontractor from responsibility for unauthorized changes, deviations or omissions or for errors of any sort in its drawings.

- Subcontractor shall be responsible for all protections required at their materials, processes and Work; underway or complete.

## 4. WORKMANSHIP:
- The Subcontractor warrants that all of its work shall be in strict conformity to all Contract Documents, building codes, applicable laws, ordinances and regulations, performed in a first class workmanlike manner and that all of the Work will be free of defects in materials, workmanship or design.
- The Subcontractor warrants that its shop drawings and design submittals shall be in compliance with the Contract Documents and all applicable safety regulations and are prepared using the best engineering practices to produce a safe, functioning and efficient component of the Project.

- Subcontractor agrees to immediately remove and replace any work or component which is determined non-conforming or defective.

## 5. SUPERVISION
- The Subcontractor agrees to furnish a fit, experienced and competent supervisor, acceptable to Contractor and authorized by Subcontractor to act on its behalf on all job matters at all times when the Work is in progress.

## 6. CHANGES TO THE WORK:
- Contractor or Owner may by written order and without invalidating the Agreement, make any changes within the Prime Scope of the Work at any time without notice to sureties. Subcontractor agrees to promptly execute such changes, additions, deletions or revisions without delay. If such changes cause an increase or decrease in the cost of the Work or in the time required for completion, Subcontractor shall promptly submit to Contractor its claim for adjustment in cost or time within ten (10) days or such shorter time as the Prime Contract may require.

5



o Subcontractor shall be entitled to an equitable adjustment of the Contract sum or time of performance only to the same extent and according to the same provisions as Contractor's equitable adjustment from the Owners. Subcontractor's allocable share of Contractor's equitable adjustment shall be fairly and reasonably determined by Contractor after allowance for Contractor's cost or presenting and recovering the claim, normal overhead and profit and apportionment's to other affected Subcontractors. Under no circumstances shall Subcontractor's entitlement exceed the Contractor's entitlement after deduction of the expenses and costs described above.

o No claim of Subcontractor for additional compensation or time shall be allowed unless Subcontractor shall have given notice in writing of any change, changed condition or claim for equitable adjustment within the time and in compliance with all provisions and requirements of the Contract Documents.

o Under no circumstances shall Contractor be liable to Subcontractor for damages resulting from delays or acceleration of the work or loss of productivity. Contractor's liability to Subcontractor is strictly limited to allocation of damages recovered from and time extensions allowed by the Owner for the Subcontractor Scope of Work. Time extensions shall be Subcontractor's sole remedy for delays caused solely by the Contractor.

## 7. INSURANCE:

o Insurance shall be primary and non-contributory and shall name the Contractor as an additional insured for limits of:

Comprehensive Prime Liability Insurance:

| | |
|---|---|
| • Occurrence Limit | $1,000,000 |
| • Personal Injury | $1,000,000 |
| • Prime Aggregate | $2,000,000 |

Products-Completed Operations:

| | |
|---|---|
| • Aggregate | $2,000,000 |
| • Business Auto Insurance for all vehicles used by Subcontractor, its servants, agents, subcontractors and suppliers on jobsite: | $1,000,000 |
| • Workers' Compensation | Statutory Limits |
| • Employers' Liability | $500,000/$500,000/$500,000 |
| • Umbrella/Excess Liability | $4,000,000 |

EXH



10

- ○ Insurance carriers must provide 30 days notice of cancellation of policies. Replacement of cancelled policies must occur without lapse in coverage. The Subcontractor shall submit insurance certificates to the Contractor before beginning work, but in no event later than 30 days after signing contract. In no event shall the Subcontractor initiate any Work on-site without a completed Certificate of Insurance filed with the Contractor.

- ○ Subcontractor insurance shall remain in place for completed operations throughout the warranty period, but in no case less than one (1) year from 12.23.2023 Substantial Completion of the Project

- ○ The Subcontractor waives all rights against (1) Contractor and any of their subcontractors, sub-subcontractors, agents and employees, each of the other, and (2) the Owner, the Architect, the Architect's consultants, separate contractors, and any of their subcontractors, sub-subcontractors, agents and employees for damages caused by fire or other causes of loss whether covered by property insurance provided under the Prime Contract or other property insurance applicable to the Work or not, except such rights as they may have to proceeds of such insurance held by the Owner as a fiduciary. The Subcontractor shall require of the Subcontractor's Sub-subcontractors, agents and employees, by appropriate agreements, written where legally required for validity, similar waivers in favor of the parties enumerated herein. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged

## 8. INDEMNIFICATION:

- ○ To the fullest extent permitted by law, the Subcontractor shall fully indemnify, defend and hold harmless Owner, Contractor, Architect, Architect's consultants and agents and all employees and agents of any of them, from and against all suits, claims, actions, lawsuits by Subcontractor's employees, judgments, damages, losses, injuries, death, and expenses (including but not limited to attorney's fees and litigation expenses) arising directly or indirectly out of, or in connection with, the obligations herein undertaken or resulting out of, or in connection with, operations conducted by (or in the work area of) the Subcontractor, the Subcontractor's Sub-contractors, anyone directly or indirectly employed by them or anyone for whose acts they may be liable. All of Subcontractor's indemnity obligations agreed to herein shall be binding on Subcontractor without regard to whether such claim, damage, loss or expense is caused in whole or in part by a party indemnified hereunder.

## 9. SURETY BOND:

- ○ Subcontractor shall furnish Payment and Performance Bonds with corporate surety acceptable to the Contractor in the contract sum prior to the commencement of work if so requested. Pricing for Bonds required shall be reimbursed Subcontractor at cost not to exceed 3% of contract value. Please submit alternate cost for bond.

## 10. DISPUTES:

- ○ In the event of a dispute, claim or disagreement of any kind relating to this agreement, Subcontractor shall avail itself of a dispute resolution process with Contractor; for any claim not resolved by this process the method of binding dispute resolution shall be litigation in the courts of the District of Columbia.

## 11. SHOP DRAWINGS, SAMPLES AND DATA SUBMISSIONS:

- ○ All submittals such as shop drawings, catalogs, samples and material lists required by Prime Contract which pertain to this work shall be furnished complete and timely. Subcontractor shall be responsible for delays because of failure to do so and for any deviation from plans and specifications. All deviations from the Prime Contract documents must be noted clearly on the submittals, and by separate cover letter the Subcontractor shall state reasons for the deviation and refer to the applicable contract provision.

Submittals are due 11.20.2022

## 13. EXTENSION OF TIME:

2100 Reston Parkway. Suite 104. Reston, VA 20191    o 202-464-8750    f 202-464-8755    www.winmarconstruction.com

EXH



11

o Subcontractor shall be entitled to an extension of time for performing and completion the work covered by this agreement upon the same terms and conditions an extension of time is allowable and only to the extent actually allowed to the Contractor by Owner, or its representative, under the terms of the Prime Contract. Notice of the excusable delay shall be given to the Contractor in writing within three (3) calendar days from the beginning of said delay in order that the Contractor may in turn notify the Owner, and if not given timely, said excusable delay may be considered waived. The Owner's decision, or its representative, with regard to the delay, including the assessment of liquidated damages, shall be binding upon and chargeable to the Subcontractor, subject only to the disputes procedure provided in the Prime Contract.

## 14. DAMAGES FOR DELAY:

o The Contractor shall not be liable to Subcontract for unforeseeable delay occurring beyond the Contractor control or for delay caused by Owner or other subcontractor. Subcontractor shall be entitled to reimbursement for any damages for delays recovered from the Owner only, and the Subcontractor shall have the right, at its expense, against the Owner to exercise all provisions of the Prime Contract to recover said damages. Time extension only shall be granted for delays caused solely by the Contractor

## 15. SCHEDULE:

o The Contractor intends to schedule this project using CPM Schedule techniques. In such event, Subcontractor agrees to meet with the Contractor and to provide the necessary detailed information to properly depict activities, including their cost and duration, at no additional cost to the Contractor. All such data shall be provided within fifteen (15) days of Winmar's written notice and request.

## 16. DEFAULT TERMINATION:

o The following shall be deemed a breach of this agreement. Failure to fulfill any obligation of this Subcontract or of the Prime Contract concerning the Subcontractor's work or responsibilities; failure to pay for labor and material, payroll taxes, contributions or insurance premiums, failure to maintain the project schedule, interference with the performance of the work by others for any reason; an act of bankruptcy or insolvency. If the Subcontractor breaches the Subcontract, the Contractor may terminate Subcontractor's right to proceed upon three (3) days written notice. The Contractor may then have the work completed and may use Subcontractor's material, supplies, tools and equipment to complete. Subcontractor and its surety shall continue liable for all cost to complete and any damages and expenses including reasonable counsel fees, liquidated damages assessed by Owner and other liabilities which may result from the default and breach, without waiver or any other rights or remedies available to the Contractor, including right of setoff and collection of any funds which may due Subcontractor under other subcontracts with the Contractor

## 17. EXTRA WORK:

o Only extra work authorized by the Contractor as an extra or change in writing shall be paid for. If the extra work direction does not originate from Owner's direction and there is no prior agreement on price, then Subcontractor shall be paid for the costs of said work plus fifteen percent (15%) for overhead, profit, supervision and small tools, which will constitute the entire amount due the Subcontractor for the extra work.

## 18. OWNER CHANGES:

o Changes ordered by Owner shall be performed and paid for in accordance with the terms of the Prime Contract, including all rights of dispute and appeal, provided reservation and exercise of said rights do not interfere with the progress of the work.

## 19. CONTRACT INTERPRETATION:

o The Contractor interpretation of contract requirements shall be binding upon Subcontractor and complied with, except that Subcontractor shall have the right to claim adjustment of the contract because of said interpretation, if claim in writing is made within forty-eight (48) hours after ruling and direction.

EXH

**wm winmar**

12

## 20. DISPUTES:

○ Disputes arising out of Owner Acts, omissions, or responsibilities shall be resolved in accordance with the disputes procedures in the Prime Contract. Subcontractor shall have the right to exercise those rights at its sole cost and shall be bound thereby. the Contractor shall have no direct liability except to give Subcontractor opportunity to exercise rights in the Prime Contract. Disputes with the Contractor shall be resolved by arbitration in accordance with the rules of the American Arbitration Association. Disputes shall not interfere with the progress of the job. Work shall proceed as ordered, subject to claim.

## 21. BACKCHARGES:

○ All charges and back charges assessed by the Contractor against the Subcontractor shall be deemed accepted unless rejected in writing within (30) days.

## 22. PLANT AND CLEANUP:

○ Subcontractor shall provide its own plant and facilities, including scaffolding and hoists, do its own cleanup, and repair or replace damaged, defective and defaced work caused by its own negligence. The Subcontractor shall cleanup and remove from the site all of its rubbish, debris etc. on a daily basis, unless the Contractor directs otherwise. Upon completion of the subcontract work, all Subcontractor's materials, equipment, etc., must be immediately removed from the jobsite by Subcontractor. Failure to comply will permit the Contractor to do so and back charge Subcontractor for the cost. If Subcontractor uses the Contractor's hoist, crane, scaffolding or facilities, it will be responsible for the operating expenses of such equipment when in use for the Subcontractor's benefits.

## 23. BANKRUPTCY AND DELIQUENT TAXES:

○ In the event of any act of bankruptcy or Subcontractor creditor claim against the Contractor or its surety, or notice of levy involving delinquent taxes, the Contractor shall have the right to withhold payments and apply the same to secure performance of the Subcontract without prejudice to all other rights against Subcontractor or its surety.

## 24. RESPONSIBILITY FOR WORK IN PLACE:

○ The Subcontractor shall check all work performed by others necessary to "receive" the Subcontractor's work. Failure to give notice of any discrepancy shall relieve the Contractor of any responsibility therefore. The Subcontractor shall be responsible for all field measurements and shall check elevations and grades to insure proper fitting of its work. It shall not be incumbent upon the Contractor to discover any mistakes, errors, omissions or deviations from the contract requirements in the subcontract drawings, and the Owner's final approval of drawings made by the Subcontractor shall not relieve the Subcontractor from responsibility for unauthorized changes, deviations or omissions or for errors of any sort in its drawings.

## 25. LICENSES AND FEES:

○ Subcontractor shall be responsible for all taxes, permits, licenses and fees necessary to perform its work, including any increase therein, if any, during the life of the Subcontract.

## 26. LABOR FORCE:

○ Subcontractor shall be responsible for performance regardless of any interference of any trades council or other labor or union organization. Any work stoppage by employees which will unreasonably delay the work will be a breach of the Subcontract subject to the rights set forth in Paragraph 15.

## 27. NONDISCRIMINATION:

○ Subcontractor shall not discriminate against any employee or applicant for employment, advancement, transfer, layoff or termination because of race, religion, color, gender, or national origin. All Equal Opportunity or affirmative action requirements of the Prime Contract shall be obligations of the Subcontractor.

---

EXH



13

## 28. SUPERINTENDENCE:
- Subcontractor shall employ on the jobsite a competent Superintendent, satisfactory to the Contractor with full authority to act on Subcontractor's behalf. The Contractor shall have the right to require replacement.

## 29. PATENT INFRINGEMENT:
- Subcontractor shall indemnify the Contractor from any use of infringement of patents.

## 30. TERMINATION FOR CONVENIENCE:
- the Contractor shall have the right to terminate this agreement for its own convenience for any reason by giving notice of termination effective upon receipt thereof by Subcontractor. Termination for default under Paragraph 16, if wrongfully made, shall be treated as a termination for convenience. Settlement of the contract shall be accomplished in accordance with the provisions of the Termination for Convenience clause in the Prime Contract. If not, the Subcontractor shall be paid only the actual cost for work and labor in place, plus fifteen percent

  (15%), or a prorata percentage of the Subcontract equal to the percentage of completion whichever is less. Subcontractor shall not be entitled to anticipated profits on unperformed portions of the work.

## 31. ASSIGNMENT:
- No assignment hereunder is allowed without written approval of the Contractor

## 32. NOTICES:
- All notices required under this subcontract or the Prime Contract shall be addressed to Contractor's office located at 1010 Wisconsin Ave, NW, Suite 303 Washington, DC 20007. Notices required by the various provisions of the Prime Contract (not otherwise dealt with herein) shall be due in the Contractor's office in one-half (1/2) the time specified in the Prime Contract so that the Contractor will have sufficient time to forward its notice within the required period. Failure of Subcontractor to forward notices in a timely manner as required by the various equitable adjustment provisions of the Prime Contract shall operate to waive its rights to any such adjustments if the Owner rejects the claim.

## 33. OWNER APPROVAL:
- This Agreement is contingent upon Subcontractor or its product being approved by the Owner. If a disqualification occurs because of failure to comply with and strictly fulfill the obligations herein, said failure shall be deemed a breach by the Subcontractor. Any other rights of disqualification by Owner shall render this Agreement null and void.

## 34. RECITATION AND SEVERABILITY:
- Attachments are part of this Agreement. If this Agreement is retained by Subcontractor without executing and returning same within ten (10) days, it shall be deemed accepted; however, acceptance in writing is a condition precedent to payment to due hereunder. The Subcontractor shall not deal directly with or work directly for Owner. This instrument is the entire Agreement between the parties. If any provisions herein are held to be invalid by any competent court, the remaining Agreement shall survive. This Agreement shall control any inconsistency in any documents referred to or incorporated by reference.

## 35. OSHA:
- The Subcontractor shall comply with OSHA and State-equivalent standards and requirements and shall indemnify the Contractor from any failure to do so, including fines and abatement costs and delays to project. Failure to comply shall be a breach of contract, subject to the provisions of Paragraph 16.

## 36. WARRANTY:

---

EXH



14

o The Subcontractor warrants to the Owner, Architect and Contractor that materials and equipment furnished under this Subcontract will be of good quality and new, unless otherwise required or permitted by the Subcontract Documents, that the Work of this Subcontract will be free from defects not inherent in the quality required or permitted, and that the Work will conform to the requirements of the Subcontract Documents. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. The Subcontractor's warranty excludes remedy for damage or defect caused by abuse, modifications not executed by the Subcontractor, improper or insufficient maintenance, improper operation, or normal wear and tear under normal usage. This warranty shall be in addition to and not in limitation of any other warranty or remedy required by law or by the Subcontract Documents. Warranty shall extend for a period of one (1) year after the issuance of Final Certificate of Completion of the Project or such longer period of time as the Contract Documents shall require. Subcontractor agrees to correct any defect, latent or patent, arising within the warranty period, without additional cost.

## 37. MISCELLANEOUS:

o This Subcontract Agreement shall be governed by the laws of Washington DC. Any claim arising out of or relating to this Agreement shall be settled in the District of Columbia. o No changes, amendments or modifications of this contract shall be valid unless in writing and signed by the parties.

**CONTRACTOR:**
Winmar Construction, Inc.

**SUBCONTRACTOR:**
Iron Kingdom, Inc

By: _____
Winmar Construction, Inc.

Date: 11-11-22 _____

By: _____

Title: PRESIDENT _____

Date: 11-07-2022 _____

Subcontractor shall sign and return one copy for the Contractor's file.

EXH

**winmar**
C O N S T R U C T I O N

15

**Exhibit A**
**Drawing List**



WINMAR CONSTRUCTION INC.

Exhibit A
Drawing List

Printed on Mon Sep 19, 2022 at 09:37 pm EDT

Job #: 221-020 Sixty DC
1337 Connecticut Avenue NW
Washington, District of Columbia 20036

## Current Drawings

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| **Architectural** | | | | | |
| A-001 | COVER SHEET / SHEET LIST / SYMBOLS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-002 | BZA APPROVAL | 0 | 05/13/2022 | 06/06/2022 | PERMIT REVISION SET #4 (05/13/22) |
| A-003 | SITE PLAN | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-010 | GENERAL NOTES | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-011 | GENERAL NOTES | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-030 | CODE ANALYSIS / EGRESS PLANS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-040 | ADA | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-060 | U.L. DESIGNS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-061 | U.L. DESIGNS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-062 | U.L. DESIGNS/FIRE STOPPING | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-063 | U.L. DESIGNS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-064 | U.L. DESIGNS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-065 | U.L. DESIGNS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-070 | WALL TYPES | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-080 | DOOR SCHEDULE | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-081 | DOOR SCHEDULE | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-082 | DOOR SCHEDULE | 0 | 05/13/2022 | 06/06/2022 | PERMIT REVISION SET #4 (05/13/22) |
| A-083 | DOOR SCHEDULE | 0 | 05/13/2022 | 06/06/2022 | PERMIT REVISION SET #4 (05/13/22) |
| A-084 | WINDOW SCHEDULE | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-085 | WINDOW SCHEDULE | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-086 | WINDOW SCHEDULE | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |



WINMAR CONSTRUCTION INC.

Exhibit A
Drawing List

Printed on Mon Sep 19, 2022 at 09:37 pm EDT

Job #: 221-020 Sixty DC
1337 Connecticut Avenue NW
Washington, District of Columbia 20036

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| A-087 | HARDWARE SETS | 0 | 05/13/2022 | 06/06/2022 | PERMIT REVISION SET #4 (05/13/22) |
| A-090 | EROSION AND SEDIMENT CONTROL PLAN | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-091 | DEMOLITION PLANS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-092 | DEMOLITION PLANS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-093 | DEMOLITION PLANS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-094 | DEMOLITION PLANS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-100 | BASEMENT PLAN | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-101 | GROUND FLOOR PLAN | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-102 | SECOND FLOOR PLAN | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-103 | THIRD FLOOR PLAN | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-104 | FOURTH FLOOR PLAN | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-105 | FIFTH FLOOR PLAN | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-106 | SIXTH FLOOR PLAN | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-107 | 7TH FLOOR PLAN | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-108 | ROOF PLAN | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-200 | FRONT AND REAR ELEVATION | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-201 | SOUTH ELEVATION | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-202 | NORTH ELEVATION | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-300 | BUILDING SECTION | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-301 | BUILDING SECTION | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-302 | BUILDING SECTION/WALLSECTIONS | 0 | 05/13/2022 | 06/06/2022 | PERMIT REVISION SET #4 (05/13/22) |
| A-303 | WALL SECTION | 0 | 05/13/2022 | 06/06/2022 | PERMIT REVISION SET #4 (05/13/22) |
| A-394 | ENLARGED BASEMENT PLAN- CONNECTICUT | 2 | 08/08/2022 | 08/09/2022 | Addendum 1 (08/08/22) |
| A-395 | ENLARGED BASMENT PLAN- 18TH STREET | 2 | 08/08/2022 | 08/09/2022 | Addendum 1 (08/08/22) |
| A-396 | ENLARGED GROUND FLOOR- CONNECTICUT | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET |



**WINMAR CONSTRUCTION INC.**

Exhibit A
Drawing List

Printed on Mon Sep 19, 2022 at 09:37 pm EDT

Job #: 221-020 Sixty DC
1337 Connecticut Avenue NW
Washington, District of Columbia 20036

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| | | | | | (07/20/22) |
| A-397 | ENLARGED GROUND FLOOR- 18TH STREET | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-398 | ENLARGED PARTIAL 2nd FLOOR PLAN- CONNECTICUT | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-399 | ENLARGED PARTIAL 2nd FLOOR PLAN-18th STREET | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-400 | ENLARGED PARTIAL 3rd FLOOR PLAN - CONNECTICUT | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-401 | ENLARGED PARTIAL 3rd FLOOR PLAN -18th STREET | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-402 | ENLARGED PARTIAL 4th FLOOR PLAN - CONNECTICUT | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-403 | ENLARGED PARTIAL 4th FLOOR PLAN -18th STREET | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-404 | ENLARGED PARTIAL 5th FLOOR PLAN - CONNECTICUT | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-405 | ENLARGED PARTIAL 5th FLOOR PLAN -18th STREET | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-406 | ENLARGED PARTIAL 6th FLOOR PLAN - CONNECTICUT | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-407 | ENLARGED PARTIAL 6th FLOOR PLAN -18th STREET | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-408 | ENLARGED PARTIAL 7th FLOOR PLAN - CONNECTICUT | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-409 | ENLARGED PARTIAL 7th FLOOR PLAN -18th STREET | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-422 | REFLECTED CEILING PLANS | 0 | 12/22/2017 | 06/06/2022 | PERMIT REVISION SET #4 (05/13/22) |
| A-423 | REFLECTED CEILING PLANS | 0 | 12/21/2017 | 06/06/2022 | PERMIT REVISION SET #4 (05/13/22) |
| A-424 | REFLECTED CEILING PLANS | 0 | 12/21/2017 | 06/06/2022 | PERMIT REVISION SET #4 (05/13/22) |
| A-500 | DETAILS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-501 | DETAILS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-502 | DETAILS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-503 | DETAILS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-504 | 18TH STREET ENTRY | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-505 | 18TH STREET ENTRY | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-600 | WALL SECTIONS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |



**WINMAR CONSTRUCTION INC.**

Exhibit A
Drawing List

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| A-601 | WALL SECTIONS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-602 | SECTION DETAILS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-603 | SECTION DETAILS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-604 | SECTION DETAILS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-605 | SECTION DETAILS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-606 | OPENING DETAILS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-607 | SECTION DETAILS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-610 | PLAN DETAILS | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-611 | SECTION DETAILS | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-701 | STAIR 1 PLAN, SECTION, AND DETAIL | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-702 | STAIR 2 PLAN, SECTION, AND DETAIL | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-703 | ELEVATOR PLAN, SECTION, AND DETAIL | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-704 | TYP. STAIR DETAIL | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| A-705 | SIGNAGE | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| **Electrical** | | | | | |
| E100 | GENERAL NOTES, LEGEND & ABBREVIATIONS | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| E101 | ELECTRICAL SCHEDULES | 1 | 08/08/2022 | 08/09/2022 | Addendum 1 (08/08/22) |
| E102 | ELECTRICAL SCHEDULES | 1 | 08/08/2022 | 08/09/2022 | Addendum 1 (08/08/22) |
| E106 | ELECTRICAL SCHEDULES | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| E109 | POWER RISER DIAGRAM | 1 | 08/08/2022 | 08/09/2022 | Addendum 1 (08/08/22) |
| E200 | BASEMENT AND FIRST FLOOR PLANS | 1 | 08/08/2022 | 08/09/2022 | Addendum 1 (08/08/22) |
| E201 | SECOND FLOOR PLAN | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| E204 | THIRD FLOOR PLAN | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| E205 | FOURTH FLOOR PLAN | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| E206 | FIFTH FLOOR PLAN | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET |



WINMAR CONSTRUCTION INC.

Exhibit A
Drawing List

Printed on Mon Sep 19, 2022 at 09:37 pm EDT

Job #: 221-020 Sixty DC
1337 Connecticut Avenue NW
Washington, District of Columbia 20036

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| | | | | | (07/20/22) |
| E207 | SIXTH FLOOR PLAN | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| E208 | ROOF LEVEL PLAN | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| **Fire Protection** | | | | | |
| FA100 | GENERAL NOTES | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| FA300 | BASEMENT & 1ST FLOOR PLANS | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| FA301 | 2ND & 3RD FLOOR PLANS | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| FA302 | 4TH FLOOR PLAN | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| FA303 | 5TH FLOOR PLAN | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| FA304 | 6TH FLOOR PLAN | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| FA305 | ROOF PLAN | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| FA500 | FIRE ALARM RISER DIAGRAM | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| FP103 | FIRE RISER DIAGRAM | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| **Landscape** | | | | | |
| L000 | COVER SHEET | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| L1.00 | GREEN AREA RATIO PLAN - 3RD FLOOR | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| L1.10 | GREEN AREA RATIO PLAN - 5TH FLOOR | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| L1.20 | GREEN AREA RATIO PLAN - 6TH FLOOR | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| L1.30 | GREEN AREA RATIO PLAN - ROOF | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| L1.40 | GREEN AREA RATIO PLAN - PENTHOUSE | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| L1.50 | GREEN AREA RATIO CALCULATIONS | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| L2.00 | LANDSCAPE SCHEDULE & NOTES | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| L2.10 | LANDSCAPE DETAILS (1 OF 2) | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| L2.20 | LANDSCAPE DETAILS (2 OF 2) | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET |



**WINMAR CONSTRUCTION INC.**

Exhibit A
Drawing List

Printed on Mon Sep 19, 2022 at 09:37 pm EDT

Job #: 221-020 Sixty DC
1337 Connecticut Avenue NW
Washington, District of Columbia 20036

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| | | | | | (07/20/22) |
| L3.00 | GREEN ROOF SPECIFICATIONS (1 OF 2) | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| L3.10 | GREEN ROOF SPECIFICATIONS (2 OF 2) | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| L3.20 | GREEN SCREEN SPECIFICATIONS | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| L3.30 | LANDSCAPE MAINTENANCE PLAN (1 OF 3) | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| L3.40 | LANDSCAPE MAINTENANCE PLAN (2 OF 3) | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| L3.50 | LANDSCAPE MAINTENANCE PLAN (3 OF 3) | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| **Mechanical** | | | | | |
| M100 | GENERAL NOTES, SYMBOLS & ABBREVIATIONS | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| M300 | BASEMENT AND 1ST FLOOR PLANS | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| M301 | 3RD FLOOR PLAN | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| M302 | 4TH FLOOR PLAN | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| M303 | 5TH FLOOR PLAN | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| M304 | 6TH FLOOR PLAN | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| M305 | ROOF PLAN | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| M307 | 2ND FLOOR PLAN | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| M402 | DETAILS & SCHEDULES | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| **Plumbing** | | | | | |
| P100 | GENERAL NOTES, SYMBOLS AND ABBREVIATIONS | 1 | 08/08/2022 | 08/09/2022 | Addendum 1 (08/08/22) |
| P101 | DETAILS AND SCHEDULES | 1 | 08/08/2022 | 08/09/2022 | Addendum 1 (08/08/22) |
| P102 | SCHEDULES | 0 | 08/08/2022 | 08/09/2022 | Addendum 1 (08/08/22) |
| P300 | BASEMENT FLOOR PLAN | 1 | 08/08/2022 | 08/09/2022 | Addendum 1 (08/08/22) |
| P301 | THIRD FLOOR PLAN | 1 | 08/08/2022 | 08/09/2022 | Addendum 1 (08/08/22) |
| P302 | FOURTH FLOOR PLAN | 1 | 08/08/2022 | 08/09/2022 | Addendum 1 (08/08/22) |
| P303 | FIFTH FLOOR PLAN | 1 | 08/08/2022 | 08/09/2022 | Addendum 1 (08/08/22) |
| P304 | SIXTH FLOOR PLAN | 1 | 08/08/2022 | 08/09/2022 | Addendum 1 (08/08/22) |
| P306 | ROOF LEVEL PLAN | 1 | 08/08/2022 | 08/09/2022 | Addendum 1 (08/08/22) |



WINMAR CONSTRUCTION INC.

Exhibit A
Drawing List

Printed on Mon Sep 19, 2022 at 09:37 pm EDT

Job #: 221-020 Sixty DC
1337 Connecticut Avenue NW
Washington, District of Columbia 20036

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| P307 | FIRST FLOOR PLAN | 1 | 08/08/2022 | 08/09/2022 | Addendum 1 (08/08/22) |
| P308 | SECOND FLOOR PLAN | 1 | 08/08/2022 | 08/09/2022 | Addendum 1 (08/08/22) |
| P500 | STORM RISER DIAGRAM | 0 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| **Structural** | | | | | |
| S-001 | STRUCTURAL GENERAL NOTES | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-002 | STRUCTURAL GENERAL NOTES | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-003 | STRUCTURAL GENERAL NOTES AND SPECIAL INSPECTIONS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-100 | FOUNDATION PLAN | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-101 | GROUND FLOOR FRAMING PLAN | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-102 | SECOND FLOOR FRAMING PLAN | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-103 | THIRD FLOOR FRAMING PLAN | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-104 | FOURTH FLOOR FRAMING PLAN | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-105 | FIFTH FLOOR FRAMING PLAN | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-106 | SIXTH FLOOR FRAMING PLAN | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-107 | MAIN ROOF FRAMING PLAN | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-108 | PENTHOUSE ROOF FRAMING PLAN | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-200 | ELEVATOR MAT FOUNDATION PLAN | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-201 | FOUNDATION SECTIONS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-202 | FOUNDATION SECTIONS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-203 | FOUNDATION SECTIONS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-300 | CONCRETE DETAILS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-400 | CONCRETE SHEAR WALL DETAILS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-401 | SHEAR WALL ELEVATIONS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-402 | SHEAR WALL ELEVATIONS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET |



**WINMAR CONSTRUCTION INC.**

Exhibit A
Drawing List

Printed on Mon Sep 19, 2022 at 09:37 pm EDT

Job #: 221-020 Sixty DC
1337 Connecticut Avenue NW
Washington, District of Columbia 20036

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| | | | | | (07/20/22) |
| S-403 | SHEAR WALL ELEVATIONS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-500 | STEEL DETAILS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-501 | STEEL DETAILS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-510 | METAL DECK DETAILS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-511 | METAL DECK DETAILS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-520 | GROUND FLOOR DETAILS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-521 | GROUND FLOOR DETAILS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-530 | TYPICAL FLOOR DETAILS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-531 | TYPICAL FLOOR DETAILS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-540 | 6TH FLOOR DETAILS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-541 | 6TH FLOOR DETAILS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-550 | ROOF DETAILS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-551 | ROOF DETAILS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-600 | FACADE DETAILS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-601 | FACADE DETAILS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |
| S-700 | CONCRETE REPAIR DETAILS | 1 | 07/20/2022 | 07/20/2022 | CORE & SHELL - CONSTRUCTION SET (07/20/22) |

EXH



16

**Exhibit B**
**Scope of Work**

Time is of the essence of this Agreement.  Work shall be in accordance with all contract terms and conditions, and per plans and specifications.  The Work shall include but is not limited to the following:



Exhibit B
SCOPE OF WORK ATTACHMENT TO
CONTRACT AGREEMENT AND GENERAL CONDITIONS BETWEEN
GENERAL CONTRACTOR AND SUBCONTRACTOR

**Subcontractor** –Iron Kingdom INC,    **Project Name** – Sixty DC Hotel
**Contract Date** – September 2nd 2022

1.  SUBCONTRACT INCLUSIONS. The "Subcontractor's Work" specifically includes, but is not limited to the following:

1.1 General

1.1.1   It is understood that this Agreement is based upon Work being performed "per Plans and Specifications," however this does not excuse any item (labor and material) that could reasonably be expected or inferred as a normal course of completing the Scope of Work in a professional manner.

1.1.2   This Subcontractor agrees that the Subcontract Sum includes the cost to perform all work necessary to provide a complete, useable, working facility for its portion of the Work, in accordance with the scope and intent of the Contract Documents and applicable Legal Requirements and all matters reasonably inferable there from.

1.1.3   Use adequate numbers of skilled workmen who are thoroughly trained and experienced in the necessary crafts and who are completely familiar with the requirements and methods needed for the proper performance of the Work covered by this Subcontract

1.1.4   Subcontractor shall be fully responsible for the layout of the work of this Subcontract.

1.1.5   Promptly inform the Contractor of all errors and omissions, including dimensional, as they are discovered.

1.1.6   The Subcontractor shall be responsible for the costs of stand-by trades if the Subcontractor elects to, or is required, due to his failure to maintain scheduled performance, to work other than normal working hours or on Saturdays, Sunday, or holidays.

1.1.7   The stocking, storing, delivery of tools, equipment, and materials on site and/or in the building will be subject to the Contractor's approval. All stocking, storing, or delivery by the Subcontractor must be approved by, and coordinated with the Project Superintendent and/or Project Manager.

1.1.8   All materials are to be stocked, stored and protected to insure that there is not damage to the stored materials or surrounding surfaces.

1.1.9   Subcontractor is responsible for all hoisting, scaffolding and distribution of material necessary for the proper performance of the work on this Subcontract.

1.1.10  Subcontractor shall clean up all trash and debris resulting from its operations on a daily basis and place in dumpster. Such cleanup and removal shall be done in a manner that will impede neither the progress of the Project nor other trades.

1.1.11  Subcontractor to supply all necessary ~~taxes,~~ deliveries, staging, ~~permits,~~ licenses and inspections for the work of this Subcontract.

1.1.12  Quality of work generated under this Subcontract will be of the highest quality and meet with the approval of the Contractor's and Owner's representatives in all cases.

1.1.13  The prevention of accidents on or in the vicinity of the Work is the Subcontractor's responsibility, even if Contractor establishes a safety program for the entire project. Subcontractor shall work in accordance with Contractor's safety regulations and comply with all OSHA requirements, federal and state laws, rules and regulations regarding safety and health including Personal Protection Equipment as required by OSHA. Failure to do so may result in the issuance of a citation by OSHA and/or the Contractor. Subcontractor shall also comply with all safety provisions as stated in the Prime Contract.

1.1.14  Work of Preceding Trades: The Subcontractor shall satisfy himself as to the acceptability of the surface   to which his work is to be applied or affixed, and shall



Exhibit B
SCOPE OF WORK ATTACHMENT TO
CONTRACT AGREEMENT AND GENERAL CONDITIONS BETWEEN
GENERAL CONTRACTOR AND SUBCONTRACTOR

**Subcontractor** –Iron Kingdom INC,    **Project Name** – Sixty DC Hotel
**Contract Date** – September 2nd 2022

advise Contractor in writing of any unsatisfactory conditions. Commencement of work by Subcontractor shall be construed as acceptance of the preceding work

1.2    COORDINATION - This Subcontractor agrees to provide project management expertise in the coordination of this Scope of Work.  Premium cost to change out any Work at a later date if not properly coordinated shall be this Subcontractor's responsibility.  Specific coordination includes the following:

1.2.1    Coordinate materials in such a way that no delays will be created in his Work or the work of other related subcontractors.  Keeping the agreed upon Schedule is essential, including supplying the material to maintain the production required.

1.2.2    Subcontractor will plan all work in advance and submit Requests for Information (RFIs) in writing if there is any missing information that could impede the timely completion of your Work.

1.2.3    Examine all Drawings and all sections of the Specifications, including all Addenda, to insure complete coverage of Work.

1.2.4    Promptly amend and make good any defective materials and/or workmanship to the entire approval and acceptance of Contractor, Owner, at no additional charge to said mentioned parties.

1.2.5    Coordinate all equipment, and installations with other trades by means of applicable Shop Drawings, applicable interference drawings, mock-ups, coordination meetings, and field coordination prior to proceeding with Work.

1.2.6    Assist with inspections as required and as may be requested by the Project Superintendent.

1.2.7    In the event of a conflict between the Structural, Architectural or MEP Contract Documents, the design with the greater quantity or value shall govern.

1.2.8    Subcontractor is responsible for the actual quantities of materials needed to execute the Work described in the Given Plans.

1.3    TRADE INCLUSIONS
1.3.1    This scope of work is inclusive of, but not limited to, all material, labor, equipment, tools, and other requirements needed to execute the scope of work per the 100% Construction documents 02/19/16

1.3.2    Permits, Testing and Inspections as required

1.3.3    Submittals as required

1.3.4    One year (1) warranty on all materials and workmanship from the date of substantial completion

1.3.5    Weekend Work included to keep schedule

1.3.6    As-Builts as required

1.3.7    Coordination of work with respect to other trades

1.3.8    Daily cleanup of areas worked; if Winmar has to clean up for subcontractor then a back charge will be sent for labor

1.4    TOLERANCES

1.4.1    Subcontractor acknowledges that there will be no acceptance of Work that is installed in any manner which causes other trades to compensate for improper workmanship.



Exhibit B
SCOPE OF WORK ATTACHMENT TO
CONTRACT AGREEMENT AND GENERAL CONDITIONS BETWEEN
GENERAL CONTRACTOR AND SUBCONTRACTOR

**Subcontractor** –Iron Kingdom INC,    **Project Name** – Sixty DC Hotel
**Contract Date** – September 2nd 2022

       1.4.2    All tolerances shall be within or better than recommended industry or trade specific standards as related to this Scope of Work.

2.    SUBCONTRACTOR EXCLUSIONS- The subcontractor's work specifically excludes the following:

    1.   UNIT/ALTERNATE PRICES - The following unit/alternate prices will apply to any Modifications to this Agreement. These unit/alternate prices include all costs, including delivery, hoisting, storage, labor, material, equipment usage, supervision, overhead, profit, bonds, insurance, sales/use taxes and all other items required for incorporation into the Project:

    2.   CLOSE OUT - Submit the following Close Out Documents at completion of Contract Work:

        a.   Final Release of Lien – (1) original
        b.   Subcontractor's Warranty as required by the Contract Documents - (1) original
        c.   O&M Manuals – (1) original

END OF EXHIBIT "B"

SUBCONTRACTOR                            Winmar Construction, Inc.

Agreed by: _____ 11-07-2022 _____ 11-11-22
                                Date                                  Date


**winmar**
C O N S T R U C T I O N

Project Name:    Sixty DC Hotel
Project Address:  1337 Connecticut Ave, NW
                  Washington, DC  200036

| 06-Steel | Name: | Iron kingdom | APPROVED |
|---|---|---|---|
| | Estimator: | Cris Talley | |
| | Phone: | 301.699.3448 | |
| | Base Bid: $ | 1,096,976 | 10/14/2022 |

**Trade Scope Items**

| Description | | Amount |
|---|---|---|
| Furnish and install metal stairs, pipe and tube railing, metal grating, decorative metal stairs, and metal fabrications per the contract documents. | | Inc |
| Furnish only anchor bolts, leveling plates, and bearing plates for this subcontractor's work as indicated or required for embedment in masonry and concrete by others. | | Inc |
| The work includes embeds, fasteners, sleeves, and core drilling for all work requiring such. | | Inc |
| Furnish and install post-installed anchors for this subcontractor's work in accordance with the contract documents including signed and sealed engineered calcuations. | | Inc |
| All exposed steel and steel located in exterior walls including but not limited to masonry support angles ie page A-606, lintels, and exterior metals. | | Inc |
| Furnish and install all guard & handrail systems. | | Inc |
| All rails and rail connections are to be designed by a certified engineer to support all loads required by applicable codes. | | Inc |
| Furnish and deliver embeds for guardrails. | | Inc |
| ~~Furnish and install all interior and exterior roof ladders and platforms, both fixed and retractible as indicated in the contract documents.~~ | | ~~Inc~~ |
| Furnish and install elevator houst beam, sill angles, pit ladder and sump pit grate. | | Inc |
| Furnish and install pump access pit cover frame and grate in galvonized finish. | | Inc |
| ~~Furnish and deliver elevator hoist hooks.~~ | | ~~Inc~~ |
| Furnish and install pan stairs and landings. The work includes toe boards, ~~non-slip nosings~~, risers, stringers, covers and inserts, railings, ~~dual height~~ handrails, guardrails etc. | | Inc |
| Achieve all architectually exposed installation requirements. | | Inc |
| Touch up all field welds and grind smooth as required. | | Inc |
| All structural steel and miscellaneous metals shall receive preparatory work, primers, coatings and finishes indicated and required by the contract ducuments. | | Inc |
| Paint all field welds and deck welds. | | Inc |
| Work includes coordination of steel primers with topcoats to ensure compatibility. | | Inc |
| Perform touch up painting and galvanized coatings resulting from steel erection. | | Inc |
| ~~Coordinate~~ rough-in requirements and installation of power wiring, light fixtures, and sprinkler systems within steel elements as required by the contract documents. | | Inc |
| Field verify dimensions. | | Inc |
| ~~Coordinate~~ size and location of all openings and sleeves with all contract documents, and other trades. | | Inc |
| The work includes preperation and submission of shop drawings and calculations signed and sealed by the engineer responsible for their preparation in accordance with the contract documents. | | Inc |
| Comply with all quality control certifications and requirments. | | Inc |
| Provide all safety measures required for this subcontractor's work. | | Inc |
| Mobilizations as required to perform this work. | | Inc |
| Perform all unload and inventory of steel deliveries. | | Inc |
| provide crane for all lifting of steel items. | | |
| Sales tax included. | | inc |

**Totals**

| | | | |
|---|---|---|---|
| Subcontractor Adjusted Quote | | $ | 1,096,976 |
| Other Materials | | | |
| Taxes | | | |
| Other Labor | | | |
| Bond | | | |
| Winmar Adjustment | | | |
| TOTAL | | $ | 1,096,976 |

EXH



17

## Exhibit C Project
## Schedule





9-16-22



Hotel 60 DC
Master Construction Schedule

| ID | Task Mode | Task Name | Duration | Start | Finish |
|---|---|---|---|---|---|
| 55 | | Install Fire Alarm Riser | 3 wks | Mon 12/26/22 | Fri 1/13/23 |
| 56 | | Masonry Shaft for Elevators and Stairs | 6 wks | Mon 12/26/22 | Fri 2/3/23 |
| 54 | | Install Sprinkler Riser | 3 wks | Fri 1/27/23 | Thu 2/16/23 |
| 46 | | Concrete Shear Walls | 6 wks | Fri 1/20/23 | Thu 3/2/23 |
| 51 | | Plumbing Ground Work | 4 wks | Fri 1/20/23 | Thu 2/16/23 |
| 52 | | Plumbing Risers | 4 wks | Fri 2/17/23 | Thu 3/16/23 |
| 50 | | Demo of Existing Roof Structure | 1 wk | Fri 3/3/23 | Thu 3/9/23 |
| 57 | | Mobilize Crane onsite | 2 days | Fri 3/10/23 | Mon 3/13/23 |
| 58 | | Install Steel for 6th floor | 2 wks | Tue 3/14/23 | Mon 3/27/23 |
| 59 | | Pour Concrete Slabs | 2 wks | Tue 3/14/23 | Mon 3/27/23 |
| 64 | | Install HVAC Equipment on Roof | 1 wk | Fri 4/7/23 | Thu 4/13/23 |
| 65 | | Install Elevators | 6 wks | Fri 4/7/23 | Thu 5/18/23 |
| 61 | | Install Roofing | 4 wks | Tue 3/28/23 | Mon 4/24/23 |
| 63 | | Install New Electrical Service | 2 wks | Fri 6/16/23 | Thu 6/29/23 |
| 49 | | Frame exterior walls, Insulate | 4 wks | Thu 9/7/23 | Wed 10/4/23 |
| 60 | | Install Doors, Frames and Hardware | 2 wks | Thu 10/5/23 | Wed 10/18/23 |
| 62 | | Install Exterior Windows and Curtainwall | 4 wks | Thu 10/5/23 | Wed 11/1/23 |
| 66 | | Site Work and Exterior Painting | 2 wks | Thu 11/2/23 | Wed 11/15/23 |
| 67 | | Interior Construction | 276 days | Fri 3/10/23 | Fri 3/29/24 |
| 68 | | Layout Interior Partitions | 2 wks | Fri 3/10/23 | Thu 3/23/23 |
| 69 | | Frame Interior Walls and Ceilings | 7 wks | Fri 3/10/23 | Thu 4/27/23 |
| 84 | | Install Landscaping | 2 wks | Tue 4/25/23 | Mon 5/8/23 |
| 70 | | Rough-In Wall Plumbing | 8 wks | Fri 4/28/23 | Thu 6/22/23 |
| 71 | | Rough-in Wall Electrical | 8 wks | Fri 4/28/23 | Thu 6/22/23 |
| 72 | | Wall Concealment Inspections | 2 days | Fri 6/23/23 | Mon 6/26/23 |

9-16-22



**winmar**

Hotel 60 DC
Master Construction Schedule

| ID | Task Mode | Task Name | Duration | Start | Finish |
|----|-----------|-----------|----------|-------|--------|
| 73 | | Hang and Finish Drywall | 7 wks | Tue 6/27/23 | Mon 8/14/23 |
| 74 | | Install Doors and Hardware | 2 wks | Tue 8/8/23 | Mon 8/21/23 |
| 76 | | Install Horizontal Sprinkler | 5 wks | Tue 8/15/23 | Mon 9/18/23 |
| 77 | | Install Ceiling Mechanical | 5 wks | Tue 8/15/23 | Mon 9/18/23 |
| 75 | | Install Light Fixtures | 5 wks | Thu 9/14/23 | Wed 10/18/23 |
| 82 | | Install Interior Doors and Hardware | 3 wks | Thu 9/21/23 | Wed 10/11/23 |
| 83 | | Signage | 1 wk | Thu 10/12/23 | Wed 10/18/23 |
| 78 | | Ceiling Concealment | 2 days | Thu 10/19/23 | Fri 10/20/23 |
| 79 | | Install Painting and wallcoverings | 4 wks | Mon 10/9/23 | Fri 11/3/23 |
| 80 | | Install Flooring | 5 wks | Mon 10/23/23 | Fri 11/24/23 |
| 81 | | Install Millwork | 5 wks | Mon 11/6/23 | Fri 12/8/23 |
| 85 | | Final Tele/Data | 4 wks | Mon 11/6/23 | Fri 12/1/23 |
| 86 | | Final Electrical switches, outlets, equipment | 4 wks | Mon 11/6/23 | Fri 12/1/23 |
| 87 | | Final MEP connections | 4 wks | Mon 12/4/23 | Fri 12/29/23 |
| 90 | | Punch list Walk | 2 days | Thu 12/28/23 | Fri 12/29/23 |
| 88 | | MEP Commissioning | 3 days | Mon 1/1/24 | Wed 1/3/24 |
| 91 | | Punch list completion | 3 wks | Mon 1/1/24 | Fri 1/19/24 |
| 89 | | **Final Inspections** | 1 wk | Thu 1/4/24 | Wed 1/10/24 |
| 92 | | Final Clean | 2 wks | Fri 12/29/23 | Thu 1/11/24 |
| 93 | | FFE | 5 wks | Fri 1/12/24 | Thu 2/15/24 |
| 94 | | Certificate of Occupancy | 0 days | Thu 2/15/24 | Thu 2/15/24 |
| 95 | | Operations and Training | 31 days | Fri 2/16/24 | Fri 3/29/24 |
| 96 | | Grand Opening | 0 days | Fri 3/29/24 | Fri 3/29/24 |

Page 4

9-16-22

EXH



19

## Exhibit E
## Supplemental Provisions to the Subcontract Agreement

### COMMON SCOPE ITEMS

o Subcontractor shall be fully responsible for the layout of the work of this Subcontract.

o The Subcontractor shall be responsible for the costs of stand-by trades if the Subcontractor elects to, or is required, due to his failure to maintain scheduled performance, to work other than normal working hours or on Saturdays, Sunday, or holidays.

o Subcontractor shall provide cleaning of streets, dust control, barricades and traffic control resulting from Subcontractor's operation as required to comply with local codes and ordinances for Subcontractor's work only.

o Subcontractor is responsible for all hoisting, scaffolding and distribution of material necessary for the proper performance of the work on this Subcontract.

o Subcontractor shall clean up all trash and debris resulting from its operations on a daily basis and place in dumpster. Such cleanup and removal shall be done in a manner that will impede neither the progress of the Project nor other trades.

o Subcontractor to supply all necessary ~~taxes,~~ deliveries, staging, ~~permits,~~ licenses and inspections for the work of this Subcontract.

o Quality:  Quality of work generated under this Subcontract will be of the highest quality and meet with  the approval of the Contractor's and Owner's representatives in all cases.

o Safety: The prevention of accidents on or in the vicinity of the Work is the Subcontractor's responsibility, even if Contractor establishes a safety program for the entire project. Subcontractor shall work in accordance with Contractor's safety regulations and comply with all OSHA requirements, federal and state laws, rules and regulations regarding safety and health including Personal Protection Equipment as required by OSHA. Failure to do so may result in the issuance of a citation by OSHA and/or the Contractor. Subcontractor shall also comply with all safety provisions as stated in the Prime Contract. The Contractor citation to be one hundred dollars ($100.00) per occurrence or that assessed by OSHA.

o Work of Preceding Trades: The Subcontractor shall satisfy himself as to the acceptability of the surface  to  which his work is to be applied or affixed, and shall advise Contractor in writing of any unsatisfactory conditions. Commencement of work by Subcontractor shall be construed as acceptance of the preceding work.

o Subcontractor's Relationship to Owner: Subcontractor will have no direct communications with the Owner during the course of this Subcontract unless agreed to by Contractor in writing.  All submittals, correspondence, changes, extras, payroll reports, claims complaints, and any other matters will be directed to and through Contractor.

o Back charges: The following procedures will be observed in the event of back charges.
  - Contractor will not accept back charges form Subcontractor unless the Subcontractor obtains a work order signed by the Contractor's superintendent or project manager, prior to beginning the

    work in question. No back charges or invoices from Subcontractor will be honored in the absence of a properly signed work order authorization.

EXH



20

- Submits to Contractor's accounting department for payment within 15 days of the signature date on the work order, or with the first draw request after incurring cost whichever is earlier. A duplicate of the back charge work order shall be submitted with the monthly payment application after the work is complete.
- Completes the work in its entirety to the Contractor's and Owner's satisfaction.

o  Authorization to Sign: Subcontractor/supplier shall, with the return of this Subcontractor Agreement, submit to Contractor the names of all employees of Subcontractor who are authorized to sign change orders and release of lien waivers.

EXH



21

## Exhibit F
## Requisition Requirements for the Subcontract Agreement

Requisitions are paid once a month, upon receipt of the Owner payment (refer to item 2.A of the Subcontract Agreement).

All Subcontractors are required to provide an executed and notarized original Subcontractor Requisition for Payment form (AIA G702-3). This form is due in the Contractor's office by the 20th of the month, projecting the value of work complete through the end of the month. Faxed copies of invoices will be processed for payment, however original copies must be received by the Contractor before any payment(s) will be made.

All requisitions should be sent to:

**WINMAR CONSTRUCTION INC.**
**2100 Reston Parkway. Suite 104.**
**Reston, VA 20191**
**FAX #202-464-8755**

All extras and Change Orders must be included on the requisition form. Payment on Owner Changes requires Owner approval and payment before payment by the Contractor Insurance and Bond invoices must be attached to the requisition to be processed for reimbursement (refer to item 10 of the Subcontract Agreement, if applicable).

### INSURANCE CERTIFICATE REQUIREMENTS
Insurance certificates including complete coverage must be received by WINMAR, INC. before the first requisition will be paid (refer to item 8 of the Subcontract Agreement).

### AFFIDAVIT AND WAIVER REQUIREMENTS
Subcontractor shall furnish the Affidavits and Claim Waivers as set forth in the Prime Contract as a condition precedent to any payment hereunder. A failure of the Contractor to enforce such waivers shall not be deemed a waiver of the Contractor's right to enforce them subsequently.

## Exhibit G Notice
## to Proceed

22

EXH



**Exhibit H – Safety Requirements**

JOBSITE SAFETY REGULATIONS · There is to be absolutely no consumption of alcoholic beverages on the job or property.

- Hard Hats are to be worn at all times applicable on construction jobsites.

- Safety glasses or other eye protection are to be worn when operating saws, chipping gun, jackhammer or power actuated tools.

- Do not wear loose clothing around table saws, drills or other machinery. Make sure all safety guards are properly affixed and in good working condition on all power equipment.

- Do not add gasoline to machines or portable generators while running.

- Check to see that all electrical cords and connections are in proper working order.

- First aid kits should be available in all gang boxes.

- Insure that all crews adhere to safety rules and report injuries of any kind to the Superintendent and Project Manager

HOUSEKEEPING

Good housekeeping is an important and essential part of WINMAR's Injury Prevention Program. IT IS THE RESPONSIBILITY OF ALL PERSONNEL—SUPERVISORS AND CRAFTMEN ALIKE—TO PRACTICE GOOD HOUSEKEEPING AT ALL TIMES.

- Scrap materials and rubbish are fire and accident hazards. If an excess of these materials exists in your work area, ask your supervisor to arrange for the removal before beginning work.

- You must use the trash barrels which are located throughout the jobsite. If you need one in your immediate area, notify your supervisor.

- Return all surplus materials to the stockpile at the completion of your job.

- Do not leave tools and materials where they will create a hazard for others. Put them in a gang box or return them to the tool room.

- Each employee must keep his work area reasonably free of the accumulation of scrap lumber, debris, and tripping hazards during the workday. <u>It is recommended that the work area be cleared after lunch and at the end of each day and/or shift.</u>

- Place oily rags in approved metal containers only.



EXH

- Wipe up spilled liquids immediately. If you cannot handle the problem, barricade the area and notify your supervisor so that they can arrange for the necessary cleanup.

- Keep change areas clean. Do not let soiled clothes, food scraps, and soft drink bottles or cans accumulate. If drinking cups are used, deposit them in the containers provided. Also, place sandwich wrappers, paper bags, and other trash in approved containers.

PERSONAL PROTECTIVE EQUIPMENT

Your failure or refusal to use the personal protective equipment appropriate for work may be cause for removal from the project.

- All employees, visitors and vendors must wear hard hats as well as other required personal protective equipment every designated area.

- You must wear clothing suitable for the work you are doing. The minimum attire is long pants and a shirt.

- Wear sturdy work shoes. Safety shoes are desired. Shoes with badly worn or thin soles, sneakers and sandals are not permitted.

- You must wear proper eye protection when you are exposed to flying particles, dust, objects, chemicals, or harmful light.

- Respiratory equipment may be required in areas where health hazards exist due to accumulations of harmful dust, fumes, mists or vapors.

- Safety belts and lifelines must be worn when other safeguards such as nets, planking, scaffolding or guardrails cannot be used. Be sure safety lines are independent of other rigging.

- Wear gloves when handling objects or other substances which could cut, tear or burn the hands.

- Hair nets may be required for employees whose hair is a potential source of injury.

- Electricians using insulated gloves must test their gloves for defects daily.

HAND AND PORTABLE POWER TOOLS

Only tools in a safe working condition will be permitted. You must comply with all manufacturer's instructions for the use and handling of tools. In addition observe the following safety practices:

- Inspect your tools daily to insure that they are in proper working order. Damaged or defective tools must be tagged for repair.

- Power saws, grinders and other power tools must have proper guards in place at all times. Removing guards or rendering them inoperable is not permitted.

- Power tools shall be hoisted and lowered by a hand line never by the cord or hose.

EXH



- Chords and hoses must be kept out of walkways and off of stairs, scaffolds and ladders. They must not be placed so as to create a tripping hazard for employees or where they may be subjected to damage from equipment or materials.

- Do not push wheelbarrow with handles in an upright position. Do not overfill a wheelbarrow. If a ramp or cross-over is necessary, the minimum width must be 4 feet, reinforced to minimize deflection, and sloped no more than 2-foot in 10-feet.

Electrical Tools
- All portable electric tools must be grounded (except "UL" or "FM" Approved, Double-insulated Tools)

- All electrical cords and cables must be covered or elevated, when appropriate to protect them from damage and to eliminate tripping hazards.

Pneumatic Tools
- All pneumatic hose connections must be securely fastened.

- An approved safety check valve must be installed at the manifold outlet of each supply line for hand held pneumatic tools.

  Safety clips or retainers must be installed on all pneumatic tools to prevent the accidental expulsion of the tool from the barrel.

- No one shall be permitted to work within 10 feet of pneumatic nailers and staplers and the operator must use appropriate eye protection.

- Air hoses must not be disconnected at the compressor until hose lines have been bled.

Power-Actuated Tools
- Only those who possess valid credentials are permitted to use power-actuated tools.

- All power-actuated tools must be kept under lock and key when not actually in use and appropriate warnings must be posted before their actual use.

- Every qualified operator of a power-actuated tool must have read and be knowledgeable of all requirements found therein.

Fuel Powered Tools
- All fuel-powered equipment must be shut off before being refueled.

- Smoking is prohibited during refueling operations. Other nearby sources of ignition, such as burning and welding operations, also must be halted during refueling operations.

- Make sure that appropriate warning signs are posted and that fire protection equipment is readily available during refueling operations.

EXH

 **winmar**
C O N S T R U C T I O N

25

## LADDERS

There is NO excuse for using a makeshift or defective ladder as a means of access to any work area or working platform.

- Job-built ladders must be constructed to conform to the established safety requirements and rungs must be 12 inches on-centers with filler blocks installed.  Lumber graded "select" must be used.

- Industrial-type or heavy duty-grade manufactured ladders will be used on the jobsite, except for 'gang ladders' and special purpose job-built ladders.

- Ladders with broken or missing side rails or rungs must not be used.  Repair or destroy them immediately. All ladders to be repaired must be tagged "do Not Use" and positively removed from service.

- Do not splice together short ladders to make a longer ladder.

- All straight ladders must be tied off at the top and rigidly secured at the bottom.

- Ladders shall not be placed against movable objects.

- The base of straight ladders must be set back a safe distance from vertical - approximately one-forth (1/4) of the working length of the ladder.

- Ladders used as access to a floor or platform must extend at least 3 feet above the landing.

- The areas around the top and base of ladders must be free of tripping hazards such as loose materials, trash, lumber, pipes, electrical cords etc.

26

EXH



Ladders which project into passageways or doorways where personnel, moving equipment or materials being handled, could strike them must be protected by barricades and/or guards.

- You must face the ladder at all times while ascending or descending.

- Be sure that your shoes are free of mud, grease or other substances which could cause a slip or fall.

- Do not carry any materials in your hands while using any ladder. Use a hand-line to lift materials or tools.

- Always move the ladder to avoid overreaching. A scaffold must be used for all work which cannot be done safely from a ladder.

- Stepladders must be fully opened to permit the spreader to lock. Never use a stepladder leaning against a wall or form.

- You are PROHIBITED from standing or working from the top three rungs or cleats of any ladder unless you are firmly secured to the structure with a safety harness.

- Ladders must not be used near floor openings or edges where the worker could possibly fall over the guardrail protection.

- The use of metal ladders is restricted to special applications where heavier wooden ladders are not considered practical.

- Metal ladders must not be used for electrical work or within 4 feet of open electrical apparatus, wiring, or other live electrical equipment. An adequate warning sign must be posted on all metal ladders warning of these safeguards, which states " Caution- Do Not Use Around Electrical Equipment".

SCAFFOLDING
Each scaffold MUST be inspected prior to initial use and after any alteration, repair or moving.
General Rules

- There is no such thing as a temporary scaffold. All scaffolding must be erected and maintained to conform to all established requirements.

- All scaffolds must be designed to support all dead, live and wind loads to which they will be subjected.

- Gaurdrails and midrails must be installed on all open sides and ends on any scaffold more than seven (7) feet in height above the working surface or adjacent to floor wall openings.

- Toeboards must be provided on scaffolds at locations where persons are required to work or pass under the scaffold.

- Guardrails, midrails and toeboards should be constructed from components furnished by the manufacturer. When this is not possible lumber graded "select", which is sound and free of defects, must be used. Always use 2 x 4 inch lumber for guardrails and 1 x 4 inch lumber for toeboards.



EXH

- Scaffold planks must be at least 2 x 10 inch, scaffold grade ("Select Structural") lumber or equivalent, and span not more than one foot for each one inch of the plank width between the end supports.

- Scaffold planks should be cleated and must extend beyond the end supports at least six (6) inches—but not more than twelve (12) inches.

  All scaffolds MUST be at least two planks wide regardless of height. The planks should cover the entire space between the uprights—but in no case be further than eight (8) inches from the outside guardrail and 14 inches from the building or structure. NO EMPLOYEE SHALL WORK FROM A SINGLE PLANK.

- Scaffold planks must be visually inspected before each use. Defective or damaged planks must be destroyed immediately.

- Access ladders must be provided for every scaffold five (5) feet or more in height and must provide a safe and unobstructed means of access. Climbing any portion of a scaffold frame is prohibited unless their design incorporates an unobstructed and safe means of access with rungs 12 inches on-centers.

- Adequate mud sills or other rigid footing, capable of withstanding the maximum intended load, must be provided.

- When a screw jack is used, it must extend into the leg tube at least one-third (1/3) its length, but in no case can the exposed thread exceed 12 inches.

- Scaffolding must be tied to the building or structure at intervals that do not exceed 20 feet horizontally and vertically. At least one row of ties is required, regardless of the scaffold height.

- Do not overload any scaffold. Materials should be brought up as needed and not exceed 75 pounds. A scaffold must not be loaded in excess of one-forth (1/4) of its rated capacity.

- Makeshift scaffolds, barrels, boxes, kegs and similar unstable objects must never be used as work platforms or to support scaffolds or platforms. Their use will result in immediate discharge.

- A scaffold permit must be posted on the jobsite for any scaffold over three (3) stories or 36 feet in height. This must be obtained before scaffolding can be erected.

- Where workers are required to enter the structure by passing underneath a scaffold, a screen of 18-gauge 1 x 1 inch standard wire mesh or equivalent material must be installed between the toeboard and the top rail.

- Overhead protection id required if employees working on a scaffold are exposed to overhead falling hazards. Such protection must be 2-inch planking or equivalent.

- Ladders or other unstable objects must not be placed on top of scaffold platforms to gain greater height.

- Whenever the scaffolding is erected or used within six (6) feet of outside overhead electrical wiring less than 750 volts, positive insulation barriers and safeguards must be provided.

---



EXH

- Any damage to scaffolds, framework or other supporting structures must be repaired immediately and/or promptly taken out of service and clearly marked as such.

## Bracket Scaffolds

- All bracket scaffolds shall be designed and erected with a minimum safety factor of 4, computed by using maximum rated loads, including working loads, and such other loads as may be reasonably anticipated.

- If brackets are secured to walers held by snap ties or she-bolts, they must be extended through both wall forms and be properly secured before attaching bracket.

  Metal brackets must be spaced not more than 10 feet apart.

- Wooden brackets must be an integral part of the form panel and not be used to support loads exceeding 25 pounds per square foot. Ledgers of 2 x 6 material, not projecting more than 3 feet 6 inches from the form panel and spaced not more than eight (8) feet apart, must have connections rigidly secured by 5/8-inch diameter bolts. All planks must be nailed, wired or bolted to the ledgers.

- No more than two employees shall occupy any given 10 feet of a bracket scaffold at any one time.

- All bracket platforms must consist of at least two 2 x 10 planks extending not more than 18 inches or less than 6 inches beyond each end support.

- A ladder securely attached to the form panel must be provided as access to all bracket scaffold platforms. Omit only the midrail at the ladder end of the platform to provide access while providing sufficient guardrailing.

- Climbing or working from walers is not permitted at any time.

## Rolling/Tower Scaffolds

- The platform must cover the entire space between uprights and must be cleated with at least one-inch material at each end. A 1 x 6 toeboard must be attached to sides and end of the platform.

- At least 2 of the 4 casters must be swivel type, and the casters must be locked before anyone is permitted to climb or work aloft on any rolling scaffold.

- Lock pins, bolts or equivalent means of a positive type, including caster joints, must connect all joints.

- The height of a rolling scaffold must not exceed three (3) times the width of the scaffold base unless substantial outriggers are provided on both sides of the scaffold. Every rolling/tower scaffold must be rigid, square, plumb and self-supporting.

- No one person is permitted to move a rolling tower scaffold while persons are standing or working aloft.

- Guardrails, toeboards and access ladders must be provided on all rolling and tower scaffolds.

## WELDING AND BURNING OPERATIONS



EXH

Welding and burning operations have a high potential for personal injuries and fires.  When doing either you must follow these precautions: <u>General</u>

*   Before starting to burn or weld you must inspect you work area to ensure that sparks or molten metal will not fall on combustible materials or workmen.  If you cannot provide the necessary safeguards, do not proceed.

*   You must not weld or burn in a hazardous or "Hot Work" area without obtaining written authorization from the responsible authority including permits.

*   You must be sure that suitable fire extinguishing equipment is readily available in your work area.

*   You are responsible for maintaining your burning or welding equipment in a safe condition.  If you have any reason to believe that the equipment is defective or unsafe, do not use it.

*   When burning or welding you must wear appropriate eye and face protection with suitable filter lenses.

    Keep all welding leads and burning hoses up off walkways, passageways, stairs and any other location where they may create a tripping hazard or are exposed to physical damage.

*   Never weld or burn on barrels, tanks, piping or other systems that MAY have contained either combustible or unknown products without first obtaining approval.

<u>Welding</u>

*   If your eyes may be exposed to flying objects from chipping slag or other weld-cleaning activities, you must wear approved eye protection.

*   When you are arc welding near other workmen, they must be protected, if practical, from the arc rays by non-combustible screens or must wear adequate eye and face protection.

*   The frames of all welding machines must be grounded.

<u>Burning</u>

*   Do not use matches to light torches.  Spark igniters must be used.  Torches must not be used to light smoking materials.

*   When a crescent or 'special' wrench is required to operate the acetylene cylinder valve, the wrench must be kept in position on the valve while in use.

*   You must wear appropriate gloves, body and eye protection.

<u>Storage and Handling of Cylinders</u>

*   The protective caps must be kept on all cylinders whenever they are not in actual use.

*   All cylinders must be properly secured in the upright vertical position to prevent tipping.  Do not store or use them on their sides or adjacent to any floor/wall openings.

EXH



- Oxygen and acetylene cylinders, as well as other fuel gasses in storage, must be separated from each type by 20 feet or by a 5-foot high barrier that has a one-hour fire rating.

- Cylinders must never be taken into any confined space.

Ventilation and Protection
- Welding, burning and heating performed in various types of confined spaces may require general local or mechanical exhaust ventilation to reduce the concentrations of smoke and fumes above the acceptable levels. If adequate ventilation cannot be provided, employees must be provided with and are required to use air supplied breathing apparatus.

- In the open air, when cutting, heating or welding metals having toxic significance, such as zinc, lead, cadmium, chromium-bearing metals, or other similar protective coatings, you must wear filter type respirators and/or mechanical blowers must be used.

EXCAVATIONS AND TRENCHES
All excavations, trenching operations and work done in excavations and trenches MUST conform to all established safety requirements.  At no time can these minimum safety requirements be violated regardless of contrary orders by any supervisor except in rescue operations when time would not safely permit.  The Subcontractor must obtain a trench and excavation permit whenever a trench or excavation is over five (5) feet in depth and employees will be required or permitted to enter either.

All excavations must be sloped to an angle of at least ¾ to 1 or greater.  The slope must start at the bottom and continue at ¾ to 1 to the top.

- Materials must be placed two (2) feet or more from the edge of the excavation. Precautions must be taken to prevent such materials from falling into the excavation.

- All trenches five (5) feet or more in depth must be shored or sloped ¾ to 1 to the bottom of the trench. Trenches 5 feet to 10 feet in depth must be shored from 4 to 6 foot centers.

- If the soil conditions are determined to not be stable and totally self-supporting, shoring must be installed at closer centers, or sloping done at a greater angle, for property safety.

- Every wall of an excavation must be inspected daily by the responsible supervisor.  Your responsible supervisor must be in the near proximity of any excavation where employees are working.  If evidence of cave-ins or slides is apparent, all work in the excavation must cease until necessary safety precautions have been taken to safeguard employees.

- Where vehicles or equipment operate near excavations or trenches, the sides of the excavation must be shored or braced as necessary to withstand the forces exerted by the superimposed loads.  Also, stop logs or other substantial barricades must be installed at the edge of such excavations.

EXH

# WINMAR

CONSTRUCTION

- Materials used for sheathing, shoring or bracing must be in good condition.  Timbers must be sound, free of large or loose knots, and of adequate dimension.

- A substantial casing, which extends the full depth of the shaft, must protect employees working in bell-bottom pier holes.  When working in such holes you must wear a shoulder harness secured to a lifeline that is tended full time by workmen above.

- Safe access must be provided into all excavations by means ladders, stairs or ramps within 25 feet of lateral travel distance.  If ladders are used, they must extend at least three (3) feet above grade level.

- Walkways or bridges with standard guardrails must be provided where employees or equipment are required or permitted to cross over excavations or trenches.

- Always examine the trench or excavation before backfilling, so as to be positive no one is in it.

- In locations where oxygen deficiencies or concentrations of hazardous or explosive gasses or dust are possible, the atmosphere in the excavation must be tested by an independent lab prior to the start of work and at frequent intervals, and records of same must be maintained at the jobsite.

# EXHIBIT 2



# SUBCONTRACT AGREEMENT
## MADE BETWEEN:

Iron Kingdom, Inc.
4904 Lawrence Street
Hyattsville, Maryland 20781

THE SUBCONTRACTOR Dated: 03.03.2022

## AND

WINMAR CONSTRUCTION INC.
1010 Wisconsin Ave., Suite 150
Washington, D.C. 20007

THE CONTRACTOR

---

## THE PROJECT:

Job Number:    **221-028**
Job Name:      AMEX Centurion Lounge
Location:      Ronald Reagan National
               Airport - DCA
               Arlington, Virginia
               The above information <u>must</u> appear on all financial documents for proper processing.

## THE OWNER:

American Express TRS CO INC
World Financial Center
200 Vesey Street
New York, New York 10285

## THE ARCHITECT:

Perkins & Will
1250 24th Street NW
Suite 800
Washington, DC 20037

## THE CONTRACT SUM:

The Contractor shall pay the Subcontractor in current funds for performance of this Contract:

$ 948,000.00 (Nine Hundred Forty-Eight Thousand and 00/100 Dollars) subject to terms and conditions herein.

## THE SCOPE OF WORK:

The scope of services shall be provided in the same manner and to the same extent as the Contractor, W i n m a r , is bound to the Owner in the Prime Contract, (the "Prime Contract" or "Contract for Construction"), including the terms and conditions attached as Exhibit "D" as the same shall be applicable to the Work and this Subcontract Agreement. The provisions of the Prime Contract as set forth in Exhibits attached, are incorporated in this Subcontract agreement by reference with the same force and effect as though herein set forth in full. The Contract Sum shall include all applicable Sales, Use, Delivery, etc. taxes associated with the work herein.

---



2

## CONTRACT DOCUMENTS:
- Exhibit A: Drawing List and Specifications
- Exhibit B: Scope of Work
- Exhibit C: Project Schedules
- Exhibit D: Building Rules and Regulations
- Exhibit E: Prime Provisions to the Subcontract Agreement.
- Exhibit F: Requisition Requirements for the Subcontract Agreement
- Exhibit G: Notice to Proceed
- Exhibit H: Safety Requirements

## TIME IS OF THE ESSENCE:
This is a time is of the essence Subcontract. The times and dates specified in this agreement are vital and mandatory to the Prime Contract. The Subcontractor shall proceed with work at such time and in such sequence as the Contractor may direct including overtime performance as may be necessary and as required by Schedule of Progress which may be subject to change as working conditions require. If overtime is required solely to accelerate project completion, it shall be authorized in writing and be paid for by the Contractor. Payments due may be withheld to insure timely progress and completion of work. The Subcontractor shall be liable for all losses and damages incurred by the Contractor (including consequential damages) due to inexcusable delay of the Subcontractor in the performance of the work, including delay costs not reimbursable from the Owner due to inexcusable incurred delays of the Subcontractor.

The date of **Substantial Completion** shall be 1.06.2023

Substantial Completion is defined as the stage of a construction of the project that is sufficiently complete, in accordance with the construction contract documents and regulatory requirements, so that the Owner may use or occupy the project premises or designated portion thereof for its intended purpose.

3 Days prior to Substantial Completion, the Subcontractor shall submit a comprehensive list of items to be completed or corrected in accordance with the Contract Documents to the Contractor. The Punch List shall be issued by the Contractor, augmented by items identified by the Architect and his consultants.

The **Punch List Completion Period** is 2.3.2023 after **Substantial Completion**.

The Punch List period shall last for 15 working days from the Substantial Completion date or an extended date, as may be provided by Change Order.

The date of **Final Completion** shall be 2.3.2023 The date of Final

Completion may only be extended by Change Order.

## RECITALS:
- The Contractor has a contract with the Owner for the construction of improvements to the Project in strict accordance with the terms of all Contract Documents forming a part of the Prime Contract.

- The Subcontractor has examined and is familiar with the Contract Documents comprising the Prime Contract all of which are available to the Subcontractor.

- The Subcontractor warrants that it is familiar with the Work and is capable of performance by reason of experience and expertise and is duly licensed to perform the Work and is able to address and staff the Work with qualified personnel at the times required. Subcontractor also warrants that it validly holds all federal, state, local and other governmental consents, licenses, permits or other authorizations required to permit it to perform its obligations under this Agreement and that all are current.





- The Contractor, Inc. is committed to achieving equal employment opportunities. No person or firm shall be discriminated against because of race, color, national origin, or gender in the award of the Contractor contracts or subcontracts. Neither party shall discriminate on the basis of race, color, national origin, or gender in the performance of this contract.

## 1. THE WORK TO BE PERFORMED UNDER THIS SUBCONTRACT:

o All work shall be performed as described in the Scope of Work in strict accordance with all the Contract Documents (including, but not limited to, Prime, Special and Supplemental Conditions), and all subsequently and duly issued modifications thereto, and Subcontractor shall perform all labor, supervision, plant equipment, supplies and materials necessary to complete the work and such incidental work as may be reasonably required to allow complete installation of all functioning components of the work for the Project whether specifically described or not.

o Subcontractor shall perform and coordinate its Work with that of the Contractor and all other Subcontractors for the most efficient construction of the Project as a whole.

o Subcontractor is bound to the Contractor in the same way and under the same terms and conditions as the Contractor is bound to the Owner by the Prime Contract. A copy of the Prime Contract is available for review upon request (except that compensation provisions may be deleted). Subcontractor agrees to conform to all provisions of the Prime Contract and assumes toward the Contractor the same rights, duties, obligations and liabilities as the Contractor has assumed to the Owner but as limited to the Scope of the Work shown herein. Any inconsistencies between the Prime Contract and this subcontract shall be governed by the Prime Contract.

## 2. PAYMENTS:

o The contract sum, which includes all sales and use taxes, licenses, shall be paid in periodic installments based on requisitions for payment made in the manner and on forms prescribed by the Contractor on or before the twentieth day of the month for work properly performed as of the twentieth of the month. Subcontractor shall be paid an amount equal to 90% of the amount of the work within fifteen (15) days after Contractor's receipt of payment. Contractor's receipt of payment by the Owner shall be a condition precedent to the obligation of Contractor to make any payment to the Subcontractor. Payment shall not constitute acceptance of any non-conforming or defective work.

o Final Payment shall be due within fifteen (15) days after final acceptance of the Project by Owner, Architect and Contractor's receipt of its final Payment from Owner. Final Payment to the Subcontractor shall not be construed as acceptance of any non-conforming or defective work whether latent, patent, known or unknown.

o As a condition precedent to any payment, Contractor may require proof of payment for all labor, materials and sub-sub-contracts previously performed, affidavits of payment or payroll certification, releases of mechanics liens, and adjustment of all accounts between Subcontractor and Contractor.

o Contractor shall not pay for any work not authorized in writing.

o Subcontractor must have in place and on file with the Contractor a current W-9 and Certificate of Insurance naming Contractor as insured prior to release of any funds on the Project.

## 3. PERFORMANCE AND PROGRESS:

o Subcontractor agrees to schedule its work as directed by Contractor in order to coincide with the work of all other trades to ensure the orderly progress of the Project. Contractor may from time to time adjust the progress schedule as necessary to diligently prosecute the work. Subcontractor agrees to attend all progress meetings and to promptly furnish such schedules, plans, charts and critical path analyses as may be helpful in expeditiously completing the work.



# **ꟽ winmar**

4

- o Subcontractor agrees to furnish sufficient labor, equipment, materials and supervision including overtime necessary to ensure the completion of the work according to the progress schedule established by the Contractor.

- o If the Contractor determines that the Subcontractor has failed to meet the progress schedule or fails to properly schedule or fails to properly perform the work in strict accordance with the contract documents after 24 hours' notice, Contractor may: 1) require Subcontractor to increase its forces, work overtime or take other measures to increase production or; 2) employ other forces to perform portions of the work at Subcontractor's expense. If Subcontractor shall continue after 24 hours to fail to meet the progress schedule or to properly perform the work in strict accordance with the contract documents, the Contractor may terminate this Subcontract Agreement, in which case the Contractor may take control of all tools, materials and equipment of the Subcontractor on the Project and complete the work with its own or other forces.

- o If the Subcontractor shall fail to properly perform its Work in a timely manner as a result of which the completion of the Project is delayed, Subcontractor shall reimburse Contractor all liquidated damages or other delay damages suffered by the Contractor. Contractor shall have the right to reasonably and fairly apportion such delays among any subcontractor or other party responsible for such delays whether or not concurrent or consecutive.

- o If the Subcontractor shall fail to make full and timely payment of all moneys due to its Subcontractors, suppliers, or creditors, the Contractor may, at its sole option, withhold funds from Subcontractor's entitlements under this Agreement or any other funds owing to Subcontractor from any or all other contracts or agreements between Subcontractor and Contractor.

- o The Subcontractor shall check all work performed by others necessary to "receive" the Subcontractor's work. Failure to give notice of any discrepancy shall relieve the Contractor of any responsibility therefore. The Subcontractor shall be responsible for all field measurements and shall check elevations and grades to insure proper fitting of its work. It shall not be incumbent upon the Contractor to discover any mistakes, errors, omissions or deviations from the contract requirements in the subcontract drawings, and the Owner's final approval of drawings made by the Subcontractor shall not relieve the Subcontractor from responsibility for unauthorized changes, deviations or omissions or for errors of any sort in its drawings.

- o Subcontractor shall be responsible for all protections required at their materials, processes and Work; underway or complete.

## 4. WORKMANSHIP:
- o The Subcontractor warrants that all of its work shall be in strict conformity to all Contract Documents, building codes, applicable laws, ordinances and regulations, performed in a first class workmanlike manner and that all of the Work will be free of defects in materials, workmanship or design.
- o The Subcontractor warrants that its shop drawings and design submittals shall be in compliance with the Contract Documents and all applicable safety regulations and are prepared using the best engineering practices to produce a safe, functioning and efficient component of the Project.

- o Subcontractor agrees to immediately remove and replace any work or component which is determined non-conforming or defective.

## 5. SUPERVISION
- o The Subcontractor agrees to furnish a fit, experienced and competent supervisor, acceptable to Contractor and authorized by Subcontractor to act on its behalf on all job matters at all times when the Work is in progress.

## 6. CHANGES TO THE WORK:





- Contractor or Owner may by written order and without invalidating the Agreement, make any changes within the Prime Scope of the Work at any time without notice to sureties. Subcontractor agrees to promptly execute such changes, additions, deletions or revisions without delay. If such changes cause an increase or decrease in the cost of the Work or in the time required for completion, Subcontractor shall promptly submit to Contractor its claim for adjustment in cost or time within ten (10) days or such shorter time as the Prime Contract may require.

- Subcontractor shall be entitled to an equitable adjustment of the Contract sum or time of performance only to the same extent and according to the same provisions as Contractor's equitable adjustment from the Owners. Subcontractor's allocable share of Contractor's equitable adjustment shall be fairly and reasonably determined by Contractor after allowance for Contractor's cost or presenting and recovering the claim, normal overhead and profit and apportionment's to other affected Subcontractors. Under no circumstances shall Subcontractor's entitlement exceed the Contractor's entitlement after deduction of the expenses and costs described above.

- No claim of Subcontractor for additional compensation or time shall be allowed unless Subcontractor shall have given notice in writing of any change, changed condition or claim for equitable adjustment within the time and in compliance with all provisions and requirements of the Contract Documents.

- Under no circumstances shall Contractor be liable to Subcontractor for damages resulting from delays or acceleration of the work or loss of productivity. Contractor's liability to Subcontractor is strictly limited to allocation of damages recovered from and time extensions allowed by the Owner for the Subcontractor Scope of Work. Time extensions shall be Subcontractor's sole remedy for delays caused solely by the Contractor.

- The following percentage mark-up shall apply to all change work request. Subcontractors and suppliers shall receive no more than 5% overhead, logistics and general conditions, and no more than 5% profit on the cost of the change order.

## 7. INSURANCE:

- Insurance shall be primary and non-contributory and shall name the Contractor as an additional insured for limits of:

Comprehensive Prime Liability Insurance:

| | |
|---|---|
| • Occurrence Limit | $1,000,000 |
| • Personal Injury | $1,000,000 |
| • Prime Aggregate | $2,000,000 |

Products-Completed Operations:

| | |
|---|---|
| • Aggregate | $2,000,000 |
| • Business Auto Insurance for all vehicles used by Subcontractor, its servants, agents, subcontractors and suppliers on jobsite: | $1,000,000 |
| • Workers' Compensation | Statutory Limits |
| • Employers' Liability | $500,000/$500,000/$500,000 |
| • Umbrella/Excess Liability | $4,000,000 |

EXH



10

- o Insurance carriers must provide 30 days notice of cancellation of policies. Replacement of cancelled policies must occur without lapse in coverage. The Subcontractor shall submit insurance certificates to the Contractor before beginning work, but in no event later than 30 days after signing contract. In no event shall the Subcontractor initiate any Work on-site without a completed Certificate of Insurance filed with the Contractor.

- o Subcontractor insurance shall remain in place for completed operations throughout the warranty period, but in no case less than one (1) year from the date of Substantial Completion of the Project

- o The Subcontractor waives all rights against (1) Contractor and any of their subcontractors, sub-subcontractors, agents and employees, each of the other, and (2) the Owner, the Architect, the Architect's consultants, separate contractors, and any of their subcontractors, sub-subcontractors, agents and employees for damages caused by fire or other causes of loss whether covered by property insurance provided under the Prime Contract or other property insurance applicable to the Work or not, except such rights as they may have to proceeds of such insurance held by the Owner as a fiduciary. The Subcontractor shall require of the Subcontractor's Sub-subcontractors, agents and employees, by appropriate agreements, written where legally required for validity, similar waivers in favor of the parties enumerated herein. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged

## 8. INDEMNIFICATION:

To the fullest extent permitted by law, the Subcontractor shall fully indemnify, defend and hold harmless Owner, Contractor, Architect, Architect's consultants and agents and all employees and agents of any of them, from and against all suits, claims, actions, lawsuits by Subcontractor's employees, judgments, damages, losses, injuries, death, and expenses (including but not limited to attorney's fees and litigation expenses) arising directly or indirectly out of, or in connection with, the obligations herein undertaken or resulting out of, or in connection with, operations conducted by (or in the work area of) the Subcontractor, the Subcontractor's Sub-contractors, anyone directly or indirectly employed by them or anyone for whose acts they may be liable. All of Subcontractor's indemnity obligations agreed to herein shall be binding on Subcontractor without regard to whether such claim, damage, loss or expense is caused in whole or in part by a party indemnified hereunder.

## 9. SURETY BOND:

- o Subcontractor shall furnish Payment and Performance Bonds with corporate surety acceptable to the Contractor in the contract sum prior to the commencement of work if so requested. Pricing for Bonds required shall be reimbursed Subcontractor at cost not to exceed 3% of contract value. Please submit alternate cost for bond.

## 10. DISPUTES:

- o In the event of a dispute, claim or disagreement of any kind relating to this agreement, Subcontractor shall avail itself of a dispute resolution process with Contractor; for any claim not resolved by this process the method of binding dispute resolution shall be litigation in the courts of the District of Columbia.

## 11. SHOP DRAWINGS, SAMPLES AND DATA SUBMISSIONS:

- o All submittals such as shop drawings, catalogs, samples and material lists required by Prime Contract which pertain to this work shall be furnished complete and timely. Subcontractor shall be responsible for delays because of failure to do so and for any deviation from plans and specifications. All deviations from the Prime Contract documents must be noted clearly on the submittals, and by separate cover letter the Subcontractor shall  state reasons for the deviation and refer to the applicable contract provision.

Submittals are due within 3 weeks after receipt of draft contract or letter of intent.

---



EXH

# ᄢᄀ **winmar**

11

## 13. EXTENSION OF TIME:

o Subcontractor shall be entitled to an extension of time for performing and completion the work covered by this agreement upon the same terms and conditions an extension of time is allowable and only to the extent actually allowed to the Contractor by Owner, or its representative, under the terms of the Prime Contract. Notice of the excusable delay shall be given to the Contractor in writing within three (3) calendar days from the beginning of said delay in order that the Contractor may in turn notify the Owner, and if not given timely, said excusable delay may be considered waived. The Owner's decision, or its representative, with regard to the delay, including the assessment of liquidated damages, shall be binding upon and chargeable to the Subcontractor, subject only to the disputes procedure provided in the Prime Contract.

## 14. DAMAGES FOR DELAY:

o The Contractor shall not be liable to Subcontract for unforeseeable delay occurring beyond the Contractor control or for delay caused by Owner or other subcontractor. Subcontractor shall be entitled to reimbursement for any damages for delays recovered from the Owner only, and the Subcontractor shall have the right, at its expense, against the Owner to exercise all provisions of the Prime Contract to recover said damages. Time extension only shall be granted for delays caused solely by the Contractor, or force majeure.

## 15. SCHEDULE:

o The Contractor intends to schedule this project using CPM Schedule techniques. In such event, Subcontractor agrees to meet with the Contractor and to provide the necessary detailed information to properly depict activities, including their cost and duration, at no additional cost to the Contractor. All such data shall be provided within fifteen (15) days of Winmar's written notice and request.

## 16. DEFAULT TERMINATION:

o The following shall be deemed a breach of this agreement. Failure to fulfill any obligation of this Subcontract or of the Prime Contract concerning the Subcontractor's work or responsibilities; failure to pay for labor and material, payroll taxes, contributions or insurance premiums, failure to maintain the project schedule, interference with the performance of the work by others for any reason; an act of bankruptcy or insolvency. If the Subcontractor breaches the Subcontract, the Contractor may terminate Subcontractor's right to proceed upon three (3) days written notice. The Contractor may then have the work completed and may use Subcontractor's material, supplies, tools and equipment to complete. Subcontractor and its surety shall continue liable for all cost to complete and any damages and expenses including reasonable counsel fees, liquidated damages assessed by Owner and other liabilities which may result from the default and breach, without waiver or any other rights or remedies available to the Contractor, including right of setoff and collection of any funds which may due Subcontractor under other subcontracts with the Contractor

## 17. EXTRA WORK:

o Only extra work authorized by the Contractor as an extra or change in writing shall be paid for. If the extra work direction does not originate from Owner's direction and there is no prior agreement on price, then Subcontractor shall be paid for the costs of said work plus ten percent (10%) for overhead, profit, supervision and small tools, which will constitute the entire amount due the Subcontractor for the extra work.

## 18. OWNER CHANGES:

o Changes ordered by Owner shall be performed and paid for in accordance with the terms of the Prime Contract, including all rights of dispute and appeal, provided reservation and exercise of said rights do not interfere with the progress of the work.

## 19. CONTRACT INTERPRETATION:

o The Contractor interpretation of contract requirements shall be binding upon Subcontractor and complied with, except that Subcontractor shall have the right to claim adjustment of the contract because of said interpretation, if claim in writing is made within forty-eight (48) hours after ruling and direction.

---

EXH

# ⬚⬚ winmar

12

## 20. DISPUTES:

o Disputes arising out of Owner Acts, omissions, or responsibilities shall be resolved in accordance with the disputes procedures in the Prime Contract. Subcontractor shall have the right to exercise those rights at its sole cost and shall be bound thereby. the Contractor shall have no direct liability except to give Subcontractor opportunity to exercise rights in the Prime Contract. Disputes with the Contractor shall be resolved by arbitration in accordance with the rules of the American Arbitration Association. Disputes shall not interfere with the progress of the job. Work shall proceed as ordered, subject to claim.

## 21. BACKCHARGES:

o All charges and back charges assessed by the Contractor against the Subcontractor shall be deemed accepted unless rejected in writing within (30) days.

## 22. PLANT AND CLEANUP:

o Subcontractor shall provide its own plant and facilities, including scaffolding and hoists, do its own cleanup, and repair or replace damaged, defective and defaced work caused by its own negligence. The Subcontractor shall cleanup and remove from the site all of its rubbish, debris etc. on a daily basis, unless the Contractor directs otherwise. Upon completion of the subcontract work, all Subcontractor's materials, equipment, etc., must be immediately removed from the jobsite by Subcontractor. Failure to comply will permit the Contractor to do so and back charge Subcontractor for the cost. If Subcontractor uses the Contractor's hoist, crane, scaffolding or facilities, it will be responsible for the operating expenses of such equipment when in use for the Subcontractor's benefits.

## 23. BANKRUPTCY AND DELIQUENT TAXES:

o In the event of any act of bankruptcy or Subcontractor creditor claim against the Contractor or its surety, or notice of levy involving delinquent taxes, the Contractor shall have the right to withhold payments and apply the same to secure performance of the Subcontract without prejudice to all other rights against Subcontractor or its surety.

## 24. RESPONSIBILITY FOR WORK IN PLACE:

o The Subcontractor shall check all work performed by others necessary to "receive" the Subcontractor's work. Failure to give notice of any discrepancy shall relieve the Contractor of any responsibility therefore. The Subcontractor shall be responsible for all field measurements and shall check elevations and grades to insure proper fitting of its work. It shall not be incumbent upon the Contractor to discover any mistakes, errors, omissions or deviations from the contract requirements in the subcontract drawings, and the Owner's final approval of drawings made by the Subcontractor shall not relieve the Subcontractor from responsibility for unauthorized changes, deviations or omissions or for errors of any sort in its drawings.

## 25. LICENSES AND FEES:

o Subcontractor shall be responsible for all taxes, licenses necessary to perform its work, including any increase therein, if any, during the life of the Subcontract.

## 26. LABOR FORCE:

o Subcontractor shall be responsible for performance regardless of any interference of any trades council or other labor or union organization. Any work stoppage by employees which will unreasonably delay the work will be a breach of the Subcontract subject to the rights set forth in Paragraph 15.

## 27. NONDISCRIMINATION:

o Subcontractor shall not discriminate against any employee or applicant for employment, advancement, transfer, layoff or termination because of race, religion, color, gender, or national origin. All Equal Opportunity or affirmative action requirements of the Prime Contract shall be obligations of the Subcontractor.

## 28. SUPERINTENDENCE:

o Subcontractor shall employ on the jobsite a competent Superintendent, satisfactory to the Contractor with full



EXH

# ⊔⊓ winmar

13

authority to act on Subcontractor's behalf. The Contractor shall have the right to require replacement.

## 29. PATENT INFRINGEMENT:
o Subcontractor shall indemnify the Contractor from any use of infringement of patents.

## 30. TERMINATION FOR CONVENIENCE:
o the Contractor shall have the right to terminate this agreement for its own convenience for any reason by giving notice of termination effective upon receipt thereof by Subcontractor. Termination for default under Paragraph 16, if wrongfully made, shall be treated as a termination for convenience. Settlement of the contract shall be accomplished in accordance with the provisions of the Termination for Convenience clause in the Prime Contract. If not, the Subcontractor shall be paid only the actual cost for work and labor in place, plus fifteen percent

(15%), or a prorata percentage of the Subcontract equal to the percentage of completion whichever is less. Subcontractor shall not be entitled to anticipated profits on unperformed portions of the work.

## 31. ASSIGNMENT:
o No assignment hereunder is allowed without written approval of the Contractor

## 32. NOTICES:
o All notices required under this subcontract or the Prime Contract shall be addressed to Contractor's office located at 1010 Wisconsin Ave, NW, Suite 303 Washington, DC 20007. Notices required by the various provisions of the Prime Contract (not otherwise dealt with herein) shall be due in the Contractor's office in one-half (1/2) the time specified in the Prime Contract so that the Contractor will have sufficient time to forward its notice within the required period. Failure of Subcontractor to forward notices in a timely manner as required by the various equitable adjustment provisions of the Prime Contract shall operate to waive its rights to any such adjustments if the Owner rejects the claim.

## 33. OWNER APPROVAL:
o This Agreement is contingent upon Subcontractor or its product being approved by the Owner. If a disqualification occurs because of failure to comply with and strictly fulfill the obligations herein, said failure shall be deemed a breach by the Subcontractor. Any other rights of disqualification by Owner shall render this Agreement null and void.

## 34. RECITATION AND SEVERABILITY:
o Attachments are part of this Agreement. If this Agreement is retained by Subcontractor without executing and returning same within ten (10) days, it shall be deemed accepted; however, acceptance in writing is a condition precedent to payment to due hereunder. The Subcontractor shall not deal directly with or work directly for Owner. This instrument is the entire Agreement between the parties. If any provisions herein are held to be invalid by any competent court, the remaining Agreement shall survive. This Agreement shall control any inconsistency in any documents referred to or incorporated by reference.

## 35. OSHA:
o The Subcontractor shall comply with OSHA and State-equivalent standards and requirements and shall indemnify the Contractor from any failure to do so, including fines and abatement costs and delays to project. Failure to comply shall be a breach of contract, subject to the provisions of Paragraph 16.

## 36. WARRANTY:
o The Subcontractor warrants to the Owner, Architect and Contractor that materials and equipment furnished under this Subcontract will be of good quality and new, unless otherwise required or permitted by the Subcontract Documents, that the Work of this Subcontract will be free from defects not inherent in the quality required or permitted, and that the Work will conform to the requirements of the Subcontract Documents. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. The Subcontractor's warranty excludes remedy for damage or defect caused by abuse, modifications not executed by the Subcontractor, improper or insufficient maintenance, improper operation, or normal wear



EXH

**ɰɱ winmar**

14

and tear under normal usage. This warranty shall be in addition to and not in limitation of any other warranty or remedy required by law or by the Subcontract Documents. Warranty shall extend for a period of one (1) year after the issuance of Final Certificate of Completion of the Project or such longer period of time as the Contract Documents shall require. Subcontractor agrees to correct any defect, latent or patent, arising within the warranty period, without additional cost.

## 37. MISCELLANEOUS:

○ This Subcontract Agreement shall be governed by the laws of Washington DC. Any claim arising out of or relating to this Agreement shall be settled in the District of Columbia.

○ No changes, amendments or modifications of this contract shall be valid unless in writing and signed by the parties.

**CONTRACTOR:**
WINMAR CONSTRUCTION INC.

By:

WINMAR CONSTRUCTION INC.

Date: 3/17/2022

**SUBCONTRACTOR:**

Iron Kingdom, Inc.

By:

Title: PRESIDENT

Date: 16 MARCH 2022

Subcontractor shall sign and return one copy for the Contractor's file.



**Exhibit A**
**Drawing List**
**Specification List**



# THE CENTURION LOUNGE

# EXHIBIT A.1 - DRAWING INDEX

## Current Drawings

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| **General** | | | | | |
| GN00.00 | Cover Sheet | | | | |
| GN01.00 | INDEX OF DRAWINGS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| GN02.00 | SITE LOGISTICS DESCRIPTION | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| GN02.02 | SITE LOGISTICS PLANS- CONCOURSE LEVEL | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| GN02.03 | SITE LOGISTICS PLANS- TICKETING LEVEL | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| GN02.20 | SITE LOGISTICS ELEVATIONS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| GN04.00 | CODE COMPLIANCE DATA | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| GN04.01 | CODE COMPLIANCE- ENVELOPE PERFORMANCE | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| GN04.02 | OVERALL LIFE SAFETY PLAN- CONCOURSE LEVEL | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| GN04.12 | LIFE SAFETY PLAN- CONCOURSE LEVEL | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| GN04.13 | LIFE SAFETY PLAN- TICKETING LEVEL | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| GN05.01 | ACCESSIBILITY DIAGRAMS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| GN05.02 | ACCESSIBILITY DIAGRAMS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| GN05.03 | ACCESSIBILITY DIAGRAMS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| GN05.04 | TYPICAL MOUNTING HEIGHTS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| GN06.01 | FIRE RESISTANCE DETAILS AND DIAGRAMS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| GN06.02 | FIRE RESISTANCE DETAILS AND DIAGRAMS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| GN06.03 | FIRE RESISTANCE DETAILS AND DIAGRAMS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| **Civil** | | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| C100 | TRAFFIC CONTROL PLAN | | | | |
| C101 | TRAFFIC CONTROL PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| C700.00 | General Notes, Abbreviations, and Symbols, Survey Controls | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| C701.00 | Existing Conditions Plan | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| C702.00 | Demolition Plan | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| C703.00 | Erosion and Sediment Control Plan | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| C703.01 | Site Plan | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| C703.02 | Utility Plan | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| C703.03 | Grading Plan | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| C705.00 | Erosion and Sediment Control Notes | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| C705.01 | Erosion and Sediment Control Details | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| C705.02 | Erosion and Sediment Control Details | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| **Architectural** | | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| A00.00 | GENERAL NOTES, SYMBOLS AND ABBREVIATIONS | | | | |
| | | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |

Case 1:24-cv-00968-JEB   Document 9   Filed 05/07/24   Page 90 of 152




# THE CENTURION LOUNGE

# EXHIBIT A.1 - DRAWING INDEX

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| AR01.00 | SITE PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| AR02.02 | DEMOLITION PLAN- CONCOURSE LEVEL | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| AR02.03 | DEMOLITION PLAN- TICKETING LEVEL | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| AR02.12 | DEMOLITION RCP- CONCOURSE LEVEL | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| AR02.20 | DEMOLITION ELEVATIONS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| AR02.40 | DEMOLITION DETAILS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| AR03.02 | FLOOR PLAN- CONCOURSE LEVEL | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| AR03.02A | PARTITION PLAN- CONCOURSE LEVEL | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| AR03.03 | FLOOR PLAN- TICKETING LEVEL | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| AR03.03A | SLAB PENETRATION PLAN- TICKETING LEVEL NORTH | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| AR03.03B | SLAB PENETRATION PLAN- TICKETING LEVEL SOUTH | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| AR03.03C | PARTITION PLAN- TICKETING LEVEL NORTH | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| AR03.03D | PARTITION PLAN- TICKETING LEVEL SOUTH | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| AR03.04 | ROOF PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| AR03.04A | ROOF PENETRATION PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R03.12 | RCP PLAN- CONCOURSE LEVEL | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R03.13 | RCP PLAN- TICKETING LEVEL | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R03.22 | LIGHTING ZONES PLAN- CONCOURSE LEVEL | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R03.23 | LIGHTING ZONE PLAN- TICKETING LEVEL | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R03.32 | FINISH PLAN- CONCOURSE LEVEL | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R03.33 | FINISH PLAN- TICKETING LEVEL | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R03.42 | FURNITURE PLAN- CONCOURSE LEVEL | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R03.43 | FURNITURE PLAN- TICKETING LEVEL | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R03.52 | SIGNAGE LOCATION PLAN- CONCOURSE LEVEL | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R03.53 | SIGNAGE LOCATION PLAN- TICKETING LEVEL | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R04.01 | ENLARGED PLANS - ENTRANCE | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R04.02 | ENLARGED ELEVATIONS - ENTRANCE | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R04.03 | ENLARGED PLAN, RCP AND INTERIOR ELEVATIONS - EMPLOYEE LOUNGE AREA | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R04.04 | ENLARGED PLAN, RCP AND INTERIOR ELEVATIONS - RECEPTION AREA | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R04.05 | ENLARGED PLAN, RCP AND INTERIOR ELEVATIONS - GALLERY | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R04.06 | ENLARGED PLAN, RCP AND INTERIOR ELEVATIONS - WORK SPACE & LOUNGE 2 | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R04.07 | ENLARGED PLAN, RCP AND INTERIOR ELEVATIONS - QUIET LOUNGE AREA | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R04.08 | ENLARGED PLAN, RCP AND INTERIOR ELEVATIONS - MULTIPURPOSE ROOM & PHONE ROOM | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R04.09 | ENLARGED PLANS - CAFE | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R04.10 | ENLARGED ELEVATIONS - CAFE | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R04.11 | ENLARGED PLAN, RCP AND INTERIOR ELEVATIONS - RESTROOMS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R04.12 | ENLARGED PLAN, RCP AND INTERIOR ELEVATIONS - SHOWER ROOM & STAFF RESTROOM | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R04.13 | ENLARGED PLANS - KITCHEN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |

Case 1:24-cv-00968-JEB   Document 9   Filed 05/07/24   Page 91 of 152



# THE CENTURION LOUNGE

# EXHIBIT A.1 - DRAWING INDEX

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| AR04.14 | ENLARGED ELEVATIONS- KITCHEN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| AR05.01 | EXTERIOR ELEVATIONS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| AR05.02 | EXTERIOR ELEVATIONS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| AR05.03 | BUILDING ENVELOPE SYSTEM AND EXTERIOR GLASS INFORMATION | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| AR06.01 | OVERALL SECTIONS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| AR06.02 | OVERALL SECTIONS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| AR06.03 | OVERALL SECTIONS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| AR06.10 | WALL SECTIONS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| AR07.01 | STAIR PLANS, SECTIONS & DETAILS - LOUNGE ENTRANCE | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| AR07.02 | STAIRS DETAILS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| AR07.03 | ELEVATOR | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| AR07.04 | RAMP AND PLATFORM STEPS ENLARGMENT AND DETAILS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| AR08.10 | EXTERIOR DETAILS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| AR08.11 | EXTERIOR DETAILS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| AR08.12 | EXTERIOR DETAILS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| AR08.13 | EXTERIOR DETAILS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R08.14 | EXPANSION JOINTS KEY PLANS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R08.15 | EXPANSION JOINT COVER DETAILS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R08.21 | INTERIOR DETAILS- GALLERY | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R08.22 | INTERIOR DETAILS - RECEPTION CASEWORK | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R08.23 | INTERIOR DETAILS - BEVERAGE COUNTER | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R08.24 | INTERIOR DETAILS - LIVING WALL | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R08.25 | INTERIOR DETAILS - BUFFET | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R08.26 | INTERIOR DETAILS - BAR | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R08.27 | INTERIOR DETAILS - NOOK & BANQUETTE | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R08.28 | INTERIOR DETAILS- FOOD AND BEVERAGE CEILING SCULPTURE | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R08.29 | INTERIOR DETAILS - MEDIA WALL | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R08.30 | INTERIOR DETAILS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R08.31 | INTERIOR DETAILS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R08.32 | INTERIOR DETAILS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R08.33 | INTERIOR DETAILS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R08.34 | INTERIOR DETAILS - RESTROOMS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R08.35 | INTERIOR DETAILS- TYPICAL MATERIAL TRANSITIONS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R08.40 | TYPICAL PENETRATION DETAILS - EXTERIOR | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R08.41 | TYPICAL PENETRATION DETAILS - EXTERIOR & INTERIOR | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R08.42 | TYPICAL SUSPENDED CEILING DETAILS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R08.43 | TYPICAL SUSPENDED CEILING DETAILS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R08.44 | INTERIOR TYPICAL PARTITION DETAILS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |


## THE CENTURION LOUNGE

# EXHIBIT A.1 - DRAWING INDEX

Case 1:24-cv-00968-JEB   Document 9   Filed 05/07/24   Page 93 of 152

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| R08.50 | TYPICAL BASE DETAILS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R08.51 | TYPICAL FLOOR TRANSITIONS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R09.01 | TYPICAL FINISH SCHEDULE | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R09.02 | TYPICAL FINISH & ACCESSORIES SCHEDULE | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R09.10 | TYPICAL EQUIPMENT, HARDWARE & FIXTURE SCHEDULES | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R09.20 | INTERIOR PARTITION TYPE CHARTS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R09.30 | DOOR SCHEDULE AND DETAILS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R09.31 | DOOR SCHEDULE AND DETAILS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R10.70 | OVERALL PORT PERSPECTIVES AND SIGNAGE | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R10.71 | GRAPHICS SCHEDULE | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R10.72 | GRAPHICS SCHEDULE | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R10.73 | GRAPHICS SCHEDULE | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| R10.74 | GRAPHICS SCHEDULE | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| **Structural** | | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| T00.01 | GENERAL NOTES | | | | |
| T00.02 | GENERAL NOTES & ABBREVIATIONS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| T00.03 | SPECIAL INSPECTIONS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| T00.04 | SPECIAL INSPECTIONS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| T00.05 | DESIGN LOAD PLANS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| T03.02 | FRAMING PLAN - CONCOURSE LEVEL | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| T03.03 | FRAMING PLAN - TICKETING LEVEL | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| T03.04 | ROOF FRAMING PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| T03.05 | HIGH ROOF FRAMING PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| T03.06 | STAIR FRAMING PLAN AND DETAILS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| T04.01 | COLUMN SCHEDULE AND DETAILS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| T04.02 | TYPICAL STEEL DETAILS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| T04.03 | TYPICAL STEEL DETAILS AND EXISTING STRUCTURE REINFORCEMENT DETAILS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| T04.11 | FLOOR FRAMING DETAILS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| T04.12 | FLOOR FRAMING DETAILS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| T04.13 | FLOOR FRAMING DETAILS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| T04.14 | FLOOR FRAMING DETAILS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| T04.21 | ROOF FRAMING DETAILS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| T04.22 | ROOF FRAMING DETAILS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| T04.23 | ROOF FRAMING DETAILS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| **Mechanical** | | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E00.01 | MECHANICAL COVER SHEET | | | | |
| E02.02 | MECHANICAL CONCOURSE DEMO FLOOR PLAN - DUCTWORK & PIPING | 2 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E03.02 | MECHANICAL CONCOURSE FLOOR PLAN - DUCTWORK | 2 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| | | 2 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |



# THE CENTURION LOUNGE

# EXHIBIT A.1 - DRAWING INDEX

Case 1:24-cv-00968-JEB   Document 9   Filed 05/07/24   Page 94 of 152

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| IE03.03 | MECHANICAL TICKETING FLOOR PLAN - DUCTWORK | 2 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| IE03.04 | MECHANICAL ROOF PLAN - DUCTWORK | 2 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| IE03.12 | MECHANICAL CONCOURSE FLOOR PLAN - PIPING | 2 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| IE03.13 | MECHANICAL TICKETING FLOOR PLAN - PIPING | 2 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| IE04.01 | MECHANICAL DIAGRAMS (SHEET 1 OF 5) | 2 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| IE04.02 | MECHANICAL DIAGRAMS (SHEET 2 OF 5) | 2 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E04.03 | MECHANICAL DIAGRAMS (SHEET 3 OF 5) | 2 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E04.04 | MECHANICAL DIAGRAMS (SHEET 4 OF 5) | 2 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E04.05 | MECHANICAL DIAGRAMS (SHEET 5 OF 5) | 2 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E09.01 | MECHANICAL SCHEDULES (SHEET 1 OF 3) | 2 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E09.02 | MECHANICAL SCHEDULES (SHEET 2 OF 3) | 2 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E09.03 | MECHANICAL SCHEDULES (SHEET 3 OF 3) | 2 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| **Plumbing** | | | | | |
| .00.01 | PLUMBING DRAWING LIST | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| .00.02 | PLUMBING COVER SHEET | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| .02.01 | PLUMBING CONCOURSE DEMO PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| .03.01 | PLUMBING BAGGAGE LEVEL PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| .03.02 | PLUMBING CONCOURSE FLOOR PLAN - STORM, SANITARY & VENT PIPING | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| .03.02A | PLUMBING CONCOURSE FLOOR PLAN - DCW & NATURAL GAS PIPING | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| .03.03 | PLUMBING TICKETING FLOOR PLAN - SANITARY PIPING | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| .03.03A | PLUMBING TICKETING SLAB PENETRATION PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| .03.03B | PLUMBING TICKETING ACCESS PANEL PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| 03.03C | PLUMBING TICKETING FLOOR PLAN - DCW & NATURAL GAS PIPING | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| 03.03D | PLUMBING TICKETING FLOOR PLAN - STORM DRAIN PIPING | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| 03.03E | PLUMBING TICKETING FLOOR PLAN - INDIRECT WASTE AND VENT PIPING | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| 03.04 | PLUMBING ROOF PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| 03.04A | PLUMBING ROOF PENETRATION PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| 03.05 | ROOF AREA CALCULATIONS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| 04.01 | PLUMBING DIAGRAMS & SCHEMATICS (SHEET 1 OF 4) | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| 04.02 | PLUMBING DIAGRAMS & SCHEMATICS (SHEET 2 OF 4) | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| 04.03 | PLUMBING DIAGRAMS & SCHEMATICS (SHEET 3 OF 4) | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| 04.04 | PLUMBING DIAGRAMS & SCHEMATICS (SHEET 4 OF 4) | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| 05.01 | PLUMBING STORM RISER DIAGRAM | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| 05.02 | PLUMBING DOMESTIC WATER & GAS RISER DIAGRAM | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| 05.03 | PLUMBING SANITARY & VENT RISER DIAGRAM | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| 09.01 | PLUMBING SCHEDULES (SHEET 1 OF 2) | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| 09.02 | PLUMBING SCHEDULES (SHEET 2 OF 2) | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| **e Protection** | | | | | |




# THE CENTURION LOUNGE

# EXHIBIT A.1 - DRAWING INDEX

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| P00.01 | SPRINKLER COVER SHEET | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| P03.01 | SPRINKLER BAGGAGE LEVEL PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| P03.02 | SPRINKLER CONCOURSE LEVEL PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| P03.02A | SPRINKLER CONCOURSE REFLECTED CEILING PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| P03.03 | SPRINKLER EXISTING TICKETING LEVEL PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| P03.03A | SPRINKLER TICKETING REFLECTED CEILING PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| P04.01 | SPRINKLER DIAGRAMS & SCHEMATICS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| **Electrical** | | | | | |
| E00.01 | ELECTRICAL DRAWING LIST | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E00.02 | ELECTRICAL COVER SHEET | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E03.02 | ELECTRICAL CONCOURSE CEILING PLAN - LIGHTING | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E03.03 | ELECTRICAL TICKETING CEILING PLAN - LIGHTING | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E03.04 | ELECTRICAL ONE PLAZA - LIGHTING | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E03.05 | ELECTRICAL ROOF FLOOR PLAN - LIGHTING | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E04.02 | ELECTRICAL CONCOURSE FLOOR PLAN - POWER AND SECURITY | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E04.03 | ELECTRICAL TICKETING FLOOR PLAN - POWER AND SECURITY | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E04.03A | ELECTRICAL TICKETING SLAB PENETRATION PLAN - POWER | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E04.04 | ELECTRICAL TICKETING FLOOR PLAN - POWER MECHANICAL | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E04.05 | ELECTRICAL ROOF PLAN - POWER AND SECURITY | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E04.05A | ELECTRICAL ROOF PENETRATION PLAN - POWER | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E04.13 | ELECTRICAL TICKETING FLOOR PLAN - KITCHEN AND BAR POWER | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E04.14 | ELECTRICAL POWER PART PLANS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E06.01 | ELECTRICAL POWER RISER DIAGRAM | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E07.01 | ELECTRICAL POWER DETAILS (SHEET 1 OF 3) | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E07.02 | ELECTRICAL POWER DETAILS (SHEET 2 OF 3) | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E07.03 | ELECTRICAL POWER DETAILS (SHEET 3 OF 3) | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E09.01 | ELECTRICAL PANEL SCHEDULES (SHEET 1 OF 3) | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E09.02 | ELECTRICAL PANEL SCHEDULES (SHEET 2 OF 3) | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E09.03 | ELECTRICAL PANEL SCHEDULES (SHEET 3 OF 3) | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E09.04 | ELECTRICAL LIGHTING SCHEDULES (SHEET 1 OF 3) | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E09.05 | ELECTRICAL LIGHTING SCHEDULES (SHEET 2 OF 3) | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E09.06 | ELECTRICAL LIGHTING SCHEDULES (SHEET 3 OF 3) | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E09.07 | ELECTRICAL LIGHTING SEQUENCE OF OPERATION | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E09.08 | ELECTRICAL LIGHTING CONTROL SCHEDULE | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E09.09 | ELECTRICAL KITCHEN AND BAR SCHEDULE (SHEET 1 OF 3) | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E09.10 | ELECTRICAL KITCHEN AND BAR SCHEDULE (SHEET 2 OF 3) | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| E09.11 | ELECTRICAL KITCHEN AND BAR SCHEDULE (SHEET 3 OF 3) | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| **Lighting** | | | | | |

Case 1:24-cv-00968-JEB   Document 9   Filed 05/07/24   Page 95 of 152




# THE CENTURION LOUNGE

## EXHIBIT A.1 - DRAWING INDEX

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| P03.000 | LIGHTING NOTES | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| P03.C02 | CONCOURSE LEVEL LIGHTING PLAN - VALUE CHART | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| P03.C02E | CONCOURSE LEVEL EMERGENCY LIGHTING PLAN - VALUE CHART | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| P03.C03 | TICKETING LEVEL LIGHTING PLAN - VALUE CHART | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| P03.C03E | TICKETING LEVEL EMERGENCY LIGHTING PLAN - VALUE CHART | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| P03.C04 | ELECTRICAL PHOTOMETRIC - ELEVATOR | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| P03.C05 | ELECTRICAL PHOTOMETRIC - STAIR | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| P03.C06 | ELECTRICAL PHOTOMETRIC - ROOF | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| P03.D01 | LIGHTING DETAILS (SHEET 1 OF 3) | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| P03.D02 | LIGHTING DETAILS (SHEET 2 OF 3) | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| P03.D03 | LIGHTING DETAILS (SHEET 3 OF 3) | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| P03.F02 | CONCOURSE LEVEL LIGHTING PLAN - FLOOR PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| P03.F03 | TICKETING LEVEL LIGHTING PLAN - FLOOR PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| P03.R02 | CONCOURSE LEVEL LIGHTING PLAN - RCP | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| P03.R03 | TICKETING LEVEL LIGHTING PLAN - RCP | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| P03.R04 | POP-UP CEILING LIGHTING PLAN - RCP | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| **Fire Alarm** | | | | | |
| A00.01 | FIRE ALARM GENERAL NOTES, ABBREVIATIONS AND SYMBOLS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| A03.02 | FIRE ALARM CONCOURSE FLOOR PLAN - FIRE ALARM | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| A03.03 | FIRE ALARM TICKETING FLOOR PLAN - FIRE ALARM | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| A04.01 | FIRE ALARM RISER DIAGRAM | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| **Audio Visual** | | | | | |
| V00.00 | AUDIO VISUAL COVER SHEET | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| V00.01 | General Notes and Specifications | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| V03.02 | Speaker RCP Plan Concourse Level | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| V03.03 | Speaker RCP Plan Ticketing Level | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| V03.12 | Audio Zone Plan Concourse Level | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| V03.13 | Audio Zone Plan Ticketing Level | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| V03.23 | Video Device Plan Ticketing Level | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| V03.32 | A/V Control Plan Concourse Level | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| V03.33 | A/V Control Plan Ticketing Level | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| V03.43 | A/V Power Plan Ticketing Level | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| V03.52 | A/V Camera Plan Concourse Level | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| V03.53 | A/V Camera Plan Ticketing Level | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| V04.01 | A/V Device Details | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| V04.02 | A/V Device Details | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| V04.03 | A/V Mounting Details | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| V04.04 | A/V Mounting Details | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |

Case 1:24-cv-00968-JEB   Document 9   Filed 05/07/24   Page 96 of 152







## THE CENTURION LOUNGE

# EXHIBIT A.1 - DRAWING INDEX

Case 1:24-cv-00968-JEB    Document 9    Filed 05/07/24    Page 97 of 152

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| V05.01 | A/V Interior Elevations | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| V05.02 | A/V Interior Elevations | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| V06.01 | A/V Rack Riser and Rack Room Layout | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| V06.02 | A/V Camera Single Lines | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| V06.03 | Audio Single Lines | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| V06.04 | Audio Single Lines | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| V06.05 | Control Single Lines | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| V06.06 | Control Single Lines | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| V06.07 | Video Single Lines | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| V06.08 | Video Single lines | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| V06.09 | Video Single Lines | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| V07.01 | A/V Device Schedule | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| V09.01 | A/V Wire schedule | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| **Food Service** | | | | | |
| G-100 | 2ND FLOOR EMPLOYEE BREAKROOM FOODSERVICE EQUIPMENT PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| G-110 | 2ND FLOOR EMPLOYEE BREAKROOM FOODSERVICE ELECTRICAL PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| G-120 | 2ND FLOOR EMPLOYEE BREAKROOM FOODSERVICE PLUMBING PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| G-130 | 2ND FLOOR EMPLOYEE BREAKROOM FOODSERVICE SPECIAL CONDITIONS PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| G-200 | FOODSERVICE KEY PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| G-201 | KITCHEN FOODSERVICE EQUIPMENT PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| G-202 | BAR FOODSERVICE EQUIPMENT PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| G-203 | BUFFET & BEVERAGE FOODSERVICE EQUIPMENT PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| G-210 | FOODSERVICE UTILITY SCHEDULE | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| G-211 | FOODSERVICE UTILITY SCHEDULE | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| G-212 | FOODSERVICE UTILITY SCHEDULE | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| G-220 | KITCHEN FOODSERVICE ELECTRICAL PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| G-221 | BAR FOODSERVICE ELECTRICAL PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| G-222 | BUFFET & BEVERAGE FOODSERVICE ELECTRICAL PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| G-230 | KITCHEN FOODSERVICE PLUMBING PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| G-231 | BAR FOODSERVICE PLUMBING PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| G-232 | BUFFET & BEVERAGE FOODSERVICE PLUMBING PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| G-240 | KITCHEN FOODSERVICE SPECIAL CONDITIONS PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| G-241 | BAR FOODSERVICE SPECIAL CONDITIONS PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| G-250 | KITCHEN FOODSERVICE MECHANICAL PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| G-260 | KITCHEN FOODSERVICE REFRIGERATION PLAN | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| G-300 | FOODSERVICE HOOD DETAILS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| G-301 | FOODSERVICE HOOD DETAILS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| G-302 | FOODSERVICE HOOD DETAILS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |



## THE CENTURION LOUNGE

# EXHIBIT A.1 - DRAWING INDEX

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| S-310 | FOODSERVICE REFRIGERATION DETAILS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| S-400 | FOODSERVICE ELEVATIONS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| ecurity | | | | | |
| Y000 | COVER SHEET | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| Y001 | GENERAL SHEET | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| Y101 | DEVICE PLACEMENT PLAN - TICKETING LEVEL | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| Y102 | DEVICE PLACEMENT PLAN- CONCOURSE LEVEL | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| Y201 | PRODUCT TYPICALS | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| elecom | | | | | |
| 003.02 | TELECOM CABLE PLAN - CONCOURSE LEVEL | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| 003.03 | TELECOM CABLE PLAN - TICKETING LEVEL | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| 003.12 | WIFI ANTENNA PLAN - CONCOURSE LEVEL | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| 003.13 | WIFI ANTENNA PLAN - TICKETING LEVEL | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| 005.01 | TELECOM CABLING DETAILS 1 | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| 005.02 | TELECOM CABLING DETAILS 2 | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| 009.01 | TELECOM CABLE SCHEDULE | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| 010.01 | TELECOM SPECIFICATIONS 1 | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| 010.02 | TELECOM SPECIFICATIONS 2 | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |
| 010.03 | TELECOM SOW AND SCHEDULES | 1 | 10/29/2021 | 11/17/2021 | Permit Set (10/29/21) |

Case 1:24-cv-00968-JEB   Document 9   Filed 05/07/24   Page 98 of 152



## THE CENTURION LOUNGE

**Lum winmar**

# EXHIBIT A.2 - Specification INDEX

**Current Specifications**

| Number | Description | Revision | Issued Date | Received Date | Set |
|---|---|---|---|---|---|
| **00 - Procurement and Contracting Requirements** | | | | | |
| 000107 | Professional Seals Page | 0 | 10/29/21 | 11/17/21 | Permit Set |
| 000110 | Table of Contents | 2 | 10/29/21 | 11/17/21 | Permit Set |
| **01 - General Requirements** | | | | | |
| 011000 | Summary | 0 | 10/29/21 | 11/17/21 | Permit Set |
| 011300 | Delegated Design Requirements | 0 | 10/29/21 | 11/17/21 | Permit Set |
| 011413 | Airport Personnel Identification/Access Control and Security | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 012500 | Substitution Procedures | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 012600 | Contract Modification Procedures | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 012900 | Payment Procedures | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 013100 | Project Management and Coordination | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 013200 | Construction Progress Documentation | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 013233 | Photographic Documentation | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 013300 | Submittal Procedures | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 014000 | Quality Requirements | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 014200 | References | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 015000 | Temporary Facilities and Controls | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 016000 | Product Requirements | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 017300 | Execution | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 017329 | Cutting and Patching | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 017419 | Construction Waste Management and Disposal | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 017700 | Closeout Procedures | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 017823 | Operation and Maintenance Data | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 017839 | Project Record Documents | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 017900 | Demonstration and Training | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 018316 | Exterior Enclosure Performance Requirements | 0 | 10/29/21 | 11/17/21 | Permit Set |
| **02 - Existing Conditions** | | | | | |
| 024119 | Selective Demolition | 1 | 10/29/21 | 11/17/21 | Permit Set |
| **03 - Concrete** | | | | | |
| 033000 | Cast-in-Place Concrete | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 034500 | Precast Architectural Concrete | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 034900 | Glass-Fiber-Reinforced Concrete | 1 | 10/29/21 | 11/17/21 | Permit Set |
| **05 - Metals** | | | | | |

Case 1:24-cv-00968-JEB   Document 9   Filed 05/07/24   Page 99 of 152



# THE CENTURION LOUNGE

# EXHIBIT A.2 - Specification INDEX

Case 1:24-cv-00968-JEB   Document 9   Filed 05/07/24   Page 100 of 152

| Number | Description | Revision | Issued Date | Received Date | Set |
|---|---|---|---|---|---|
| 051200 | Structural Steel | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 053100 | Steel Deck | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 054000 | Cold-Formed Metal Framing | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 054500 | Metal Support Assemblies | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 055000 | Metal Fabrications | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 057100 | Decorative Metal Stairs | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 057313 | Glazed Decorative Metal Railings | 1 | 10/29/21 | 11/17/21 | Permit Set |
| **06 - Wood, Plastics, and Composites** | | | | | |
| 061053 | Miscellaneous Rough Carpentry | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 061600 | Sheathing | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 062023 | Interior Finish Carpentry | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 064113 | Wood-Veneer-Faced Architectural Cabinets | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 064600 | Wood Trim | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 066400 | Plastic Paneling | 1 | 10/29/21 | 11/17/21 | Permit Set |
| **07 - Thermal and Moisture Protection** | | | | | |
| 071413 | Hot Fluid-Applied Rubberized Asphalt Waterproofing | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 071800 | Traffic Coatings | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 072100 | Thermal Insulation | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 072726 | Fluid-Applied Membrane Air Barriers | 0 | 09/30/21 | 10/01/21 | 100% Percent Contract Set |
| 074213 | Metal Wall Panels | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 075423 | Thermoplastic-Polyolefin Roofing | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 076200 | Sheet Metal Flashing and Trim | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 077100 | Roof Specialties | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 077129 | Manufactured Roof Expansion Joints | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 077200 | Roof Accessories | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 078100 | Applied Fireproofing | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 078123 | Intumescent Fireproofing | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 078413 | Penetration Firestopping | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 078446 | Fire-Resistive Joint Systems | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 079100 | Preformed Joint Seals | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 079200 | Joint Sealants | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 079513.13 | Interior Expansion Joint Cover Assemblies | 0 | 10/29/21 | 11/17/21 | Permit Set |
| 079513.16 | Exterior Expansion Joint Cover Assemblies | 1 | 10/29/21 | 11/17/21 | Permit Set |
| **08 - Openings** | | | | | |
| 081113 | Hollow Metal Doors and Frames | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 081119 | Stainless-Steel Doors and Frames | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 081416 | Flush Wood Doors | 1 | 10/29/21 | 11/17/21 | Permit Set |



## THE CENTURION LOUNGE

## EXHIBIT A.2 - Specification INDEX

Case 1:24-cv-00968-JEB   Document 9   Filed 05/07/24   Page 101 of 152

| Number | Description | Revision | Issued Date | Received Date | Set |
|--------|-------------|----------|-------------|---------------|-----|
| 083113 | Access Doors and Frames | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 083313 | Coiling Counter Doors | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 084000 | Exterior Walls - General | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 084126 | All-Glass Entrances and Storefronts | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 084400 | Curtain Wall and Glazed Assemblies | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 087100 | Door Hardware | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 088000 | Glazing | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 088113 | Decorative Glass Glazing | 1 | 10/29/21 | 11/17/21 | Permit Set |
| **09 - Finishes** | | | | | |
| 092116 | Gypsum Board Assemblies | 0 | 09/30/21 | 10/01/21 | 100% Percent Contract Set |
| 092116.23 | Gypsum Board Shaft Wall Assemblies | 0 | 10/29/21 | 11/17/21 | Permit Set |
| 092216 | Non-Structural Metal Framing | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 092900 | Gypsum Board | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 093013 | Ceramic Tiling | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 095113 | Acoustical Panel Ceilings | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 095426 | Suspended Wood Ceilings | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 096513 | Resilient Base and Accessories | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 096516 | Resilient Sheet Flooring | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 096623 | Resinous Matrix Terrazzo Flooring | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 096813 | Tile Carpeting | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 097200 | Wall Coverings | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 099123 | Interior Painting | 1 | 10/29/21 | 11/17/21 | Permit Set |
| **10 - Specialties** | | | | | |
| 102413 | Aluminum Screen | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 102600 | Wall and Door Protection | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 102800 | Toilet Accessories | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 104416 | Fire Extinguishers | 1 | 10/29/21 | 11/17/21 | Permit Set |
| **11 - Kitchen Equipment** | | | | | |
| 11 40 00 | Foodservice Equipment | 1 | 10/29/21 | 11/17/21 | Permit Set |
| **12 - Furnishings** | | | | | |
| 122413 | Roller Window Shades | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 123640 | Stone Countertops | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 123661.16 | Simulated Stone Countertops | 1 | 10/29/21 | 11/17/21 | Permit Set |
| **14 - Conveying Equipment** | | | | | |
| 142400 | Hydraulic Elevators | 1 | 10/29/21 | 11/17/21 | Permit Set |
| **21 - Fire Suppression** | | | | | |
| 210517 | Sleeves and Sleeve Seals for Fire-Suppression Piping | 1 | 10/29/21 | 11/17/21 | Permit Set |



**THE CENTURION LOUNGE** — EXHIBIT A.2 - Specification INDEX

| Number | Description | Revision | Issued Date | Received Date | Set |
|---|---|---|---|---|---|
| 210518 | Escutcheons for Fire-Suppression Piping | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 210523 | General-Duty Valves for Water-Based Fire Protection Piping | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 210548 | Vibration and Seismic Controls for Fire-Suppression Piping and Equipment | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 210553 | Identification for Fire-Suppression Piping and Equipment | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 211100 | Facility Fire-Suppression Water-Service Piping | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 211119 | Facility Fire-Suppresion Water-Service Piping Part 1 | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 211313 | Wet-Pipe Sprinkler Systems | 1 | 10/29/21 | 11/17/21 | Permit Set |
| **22 - Plumbing** | | | | | |
| 22 13 19 | Sanitary Waste Piping Specialties | 0 | 10/29/21 | 11/17/21 | Permit Set |
| 22 14 23 | Storm Drainage Piping Specialties | 0 | 10/29/21 | 11/17/21 | Permit Set |
| 220516 | Expansion Fittings and Loops for Plumbing Piping | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 220517 | Sleeves and Sleeve Seals for Plumbing Pipes | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 220519 | Meters and Gages for Plumbing Piping | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 220523 | General-Duty Valves for Plumbing Piping | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 220529 | Hangers and Supports for Plumbing Piping and Equipment | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 220533 | Heat Tracing for Plumbing Piping | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 220553 | Identification for Plumbing Piping and Equipment | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 220716 | Plumbing Equipment Insulation | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 220719 | Plumbing Piping Insulation | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 221113 | Facility Water Distribution Piping | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 221116 | Domestic Water Piping | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 221119 | Domestic Water Piping Specialties | 0 | 10/29/21 | 11/17/21 | Permit Set |
| 221123 | Domestic Water Pumps | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 221316 | Sanitary Waste and Vent Piping | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 221413 | Facility Storm Drainage Piping | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 221429 | Sump Pumps | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 223200 | Domestic Water Filtration Equipment | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 223400 | Fuel-Fired, Domestic-Water Heater | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 224000 | Plumbing Fixtures | 1 | 10/29/21 | 11/17/21 | Permit Set |
| **23 - Heating, Ventilating, and Air Conditioning (HVAC)** | | | | | |
| 230523 | Globe Valves for HVAC Piping | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 230529 | Hangers and Supports for HVAC Piping and Equipment | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 230553 | Identification for HVAC Piping and Equipment | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 230593 | Testing, Adjusting, Balancing and Special Inspections | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 230700 | Pipe Insulation | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 230703 | Duct Insulation | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 230900 | Instrumentation and Control for HVAC | 1 | 10/29/21 | 11/17/21 | Permit Set |



## THE CENTURION LOUNGE

# EXHIBIT A.2 - Specification INDEX

| Number | Description | Revision | Issued Date | Received Date | Set |
|---|---|---|---|---|---|
| 231123 | Facility Natural Gas Piping | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 232113 | Hydronic Piping | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 232300 | Refrigerant Piping | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 233113 | Metal Ducts | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 233300 | Air Duct Accessories | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 233423 | HVAC Power Ventilators | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 233713 | Diffusers, Registers, and Grilles | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 237200 | Air-To-Air Energy Recovery Gas Heat Equipment | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 238219 | Fan Coil Units | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 238220 | Blower Coil Units | 1 | 10/29/21 | 11/17/21 | Permit Set |
| **26 - Electrical** | | | | | |
| 260500 | Common Work Results for Electrical | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 260519 | Low-Voltage Electrical Power Conductors and Cables | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 260526 | Grounding and Bonding for Electrical | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 260529 | Hangers and Supports for Electrical Systems | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 260533 | Raceway and Boxes for Electrical Systems | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 260536 | Cable Trays for Electrical Systems | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 260539 | Underfloor Raceways for Electrical Systems | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 260553 | Identification for Electrical Systems | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 260573 | Overcurrent Protective Device Coordination Study | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 260913 | Electrical Power Monitoring and Control | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 260923 | Lighting Control Devices | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 260933 | Central Dimming Controls | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 260936 | Modular Dimming Controls | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 260943 | Network Lighting Controls | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 262100 | Low-Voltage Overhead Electrical Power Systems | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 262200 | Low-Voltage Transformers | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 262413 | Switchboards | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 262416 | Panelboards | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 262713 | Electricity Metering | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 262726 | Wiring Devices | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 262813 | Fuses | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 262816 | Enclosed Switches and Circuit Breakers | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 262913 | Enclosed Controllers | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 262923 | Variable-Frequency Motor Controllers | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 263353 | Static Uninterruptible Power Supply | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 264313 | Transient-Voltage Suppression for Low-Voltage Electrical | 1 | 10/29/21 | 11/17/21 | Permit Set |

Case 1:24-cv-00968-JEB   Document 9   Filed 05/07/24   Page 103 of 152


**THE CENTURION LOUNGE**

# EXHIBIT A.2 - Specification INDEX

| Number | Description | Revision | Issued Date | Received Date | Set |
|---|---|---|---|---|---|
| 265100 | Lighting Fixtures | 1 | 10/29/21 | 11/17/21 | Permit Set |
| **27 - Communications** | | | | | |
| 274116 | Integrated Audio-Video System | 1 | 10/29/21 | 11/17/21 | Permit Set |
| **31 - Earthwork** | | | | | |
| 311000 | Site Clearing | 1 | 10/29/21 | 11/17/21 | Permit Set |
| **32 - Exterior Improvements** | | | | | |
| 321313 | Concrete Paving | 1 | 10/29/21 | 11/17/21 | Permit Set |
| 328400 | Planting Irrigation | 0 | 09/30/21 | 10/01/21 | 100% Percent Contract Set |

**wm winmar**

16

**Exhibit B**
**Scope of Work**

**WINMAR**

Exhibit B
SCOPE OF WORK ATTACHMENT TO
CONTRACT AGREEMENT AND GENERAL CONDITIONS BETWEEN
GENERAL CONTRACTOR AND SUBCONTRACTOR

---

**Subcontractor** – Iron Kingdom, Inc.        **Project** – 221-028 AMEX Centurion Lounge        **Contract Date** – 03/03/2022

---

1.  SUBCONTRACT INCLUSIONS. The "Subcontractor's Work" specifically includes, but is not limited to the following:

    1.1 GENERAL SCOPE ITEMS - It is the intent of this scope that the work performed pursuant to this scope be complete and acceptable in every respect. The description of work included herein are clarifications of specific items and are not intended to limit the overall scope of work required or reasonably inferred for complete and operable systems.

    1.1.1    It is understood that this Agreement is based upon Work being performed "per Plans and Specifications," however this does not excuse any item (labor and material) that could reasonably be expected or inferred as a normal course of completing the Scope of Work in a professional manner.

    1.1.2    This Subcontractor agrees that the Subcontract Sum includes the cost to perform all work necessary to provide a complete, useable, working facility for its portion of the Work, in accordance with the scope and intent of the Contract Documents and applicable Legal Requirements and all matters reasonably inferable there from.

    1.1.3    Use adequate numbers of skilled workmen who are thoroughly trained and experienced in the necessary crafts and who are completely familiar with the requirements and methods needed for the proper performance of the Work covered by this Subcontract

    1.1.4    Subcontractor shall be fully responsible for the layout of the work of this Subcontract.

    1.1.5    Promptly inform the Contractor of all errors and omissions, including dimensional, as they are discovered.

    1.1.6    The Subcontractor shall be responsible to perform designated scope of work on off hours, Saturday, Sunday or holiday, if at the subcontractor's failure to maintain scheduled performance, subcontractor not meeting schedule as shown in Exhibit C. The subcontractor may be subject to back charge, if at the subcontractor's failure to maintain scheduled performance, other trades must perform work on off hours, Saturday, Sunday or holiday to maintain the schedule shown in Exhibit C.

    1.1.7    The stocking, storing, delivery of tools, equipment, and materials on site and/or in the building will be subject to the Contractor's approval. All stocking, storing, or delivery by the Subcontractor must be approved by, and coordinated with the Project Superintendent and/or Project Manager.

    1.1.8    All materials are to be stocked, stored and protected to ensure that there is not damage to the stored materials or surrounding surfaces.

    1.1.9    Subcontractor is responsible for all hoisting, scaffolding and distribution of material necessary for the proper performance of the work on this Subcontract.

    1.1.10   Subcontractor shall clean up all trash and debris resulting from its operations, on a daily basis, and place in dumpster. Such cleanup and removal shall be done in a manner that will impede neither the progress of the Project nor other trades.

    1.1.11   Subcontractor to supply all necessary taxes, deliveries, staging, permits, licenses and inspections for the work of this Subcontract.

    1.1.12   Quality of work generated under this Subcontract will be of the highest quality and meet with the approval of the Contractor's and Owner's representatives in all cases.

    1.1.13   The prevention of accidents on or "in the vicinity of" the Work is the Subcontractor's responsibility, even if Contractor establishes a safety program for the entire project. Subcontractor shall work in accordance with Contractor's safety regulations and comply with all OSHA requirements, federal and state laws, rules and regulations

**wm winmar**

Exhibit B
SCOPE OF WORK ATTACHMENT TO
CONTRACT AGREEMENT AND GENERAL CONDITIONS BETWEEN
GENERAL CONTRACTOR AND SUBCONTRACTOR

Subcontractor – Iron Kingdom, Inc.    Project – 221-028 AMEX Centurion Lounge    Contract Date –
03/03/2022

regarding safety and health including Personal Protection Equipment as required by OSHA. Failure to do so may result in the issuance of a citation by OSHA and/or the Contractor. Subcontractor shall also comply with all safety provisions as stated in the Prime Contract.

1.1.14 Work of Preceding Trades: The Subcontractor shall satisfy himself as to the acceptability of the surface to which his work is to be applied or affixed and shall advise Contractor in writing of any unsatisfactory conditions. Commencement of work by Subcontractor shall be construed as acceptance of the preceding work.

1.1.15 Subcontractor must notify the Contractor immediately if any substrate or project condition, whether new work of others or existing, is not of an acceptable condition to proceed with Subcontractor's work.

1.1.16 DIVISION 1 COMPLIANCE. Subcontractor shall execute the work as per the requirements of Specification Section 1 – General Requirements with particular emphasis on documentation, submittals, substitutions, project record documents, as-builts, O&M Data, Training, commissioning, closeout procedures, etc. Where conflicts arise between Division 1 and subcontractors trade specific specification, the more stringent shall govern the work of this subcontract.

1.2  COORDINATION - This Subcontractor agrees to provide project management expertise in the coordination of this Scope of Work. Premium cost to change out any Work at a later date if not properly coordinated shall be this Subcontractor's responsibility. Specific coordination includes the following:

1.2.1  Coordinate materials in such a way that no delays will be created in his Work or the work of other related subcontractors. Keeping the agreed upon Schedule is essential, including supplying the material to maintain the production required.

1.2.2  Subcontractor will plan all work in advance and submit Requests for Information (RFIs) in writing if there is any missing information that could impede the timely completion of your Work.

1.2.3  Examine all Drawings and all sections of the Specifications, including all Addenda, to insure complete coverage of Work.

1.2.4  Promptly amend and make good any defective materials and/or workmanship to the entire approval and acceptance of Contractor, Owner, at no additional charge to said mentioned parties.

1.2.5  Coordinate all equipment, and installations with other trades by means of applicable Shop Drawings, applicable interference drawings, mock-ups, coordination meetings, and field coordination prior to proceeding with Work.

1.2.6  Assist with inspections as required and as may be requested by the Project Superintendent.

1.2.7  In the event of a conflict between the Structural, Architectural or MEP Contract Documents, the design with the greater quantity or value shall govern.

1.2.8  Subcontractor is responsible for the actual quantities of materials needed to execute the Work described in the Given Plans.

1.3  MANPOWER & SCHEDULE - This Subcontractor understands time is of the essence and shall complete the Work according to Contractor's Project Schedule in accordance with Article 3 of the Subcontract Agreement and all items relevant to the Schedule listed in Exhibit C. The Subcontractor acknowledges and agrees to the following additional requirements and Schedule restraints:

**wm winmar**

Exhibit B
SCOPE OF WORK ATTACHMENT TO
CONTRACT AGREEMENT AND GENERAL CONDITIONS BETWEEN
GENERAL CONTRACTOR AND SUBCONTRACTOR

**Subcontractor** – Iron Kingdom, Inc.        **Project** – 221-028 AMEX Centurion Lounge        **Contract Date** –
03/03/2022

1.3.1   Allowable work hours for the project vary depending on the area where work is to be done. Subcontractor agrees and has included off hours work as necessary and required by MWAA on the Concourse level, existing mechanical and electrical rooms, deliveries of materials, installation of some materials, Ties -in to existing systems, and work due to noise restrictions.

1.3.2   Normal work hours are 7:00 AM through 4:00 PM all week long.  If the Subcontractor must work additional hours approval of the Contractor's Superintendent is required.

1.3.3   After Hour work are 10:00 PM thru 4:30 AM all week long.

1.3.4   *Noise* – All activities during normal airport hours must be limited in noise and subject to working after hours if requested by MWAA.

1.3.5   *Foreman's Meetings* - The Subcontractor's foreman is required to attend weekly foremen meetings throughout the Subcontractor's work durations.  These meeting are Tuesday morning at 8:00 AM, date and time is subject to change.

1.3.6   *Manpower & Schedule* - Subcontractor acknowledges that this project is of a very detailed nature, which will require close coordination between other trades and the existing structure, and which will hinder the subcontractor's ability, at times, to be over-productive and may result in unwanted downtime.  Coordination with other trades and the Contractor is this Subcontractor's responsibility.  We all need to look ahead and we can expect things not to go exactly as planned.  Daily coordination meetings and weekly subcontractor progress meetings will be required to achieve this.

1.3.7   *Weather Delays* – This Subcontractor agrees to make up any lost time during the week, due to weather, on Saturday at no additional cost to the Contractor.

1.3.8   *Schedule Durations* – Subcontractor shall provide manpower to meet the durations as indicated in attached baseline schedule.  Schedule durations are based on a **five**-day work week.  This Subcontractor shall provide manpower to maintain the Work progress on a **five**-day work week.

1.4   SUBMITTALS & SHOP DRAWINGS – The Subcontractor shall commit to having *all* submittals for equipment, materials and shop drawings submitted within ten (10) calendar days of Subcontract award, this ten (10) days begins on the day this Subcontractor was formally released on this scope of work.

1.4.1   All submittals must be submitted in complete packages.  Provide one (1) PDF copy of product data and shop drawings.

1.4.2   All product literature shall be provided on a minimum sheet size of 8 ½" x 11", and a maximum sheet size of 8 ½" x 14".

1.4.3   All shop drawings must be provided on 24" x 36" sheets or larger.

1.4.4   If product samples are required, at least four (4) units of each sample type and sample color must be provided.  All submittals must be in compliance with the Contract Documents.  The Subcontractor shall affix a submittal cover page to all copies of the submittals (the submittal cover page shall include all applicable information).

1.4.4.1   *The Subcontractor acknowledges and agrees that no substitutions will be allowed without an executed Change Order as described in the "Changes In The Work" sections of this document. Deviations from plans and specifications will be removed and replaced at this Subcontractor's expense.  Approved submittals and shop documents are NOT considered Contract Documents.*

**winmar**

Exhibit B
SCOPE OF WORK ATTACHMENT TO
CONTRACT AGREEMENT AND GENERAL CONDITIONS BETWEEN
GENERAL CONTRACTOR AND SUBCONTRACTOR

**Subcontractor** – Iron Kingdom, Inc.          **Project** – 221-028 AMEX Centurion Lounge          **Contract Date** – 03/03/2022

1.4.4.2    *The Subcontractor shall attend shop drawing review meetings as necessary with the Architect as required in expediting review and approval of packages.*

1.5    Drawings & Specifications

1.5.1    This scope of work is inclusive of, but not limited to, all material, labor, equipment, tools, and other requirements needed to execute the scope of work per the Contract documents, drawings (Exhibit A.1) and specifications (Exhibit A.2) dated 10.29.2021 and all associated construction document attached here within.

1.5.2    One-year (1) warranty on all materials and workmanship from the date of substantial completion.

1.5.3    Include all necessary material, tax, freight and labor to complete installation to Winmar scheduled completion dates.

1.5.4    Saturday work to be scheduled in advance included to keep on schedule only.

1.5.5    As-Builts

1.5.6    Coordinate work with respect to other trades.

1.5.7    Coordinate ceiling layout and device requirements with other trades before install.

1.5.8    Daily cleanup of subcontractor's areas worked; if Winmar has to clean up for subcontractor then a back charge will be sent for labor. Notices shall be sent before action is taken.

1.5.9    Submit required copies of Shop Drawings & Submittals with-in two weeks of release - Provide detailed schedule of values at least (7) days after award of project.

1.5.10    Weekly Subcontractor meeting - Must start attending Meeting at least two weeks prior to start date.

1.5.11    Provide copy of company safety program and all required MSDS sheets for Materials to be used on site.

1.5.12    No substitutions will be allowed, without prior approval.

1.5.13    Provide adequate labor & equipment such as staging, scaffolding, planks, Arial work platforms, swing stage, scissor lifts, fork lifts, cranes, rigging, etc. as required for a complete performance of this subcontractor's scope of work.

1.5.14    Provide OSHA Approved Safety and Fall Protection Plan

1.5.15    Furnish, provide and Pay all permits & Inspections for this scope of work

1.5.16    Provide licenses and fees required by your work

1.5.17    Confirm all dimensions and coordinate layout to allow clearance as required by code and other work as shown on plans

1.5.18    Remove all trash and debris from site daily

1.5.19    Perform all work per local & state codes having jurisdiction

1.5.20    Includes all applicable sales taxes

1.5.21    Afterhour and overtime work is included for secured areas, and work required by MWAA to done during non-airport hours: 11:00 pm to 4:00 am.

1.5.22    Weekend Work included to keep on schedule only.

1.5.23    Fabricate and Install steel beams, angles, sill angle, flat embed plate with studs, welded and bolted connections, base plates elevator rail support tubes, and clips for elevator pit.

1.5.24    Fabricate and Install HSS tube steel columns and beams, base plates, angles and anchoring hardware for lounge entrance portal.

1.5.25    Fabricate and Install Steel splice columns, columns, plates, beams, angles, channels, HSS tube steel, flange bracing, beam clamps, stiffeners, clips, bolts, washers, plates,

**WINMAR**

**Subcontractor** – Iron Kingdom, Inc.      **Project** – 221-028 AMEX Centurion Lounge      **Contract Date** – 03/03/2022

metal decking, weld plates, shea studs, bent plates, slab edge angles, welded and bolted connections as indicated on the structural drawings.

1.5.26   Provided pre-drilled holes, for ornamental stair connection in beam.

1.5.27   Provide replacement decking, if necessary for column extensions.

1.5.28   Provide smoke eaters and protection for all wok inside of existing building and for any location that sparks, or slag can enter existing building.

1.5.29   Provide roof hatch ladder, elevator pit ladder and mechanical roof slab access ladders.

1.5.30   Furnish and install tube steel support for camera poles

1.5.31   Furnish and install Flat plate beam support.

1.5.32   Furnish and Install galvanized L angles for precast planters.

1.5.33   Furnish only 4' x 8' steel plates for working lanes, unloading area and dumpster location. Includes removal at end of the project.

1.5.34   Furnish and Install Elevator hoist beam.

1.5.35   Includes after hours for work at Concourse and baggage levels.

1.5.36   Provide smoke eaters for interior work.

1.5.37   Includes lifting and carrying equipment for complete installation. Provide installation plan included means and methods for installation of structural steel members.

1.6   TOLERANCES

1.1.1   Subcontractor acknowledges that there will be no acceptance of Work that is installed in any manner which causes other trades to compensate for improper workmanship.

1.1.2   All tolerances shall be within or better than recommended industry or trade specific standards as related to this Scope of Work.

2.   **SUBCONTRACTOR EXCLUSIONS** - The subcontractor's work specifically excludes the following:

2.1.1.1   Ornamental Stair, railings, risers and treads

2.1.1.2   Bar Foot Rail

1.   **UNIT/ALTERNATE PRICES** - The following unit/alternate prices will apply to any Modifications to this Agreement. These unit/alternate prices include all costs, including delivery, hoisting, storage, labor, material, equipment usage, supervision, overhead, profit, bonds, insurance, sales/use taxes and all other items required for incorporation into the Project:

a.   Alternate # 01 – Provide P & P Bond...................................................$18,000.00

2.   **ALLOWANCES**: - The following allowances are included in this contract: Allowances to be approved and documented prior to use. Any remaining allowances will be returned via deduct change order.

A. Allowance #01 – furnish and install One additional Beam reinforcement flat Plate.....$2,000.00
B. Allowance # 02 – Furnish and install Seven (7) Camera Support Brackets................$14,000.00
C. Allowance # 03 – Night Work at Concourse & Baggage Levels ................................$25,000.00

3.   **CLOSE OUT** - Submit the following Close Out Documents at completion of Contract Work:

a.   Final Release of Lien – (1) original

**WM winmar**

Exhibit B
SCOPE OF WORK ATTACHMENT TO
CONTRACT AGREEMENT AND GENERAL CONDITIONS BETWEEN
GENERAL CONTRACTOR AND SUBCONTRACTOR

<u>**Subcontractor**</u> – Iron Kingdom, Inc.         <u>**Project**</u> – 221-028 AMEX Centurion Lounge         <u>**Contract Date**</u> –
03/03/2022

      b.  Subcontractor's Warranty as required by the Contract Documents - (1) original
      c.  O&M Manuals – (1) original
      d.  As-Built Drawings

**<u>Final Retention release is dependent on receipt of close-out documents completion.</u>**

END OF EXHIBIT "B"

Iron Kingdom, Inc.                                           Winmar Construction, Inc.

Agreed by: _____ 3/15/2022      _____ 3/17/2022
                                        Date                                                      Date

**Wn winmar**

17

**Exhibit C**
**Project Schedule**

Case 1:24-cv-00968-JEB   Document 9   Filed 05/07/24   Page 113 of 152

# EXHIBIT - C

## THE CENTURION LOUNGE
### at
### RONALD REAGAN INTERNATIONAL AIRPORT
### PRELIMINARY PROJECT SCHEDULE

**wm winmar**

| ID | Task Mode | Task Name | Duration | Start | Finish |
|----|-----------|-----------|----------|-------|--------|
| 1 | | AMEX CENTURION LOUNGE | 341 days | Fri 10/29/21 | Mon 3/6/23 |
| 2 | | Notice of Intent to Award | 1 day | Fri 10/29/21 | Fri 10/29/21 |
| 3 | | Notice to Proceed / Contract | 1 day | Mon 12/6/21 | Mon 12/6/21 |
| 4 | | Preconstruction / Administration Submittals | 10 days | Tue 12/7/21 | Mon 12/20/21 |
| 5 | | Work Plan Submittals | 15 days | Tue 12/7/21 | Tue 12/28/21 |
| 6 | | Subcontractor Release | 20 days | Tue 12/7/21 | Wed 1/5/22 |
| 7 | | Building Permit | 1 day | Mon 12/20/21 | Mon 12/20/21 |
| 8 | | Kick-Off / Preconstruction Meeting | 1 day | Tue 12/21/21 | Tue 12/21/21 |
| 9 | | Long Lead Submittals | 150 days | Tue 12/21/21 | Fri 7/22/22 |
| 10 | | Structural Steel | 20 days | Tue 12/21/21 | Wed 1/19/22 |
| 11 | | Glass & Glazing | 15 days | Tue 12/21/21 | Wed 1/12/22 |
| 12 | | Elevator | 20 days | Wed 12/29/21 | Wed 1/26/22 |
| 13 | | Plumbing Equipment | 20 days | Thu 1/6/22 | Wed 2/2/22 |
| 14 | | HVAC Equipment | 20 days | Thu 1/6/22 | Wed 2/2/22 |
| 15 | | Electrical Equipment | 20 days | Thu 1/6/22 | Wed 2/2/22 |
| 16 | | Light Fixtures | 20 days | Thu 1/6/22 | Wed 2/2/22 |
| 17 | | Submittal Approval & Release | 20 days | Thu 1/6/22 | Wed 2/2/22 |
| 18 | | Fabrication - Structural Steel | 70 days | Thu 1/27/22 | Wed 5/4/22 |
| 19 | | Fabrication - Glass & Glazing | 65 days | Thu 1/13/22 | Wed 4/13/22 |
| 20 | | Fabrication - Elevator | 120 days | Thu 2/3/22 | Fri 7/22/22 |
| 21 | | Fabrication - Plumbing Equipment | 30 days | Thu 2/3/22 | Wed 3/16/22 |
| 22 | | Fabrication - HVAC Equipment | 70 days | Thu 1/27/22 | Wed 5/4/22 |
| 23 | | Fabrication - Electrical Equipment | 50 days | Thu 2/3/22 | Wed 4/13/22 |



| | | | | |
|---|---|---|---|---|
| Task | | External Tasks | Manual Task | Finish-only |
| Split | | External Milestone | Duration-only | Deadline |
| Milestone | | Inactive Task | Manual Summary Rollup | Progress |
| Summary | | Inactive Milestone | Manual Summary | |
| Project Summary | | Inactive Summary | Start-only | |

Project: AMEX DCA Project Sched
Date: Wed 12/1/21

Page 1

# EXHIBIT - C

## THE CENTURION LOUNGE
### at
### RONALD REAGAN INTERNATIONAL AIRPORT
### PRELIMINARY PROJECT SCHEDULE



Case 1:24-cv-00968-JEB   Document 9   Filed 05/07/24   Page 114 of 152

| ID | Task Mode | Task Name | Duration | Start | Finish |
|---|---|---|---|---|---|
| 24 | | Light Fixtures | 40 days | Thu 2/3/22 | Wed 3/30/22 |
| 25 | | **Critical Submittals** | 30 days | Thu 1/13/22 | Wed 2/23/22 |
| 26 | | Concrete | 5 days | Thu 1/13/22 | Wed 1/19/22 |
| 27 | | Waterproofing | 15 days | Thu 1/13/22 | Wed 2/2/22 |
| 28 | | Roofing | 15 days | Thu 1/13/22 | Wed 2/2/22 |
| 29 | | Millwork | 30 days | Thu 1/13/22 | Wed 2/23/22 |
| 30 | | Foodservic Equipment | 30 days | Thu 1/13/22 | Wed 2/23/22 |
| 31 | | Fire Supprssion Shops | 30 days | Thu 1/13/22 | Wed 2/23/22 |
| 32 | | HVAC Duct Shops | 20 days | Thu 1/13/22 | Wed 2/9/22 |
| 33 | | Fire Alarm Shops | 20 days | Thu 1/13/22 | Wed 2/9/22 |
| 34 | | Finish Submittals | 20 days | Thu 1/13/22 | Wed 2/9/22 |
| 35 | | Submittal Approval & Release | 30 days | Thu 1/27/22 | Wed 3/9/22 |
| 36 | | Mobilization | 25 days | Mon 2/28/22 | Fri 4/1/22 |
| 37 | | Field Office Trailers & Storage Containers | 5 days | Mon 2/28/22 | Fri 3/4/22 |
| 38 | | Temporary Power Lighting | 5 days | Mon 3/7/22 | Fri 3/11/22 |
| 39 | | Pre Installation Meetings Begin | 1 day | Mon 3/7/22 | Mon 3/7/22 |
| 40 | | Perimeter Barricades | 10 days | Mon 3/7/22 | Fri 3/18/22 |
| 41 | | Temp Barricades - CL, Existing Store Front Protection | 10 days | Tue 3/8/22 | Mon 3/21/22 |
| 42 | | Traffic Controls & Signage | 10 days | Mon 3/21/22 | Fri 4/1/22 |
| 43 | | ECSC | 5 days | Mon 3/21/22 | Fri 3/25/22 |
| 44 | | Demoltion & Concrete | 110 days | Tue 3/22/22 | Wed 8/24/22 |
| 45 | | Demolition Phase 1 - TL (Existing Grade Up) | 15 days | Mon 3/28/22 | Fri 4/15/22 |
| 46 | | Quad 1 - C/B to 34 / 34.75 | 32 days | Tue 3/22/22 | Wed 5/4/22 |

| | | | |
|---|---|---|---|
| Task | | External Tasks | Manual Task | Finish-only |
| Split | | External Milestone | Duration-only | Deadline |
| Milestone | | Inactive Task | Manual Summary Rollup | Progress |
| Summary | | Inactive Milestone | Manual Summary | |
| Project Summary | | Inactive Summary | Start-only | |

Project: AMEX DCA Project Sched
Date: Wed 12/1/21

# EXHIBIT - C

## THE CENTURION LOUNGE
### at
### RONALD REAGAN INTERNATIONAL AIRPORT
### PRELIMINARY PROJECT SCHEDULE

winmar

| ID | Task Mode | Task Name | Duration | Start | Finish |
|---|---|---|---|---|---|
| 47 | | C Level Column platform Enclosures | 10 days | Tue 3/22/22 | Mon 4/4/22 |
| 48 | | Install Steel stiffners, angles at columns | 10 days | Tue 4/5/22 | Mon 4/18/22 |
| 49 | | Install Steel for Elevator Opening | 5 days | Tue 4/5/22 | Mon 4/11/22 |
| 50 | | Remove Topping Slab | 5 days | Tue 4/5/22 | Mon 4/11/22 |
| 51 | | Temp Enclosure over Elevator | 3 days | Tue 4/12/22 | Thu 4/14/22 |
| 52 | | Waterproofing Install and Patch daily | 18 days | Tue 4/5/22 | Thu 4/28/22 |
| 53 | | Core drill new MEP penetrations / Install Sleeves | 5 days | Tue 4/12/22 | Mon 4/18/22 |
| 54 | | Install Curb Dowels | 5 days | Tue 4/12/22 | Mon 4/18/22 |
| 55 | | Cut Opening for Elevator | 2 days | Fri 4/15/22 | Mon 4/18/22 |
| 56 | | Install Column Pier extension B.6/34.5 & B/34.5 | 3 days | Tue 4/19/22 | Thu 4/21/22 |
| 57 | | Steel Inspections | 13 days | Tue 4/5/22 | Thu 4/21/22 |
| 58 | | Pour New Curtainwall Curb | 5 days | Fri 4/22/22 | Thu 4/28/22 |
| 59 | | Pour New Interior Topping Slab | 4 days | Fri 4/29/22 | Wed 5/4/22 |
| 60 | | Quad 2 - C/B to 34.75 / 35.6 | 30 days | Tue 4/5/22 | Mon 5/16/22 |
| 61 | | C Level Column platform Enclosures | 10 days | Tue 4/5/22 | Mon 4/18/22 |
| 62 | | Install Steel stiffners, angles at columns | 10 days | Tue 4/19/22 | Mon 5/2/22 |
| 63 | | Install Steel for Stair Opening | 5 days | Tue 4/19/22 | Mon 4/25/22 |
| 64 | | Remove Topping Slab | 5 days | Tue 4/19/22 | Mon 4/25/22 |
| 65 | | Waterproofing Install and Patch daily | 16 days | Tue 4/19/22 | Tue 5/10/22 |
| 66 | | Core drill new MEP penetrations / Install Sleeves | 5 days | Tue 4/26/22 | Mon 5/2/22 |
| 67 | | Temp Enclosure over Stair Opening | 3 days | Tue 4/26/22 | Thu 4/28/22 |
| 68 | | Cut Stair Opening | 2 days | Tue 4/26/22 | Wed 4/27/22 |
| 69 | | Install Curb Dowels | 3 days | Tue 4/26/22 | Thu 4/28/22 |



Project: AMEX DCA Project Sched
Date: Wed 12/1/21

| | | | |
|---|---|---|---|
| Task | | External Tasks | Manual Task | Finish-only |
| Split | | External Milestone | Duration-only | Deadline |
| Milestone | | Inactive Task | Manual Summary Rollup | Progress |
| Summary | | Inactive Milestone | Manual Summary | |
| Project Summary | | Inactive Summary | Start-only | |

Page 3

# EXHIBIT - C



## THE CENTURION LOUNGE
### at
### RONALD REAGAN INTERNATIONAL AIRPORT
### PRELIMINARY PROJECT SCHEDULE



Case 1:24-cv-00968-JEB   Document 9   Filed 05/07/24   Page 116 of 152

| ID | Task Mode | Task Name | Duration | Start | Finish |
|---|---|---|---|---|---|
| 70 | | Install Column Pier extension B.6/35 & B/35 | 3 days | Tue 5/3/22 | Thu 5/5/22 |
| 71 | | Steel Inspections | 13 days | Tue 4/19/22 | Thu 5/5/22 |
| 72 | | Pour New Curtainwall Curb | 3 days | Fri 5/6/22 | Tue 5/10/22 |
| 73 | | Pour New Interior Topping Slab | 4 days | Wed 5/11/22 | Mon 5/16/22 |
| 74 | | Quad 3 - C/B to 35.6 / 36.5 | 25 days | Tue 4/19/22 | Mon 5/23/22 |
| 75 | | C Level Column platform Enclosures | 10 days | Tue 4/19/22 | Mon 5/2/22 |
| 76 | | Install Steel stiffners, angles at columns | 10 days | Tue 5/3/22 | Mon 5/16/22 |
| 77 | | Remove Topping Slab | 5 days | Tue 5/3/22 | Mon 5/9/22 |
| 78 | | Waterproofing Install and Patch daily | 14 days | Tue 5/3/22 | Fri 5/20/22 |
| 79 | | Core drill new MEP penetrations / Install Sleeves | 5 days | Tue 5/10/22 | Mon 5/16/22 |
| 80 | | Install Curb Dowels | 3 days | Tue 5/10/22 | Thu 5/12/22 |
| 81 | | Install Column Pier extension B.6/36 & B/36 | 2 days | Tue 5/17/22 | Wed 5/18/22 |
| 82 | | Steel Inspections | 12 days | Tue 5/3/22 | Wed 5/18/22 |
| 83 | | Pour New Curtainwall Curb | 3 days | Fri 5/13/22 | Tue 5/17/22 |
| 84 | | Pour New Interior Topping Slab | 4 days | Wed 5/18/22 | Mon 5/23/22 |
| 85 | | Quad 4 - C/B to 36.5 / 37.5 | 25 days | Tue 5/3/22 | Tue 6/7/22 |
| 86 | | C Level Column platform Enclosures | 10 days | Tue 5/3/22 | Mon 5/16/22 |
| 87 | | Install Steel stiffners, angles at columns | 10 days | Tue 5/17/22 | Tue 5/31/22 |
| 88 | | Remove Topping Slab | 5 days | Tue 5/17/22 | Mon 5/23/22 |
| 89 | | Waterproofing Install and Patch daily | 12 days | Tue 5/17/22 | Thu 6/2/22 |
| 90 | | Core drill new MEP penetrations / Install Sleeves | 5 days | Tue 5/17/22 | Mon 5/23/22 |
| 91 | | Install Curb Dowels | 3 days | Tue 5/24/22 | Thu 5/26/22 |
| 92 | | Install Column Pier extension B.6/37 & B/37 | 2 days | Wed 6/1/22 | Thu 6/2/22 |

Timeline months (header): November  January  March  May  July  September  November  January  March
10/17 11/14 12/12 1/9 2/6 3/6 4/3 5/1 5/29 6/26 7/24 8/21 9/18 10/16 11/13 12/11 1/8 2/5 3/5

| Legend | | | |
|---|---|---|---|
| Task | External Tasks | Manual Task | Finish-only |
| Split | External Milestone | Duration-only | Deadline |
| Milestone | Inactive Task | Manual Summary Rollup | Progress |
| Summary | Inactive Milestone | Manual Summary | |
| Project Summary | Inactive Summary | Start-only | |

Project: AMEX DCA Project Sched
Date: Wed 12/1/21



# EXHIBIT - C

## THE CENTURION LOUNGE
### at
## RONALD REAGAN INTERNATIONAL AIRPORT
### PRELIMINARY PROJECT SCHEDULE





Case 1:24-cv-00968-JEB   Document 9   Filed 05/07/24   Page 117 of 152

| ID | Task Mode | Task Name | Duration | Start | Finish |
|----|-----------|-----------|----------|-------|--------|
| 93 | | Steel Inspections | 12 days | Tue 5/17/22 | Thu 6/2/22 |
| 94 | | Pour New Curtainwall Curb | 3 days | Fri 5/27/22 | Wed 6/1/22 |
| 95 | | Pour New Interior Topping Slab | 4 days | Thu 6/2/22 | Tue 6/7/22 |
| 96 | | Quad 5 - C/B to 37.5 / 38.5 | 26 days | Tue 5/17/22 | Wed 6/22/22 |
| 97 | | C Level Column platform Enclosures | 10 days | Tue 5/17/22 | Tue 5/31/22 |
| 98 | | Install Steel stiffners, angles at columns | 10 days | Wed 6/1/22 | Tue 6/14/22 |
| 99 | | Remove Topping Slab | 5 days | Wed 6/1/22 | Tue 6/7/22 |
| 100 | | Waterproofing Install and Patch daily | 13 days | Wed 6/1/22 | Fri 6/17/22 |
| 101 | | Core drill new MEP penetrations / Install Sleeves | 5 days | Wed 6/1/22 | Tue 6/7/22 |
| 102 | | Install Curb Dowels | 4 days | Wed 6/8/22 | Mon 6/13/22 |
| 103 | | Install Column Pier extension B.6/38 & B/38 | 2 days | Wed 6/15/22 | Thu 6/16/22 |
| 104 | | Steel Inspections | 12 days | Wed 6/1/22 | Thu 6/16/22 |
| 105 | | Pour New Curtainwall Curb | 3 days | Tue 6/14/22 | Thu 6/16/22 |
| 106 | | Pour New Interior Topping Slab | 4 days | Fri 6/17/22 | Wed 6/22/22 |
| 107 | | Quad 6 - C/B to 38.5 / 39 | 26 days | Wed 6/1/22 | Thu 7/7/22 |
| 108 | | C Level Column platform Enclosures | 10 days | Wed 6/1/22 | Tue 6/14/22 |
| 109 | | Install Steel stiffners, angles at columns | 10 days | Wed 6/15/22 | Tue 6/28/22 |
| 110 | | Remove Topping Slab | 5 days | Wed 6/15/22 | Tue 6/21/22 |
| 111 | | Waterproofing Install and Patch daily | 13 days | Wed 6/15/22 | Fri 7/1/22 |
| 112 | | Core drill new MEP penetrations / Install Sleeves | 5 days | Wed 6/15/22 | Tue 6/21/22 |
| 113 | | Install Curb Dowels | 3 days | Wed 6/22/22 | Fri 6/24/22 |
| 114 | | Install Column Pier extension B.6/39 & B/39 | 2 days | Wed 6/29/22 | Thu 6/30/22 |
| 115 | | Steel Inspections | 12 days | Wed 6/15/22 | Thu 6/30/22 |

| | | | | |
|---|---|---|---|---|
| Task | ▬▬▬ | External Tasks | ▬▬▬ | Manual Task ▬▬▬ | Finish-only ⊐ |
| Split | ............... | External Milestone ◇ | | Duration-only ▬▬ | Deadline ↓ |
| Milestone ◆ | | Inactive Task | | Manual Summary Rollup ▬▬▬ | Progress ▬▬▬ |
| Summary ▬▬▬ | | Inactive Milestone | | Manual Summary ▬▬▬ | |
| Project Summary ▬▬▬ | | Inactive Summary | | Start-only ⊏ | |

Project: AMEX DCA  Project Sched
Date: Wed 12/1/21

**WM winmar**



| ID | Task Mode | Task Name | Duration | Start | Finish |
|---|---|---|---|---|---|
| 116 | | Pour New Curtainwall Curb | 4 days | Mon 6/27/22 | Thu 6/30/22 |
| 117 | | Pour New Interior Topping Slab | 4 days | Fri 7/1/22 | Thu 7/7/22 |
| 118 | | Building Enclosure | 70 days | Tue 5/17/22 | Wed 8/24/22 |
| 119 | | Install Structural Steel Coulmns and Beams | 15 days | Wed 6/8/22 | Tue 6/28/22 |
| 120 | | Install Metal Decking | 10 days | Wed 6/22/22 | Wed 7/6/22 |
| 121 | | Steel Inspections | 20 days | Wed 6/15/22 | Wed 7/13/22 |
| 122 | | Parapet Metal Framing | 15 days | Wed 6/29/22 | Wed 7/20/22 |
| 123 | | Install Mechanical Screen Wall Supports | 5 days | Thu 7/7/22 | Wed 7/13/22 |
| 124 | | Install Screen Walls | 10 days | Thu 7/14/22 | Wed 7/27/22 |
| 125 | | Install High Roof | 10 days | Thu 7/21/22 | Wed 8/3/22 |
| 126 | | Intall Low Roof | 10 days | Thu 7/28/22 | Wed 8/10/22 |
| 127 | | Remove existing curtainwall panel & Replace with Metal Insulated Panel 34 to 35 | 7 days | Tue 5/17/22 | Wed 5/25/22 |
| 128 | | Remove existing curtainwall panel & Replace with Metal Insulated Panel 35 to 36 | 7 days | Thu 5/26/22 | Mon 6/6/22 |
| 129 | | Remove existing curtainwall panel & Replace with Metal Insulated Panel 36 to 37 | 7 days | Wed 6/8/22 | Thu 6/16/22 |
| 130 | | Remove existing curtainwall panel & Replace with Metal Insulated Panel 37 to 38 | 7 days | Thu 6/23/22 | Fri 7/1/22 |
| 131 | | Remove existing curtainwall panel & Replace with Metal Insulated Panel 38 to 39 | 7 days | Fri 7/8/22 | Mon 7/18/22 |
| 132 | | North Curtainwall Installation | 5 days | Thu 7/14/22 | Wed 7/20/22 |
| 133 | | West Curtainwall Installation | 10 days | Thu 7/21/22 | Wed 8/3/22 |
| 134 | | South Curtainwall Installation | 5 days | Thu 8/4/22 | Wed 8/10/22 |

Project: AMEX DCA Project Sched
Date: Wed 12/1/21

| | | | | |
|---|---|---|---|---|
| Task | | External Tasks | | Manual Task | | Finish-only |
| Split | | External Milestone | | Duration-only | | Deadline |
| Milestone | | Inactive Task | | Manual Summary Rollup | | Progress |
| Summary | | Inactive Milestone | | Manual Summary | | |
| Project Summary | | Inactive Summary | | Start-only | | |

Case 1:24-cv-00968-JEB   Document 9   Filed 05/07/24   Page 118 of 152

EXHIBIT - C

# THE CENTURION LOUNGE
## at
## RONALD REAGAN INTERNATIONAL AIRPORT
## PRELIMINARY PROJECT SCHEDULE



**wm winmar**

Case 1:24-cv-00968-JEB   Document 9   Filed 05/07/24   Page 119 of 152

| ID | Task Mode | Task Name | Duration | Start | Finish |
|----|-----------|-----------|----------|-------|--------|
| 135 | | Install Parapet Coping | 10 days | Thu 8/11/22 | Wed 8/24/22 |
| 136 | | **Concourse Level** | **65 days** | **Tue 5/24/22** | **Wed 8/24/22** |
| 137 | | Demolition  Wall and Ceilings | 5 days | Tue 5/24/22 | Tue 5/31/22 |
| 138 | | MEP cutting and make safe | 5 days | Wed 6/1/22 | Tue 6/7/22 |
| 139 | | Frame Walls | 5 days | Wed 6/8/22 | Tue 6/14/22 |
| 140 | | Install Raised Concrete Platform, ramp, and Steps | 5 days | Wed 6/15/22 | Tue 6/21/22 |
| 141 | | Electrical & Fire Alarm Wall and Ceiling Rough-In | 10 days | Wed 6/15/22 | Tue 6/28/22 |
| 142 | | Sprinkler Rough - In / Modification | 10 days | Wed 6/15/22 | Tue 6/28/22 |
| 143 | | Plumbing Rough-In  (EJ-1) | 15 days | Wed 6/15/22 | Wed 7/6/22 |
| 144 | | HVAC Duct & Piping Rough-In | 15 days | Wed 6/15/22 | Wed 7/6/22 |
| 145 | | Wall Close-In Inspections | 2 days | Thu 7/7/22 | Fri 7/8/22 |
| 146 | | Hang & Finish Walls | 10 days | Mon 7/11/22 | Fri 7/22/22 |
| 147 | | Install Mechanical Units | 4 days | Mon 7/11/22 | Thu 7/14/22 |
| 148 | | Frame Ceilings | 5 days | Fri 7/15/22 | Thu 7/21/22 |
| 149 | | Install Light Fixtures | 5 days | Fri 7/22/22 | Thu 7/28/22 |
| 150 | | Grilles / Registers / Diffusers | 3 days | Fri 7/22/22 | Tue 7/26/22 |
| 151 | | Sprinkler Hydro Inspection | 2 days | Fri 7/22/22 | Mon 7/25/22 |
| 152 | | Ceiling Close-In Inspections | 2 days | Tue 7/26/22 | Wed 7/27/22 |
| 153 | | Hang and Finish Ceilings | 10 days | Thu 7/28/22 | Wed 8/10/22 |
| 154 | | Install Doors Frames | 2 days | Mon 7/25/22 | Tue 7/26/22 |
| 155 | | Install glass Storefront and Doors | 5 days | Thu 8/11/22 | Wed 8/17/22 |
| 156 | | Prime Paint Walls & Ceilings | 2 days | Thu 8/11/22 | Fri 8/12/22 |
| 157 | | Install Terrazo Flooring | 7 days | Mon 8/15/22 | Tue 8/23/22 |



| | | | |
|---|---|---|---|
| Task | External Tasks | Manual Task | Finish-only |
| Split | External Milestone | Duration-only | Deadline |
| Milestone | Inactive Task | Manual Summary Rollup | Progress |
| Summary | Inactive Milestone | Manual Summary | |
| Project Summary | Inactive Summary | Start-only | |

Project: AMEX DCA  Project Sched
Date: Wed 12/1/21

# EXHIBIT - C



## THE CENTURION LOUNGE
### at
## RONALD REAGAN INTERNATIONAL AIRPORT
## PRELIMINARY PROJECT SCHEDULE



Case 1:24-cv-00968-JEB    Document 9    Filed 05/07/24    Page 120 of 152

| ID | Task Mode | Task Name | Duration | Start | Finish |
|----|-----------|-----------|----------|-------|--------|
| 158 | | Install Doors & Hardware | 2 days | Mon 8/15/22 | Tue 8/16/22 |
| 159 | | Install VCT | 2 days | Mon 8/15/22 | Tue 8/16/22 |
| 160 | | Install Millwork | 3 days | Wed 8/17/22 | Fri 8/19/22 |
| 161 | | Finish Paint | 3 days | Mon 8/22/22 | Wed 8/24/22 |
| 162 | | AMEX Lounge | 105 days | Thu 8/11/22 | Wed 1/11/23 |
| 163 | | Frame Walls | 10 days | Thu 8/11/22 | Wed 8/24/22 |
| 164 | | Plumbing Rough- In | 15 days | Thu 8/25/22 | Thu 9/15/22 |
| 165 | | Sprinkler Rough -In | 15 days | Thu 8/25/22 | Thu 9/15/22 |
| 166 | | Mechanical Rough-In | 15 days | Thu 8/25/22 | Thu 9/15/22 |
| 167 | | Electrical & Fire Alarm Rough-In | 20 days | Thu 8/25/22 | Thu 9/22/22 |
| 168 | | HVAC Duct & Equipment installation | 20 days | Thu 9/1/22 | Thu 9/29/22 |
| 169 | | Wall Close In Inspections | 3 days | Fri 9/23/22 | Tue 9/27/22 |
| 170 | | Hang and Finish Walls | 15 days | Wed 9/28/22 | Tue 10/18/22 |
| 171 | | Install Door Frames | 5 days | Wed 10/19/22 | Tue 10/25/22 |
| 172 | | Install HVAC Roof Equipment | 10 days | Fri 9/16/22 | Thu 9/29/22 |
| 173 | | Millwork Field Measurements | 2 days | Wed 10/19/22 | Thu 10/20/22 |
| 174 | | Frame Ceilings | 10 days | Wed 10/19/22 | Tue 11/1/22 |
| 175 | | Install Light Fixtures | 10 days | Wed 10/26/22 | Tue 11/8/22 |
| 176 | | Grilles / Registers / Diffusers | 10 days | Wed 10/26/22 | Tue 11/8/22 |
| 177 | | Kitchen Exhaust Hood | 5 days | Wed 10/19/22 | Tue 10/25/22 |
| 178 | | Sprinkler Hydro Inspection | 2 days | Wed 11/2/22 | Thu 11/3/22 |
| 179 | | Ceiling Close-In Inspections | 2 days | Wed 11/9/22 | Thu 11/10/22 |
| 180 | | Hang & Finish Ceilings | 15 days | Fri 11/11/22 | Mon 12/5/22 |



| | | | | |
|---|---|---|---|---|
| Task | �largeblue | External Tasks | | Manual Task |
| Split | ............... | External Milestone | ◇ | Duration-only |
| Milestone | ◆ | Inactive Task | | Manual Summary Rollup |
| Summary | ▬▬▬ | Inactive Milestone | | Manual Summary |
| Project Summary | ▭▭▭ | Inactive Summary | | Start-only |

| | |
|---|---|
| Finish-only | ⊐ |
| Deadline | ↓ |
| Progress | ▬▬▬ |

Project: AMEX DCA  Project Sched
Date: Wed 12/1/21



| ID | Task Mode | Task Name | Duration | Start | Finish |
|---|---|---|---|---|---|
| 181 | | Install Terrazzo | 5 days | Tue 11/29/22 | Mon 12/5/22 |
| 182 | | Install Lights | 10 days | Tue 12/6/22 | Mon 12/19/22 |
| 183 | | Waterproofing & Flood Test @ Restrooms & Kitchen | 5 days | Tue 12/6/22 | Mon 12/12/22 |
| 184 | | Prime Paint Walls & Ceilings | 5 days | Tue 12/6/22 | Mon 12/12/22 |
| 185 | | Install Millwork | 10 days | Tue 12/13/22 | Tue 12/27/22 |
| 186 | | Install Ceramic Tile | 10 days | Tue 12/13/22 | Tue 12/27/22 |
| 187 | | Install Floor tile | 5 days | Tue 12/13/22 | Mon 12/19/22 |
| 188 | | Install Epoxy Flooring | 5 days | Tue 12/13/22 | Mon 12/19/22 |
| 189 | | Install Kitchen Equipment | 15 days | Tue 12/20/22 | Wed 1/11/23 |
| 190 | | Install Doors & Hardware | 4 days | Tue 12/13/22 | Fri 12/16/22 |
| 191 | | Install Plumbing Fixtures | 5 days | Wed 12/28/22 | Wed 1/4/23 |
| 192 | | Install Toilet Accessories | 5 days | Thu 1/5/23 | Wed 1/11/23 |
| 193 | | Final Paint | 10 days | Tue 12/20/22 | Wed 1/4/23 |
| 194 | | Install Carpet | 5 days | Thu 1/5/23 | Wed 1/11/23 |
| 195 | | Install Green Wall | 5 days | Tue 12/20/22 | Tue 12/27/22 |
| 196 | | Stairs | 156 days | Thu 5/5/22 | Thu 12/15/22 |
| 197 | | Install Steel framing, risers and landings | 5 days | Thu 5/5/22 | Wed 5/11/22 |
| 198 | | Terrazzo Treads | 3 days | Tue 12/6/22 | Thu 12/8/22 |
| 199 | | Install Glass Railings | 5 days | Fri 12/9/22 | Thu 12/15/22 |
| 200 | | Elevator | 23 days | Wed 10/19/22 | Fri 11/18/22 |
| 201 | | Install Rails & sills | 5 days | Wed 10/19/22 | Tue 10/25/22 |
| 202 | | Install Platform and Elevator door frames | 5 days | Wed 10/26/22 | Tue 11/1/22 |
| 203 | | Install Cab & Finishes | 10 days | Wed 11/2/22 | Tue 11/15/22 |

| | | | | |
|---|---|---|---|---|
| Task | ▬▬▬ | External Tasks | ▬▬▬ | Manual Task |
| Split | ............... | External Milestone | ◇ | Duration-only |
| Milestone | ◆ | Inactive Task | | Manual Summary Rollup |
| Summary | ▬▬▬ | Inactive Milestone | | Manual Summary |
| Project Summary | ▬▬▬ | Inactive Summary | | Start-only |

| | |
|---|---|
| Finish-only | ⊐ |
| Deadline | ↓ |
| Progress | ▬▬▬ |

Project: AMEX DCA Project Sched
Date: Wed 12/1/21

Case 1:24-cv-00968-JEB   Document 9   Filed 05/07/24   Page 121 of 152

# EXHIBIT - C



## THE CENTURION LOUNGE
### at
### RONALD REAGAN INTERNATIONAL AIRPORT
### PRELIMINARY PROJECT SCHEDULE

Case 1:24-cv-00968-JEB    Document 9    Filed 05/07/24    Page 122 of 152

| ID | Task Mode | Task Name | Duration | Start | Finish |
|---|---|---|---|---|---|
| 204 | | Elevator Inspection | 3 days | Wed 11/16/22 | Fri 11/18/22 |
| 205 | | **Close Out** | **37 days** | **Thu 1/5/23** | **Fri 2/24/23** |
| 206 | | Storage Container Removal | 5 days | Thu 1/5/23 | Wed 1/11/23 |
| 207 | | Remaining Topping Slab Removal | 5 days | Thu 1/12/23 | Wed 1/18/23 |
| 208 | | Waterproofing & New Topping slab | 5 days | Thu 1/12/23 | Wed 1/18/23 |
| 209 | | Temporay Barricades removed | 5 days | Thu 1/19/23 | Wed 1/25/23 |
| 210 | | Trailer & Traffic Control Removed | 5 days | Thu 1/26/23 | Wed 2/1/23 |
| 211 | | Equipment Start up | 7 days | Thu 1/12/23 | Fri 1/20/23 |
| 212 | | Testing and Balancing | 10 days | Thu 1/12/23 | Wed 1/25/23 |
| 213 | | Plumbing Final | 2 days | Thu 1/26/23 | Fri 1/27/23 |
| 214 | | Mechanical Final | 2 days | Thu 1/26/23 | Fri 1/27/23 |
| 215 | | Electrical Final | 2 days | Thu 1/26/23 | Fri 1/27/23 |
| 216 | | Sprinkler Final | 2 days | Mon 1/30/23 | Tue 1/31/23 |
| 217 | | Fire Alarm Final | 2 days | Mon 1/30/23 | Tue 1/31/23 |
| 218 | | Building Final | 2 days | Wed 2/1/23 | Thu 2/2/23 |
| 219 | | Substantial Completion | 1 day | Fri 2/3/23 | Fri 2/3/23 |
| 220 | | Punchlist | 15 days | Fri 2/3/23 | Thu 2/23/23 |
| 221 | | O & M Training | 10 days | Fri 2/3/23 | Thu 2/16/23 |
| 222 | | Project Completion | 1 day | Fri 2/24/23 | Fri 2/24/23 |
| 223 | | AMEX Grand Opening | 1 day | Mon 3/6/23 | Mon 3/6/23 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Task | ▬▬▬ | External Tasks | ▬▬▬ | Manual Task | ▬▬▬ | Finish-only | ⊐ |
| Split | ............... | External Milestone | ◇ | Duration-only | ▬▬▬ | Deadline | ↓ |
| Milestone | ◆ | Inactive Task | | Manual Summary Rollup | ▬▬▬ | Progress | ▬▬▬ |
| Summary | ▬▬▬ | Inactive Milestone | | Manual Summary | ▬▬▬ | | |
| Project Summary | ▬▬▬ | Inactive Summary | | Start-only | ⊏ | | |

Project: AMEX DCA  Project Sched
Date: Wed 12/1/21

**lllm winmar**

### Exhibit D
### Building Rules and Regulations

### MWAA Building Codes
https://www.mwaa.com/business/building-codes-environmental-department

### MWAA Design Manual
https://www.mwaa.com/business/airports-authority-design-manual

### BADGING PROCESS

- All personal working on site will be required to have a Winmar issued badge and must be worn at all times. Please provide a list of employees that will be working on the project in advance so their badges can be made.
- Winmar requires that at least 2 personal, preferably foreman, to obtain a MWAA security badge. This is required to work in secured areas. Anywhere within the concourse level is considered a secured area.
- The badge personal will be escorts for those not badged. The badged personal must watch and not be working.
- No one is to leave the area within being escorted to and from. Please keep this in mind when determining how many you want to have badged.
- Here is the MWAA link for additional information
- https://www.mwaa.com/business/reagan-pass-id-office#company



## lm winmar

**Exhibit E**
**Supplemental Provisions to the Subcontract Agreement**

COMMON SCOPE ITEMS

o   Subcontractor shall be fully responsible for the layout of the work of this Subcontract.

o   The Subcontractor shall be responsible for the costs of stand-by trades if the Subcontractor elects to, or is required, due to his failure to maintain scheduled performance, to work other than normal working hours or on Saturdays, Sunday, or holidays.

o   Subcontractor shall provide cleaning of streets, dust control, barricades and traffic control resulting from Subcontractor's operation as required to comply with local codes and ordinances for Subcontractor's work only.

o   Subcontractor is responsible for all hoisting, scaffolding and distribution of material necessary for the proper performance of the work on this Subcontract.

o   Subcontractor shall clean up all trash and debris resulting from its operations on a daily basis and place in dumpster. Such cleanup and removal shall be done in a manner that will impede neither the progress of the Project nor other trades.

o   Subcontractor to supply all necessary taxes, deliveries, staging, permits, licenses and inspections for the work of this Subcontract.

o   Quality:  Quality of work generated under this Subcontract will be of the highest quality and meet with    the approval of the Contractor's and Owner's representatives in all cases.

o   Safety: The prevention of accidents on or in the vicinity of the Work is the Subcontractor's responsibility, even if Contractor establishes a safety program for the entire project. Subcontractor shall work in accordance  with Contractor's safety regulations and comply with all OSHA requirements, federal and state laws, rules and regulations regarding safety and health including Personal Protection Equipment as required by OSHA. Failure  to do so may result in the issuance of a citation by OSHA and/or the Contractor. Subcontractor shall also comply with all safety provisions as stated in the Prime Contract. The Contractor citation to be one hundred dollars ($100.00) per occurrence or that assessed by OSHA.

o   Work of Preceding Trades: The Subcontractor shall satisfy himself as to the acceptability of the surface    to which his work is to be applied or affixed, and shall advise Contractor in writing of any unsatisfactory conditions. Commencement of work by Subcontractor shall be construed as acceptance of the preceding work.

o   Subcontractor's Relationship to Owner: Subcontractor will have no direct communications with the Owner  during the course of this Subcontract unless agreed to by Contractor in writing.  All submittals, correspondence, changes, extras, payroll reports, claims complaints, and any other matters will be directed to and through Contractor.

o   Back charges: The following procedures will be observed in the event of back charges.
    •   Contractor will not accept back charges form Subcontractor unless the Subcontractor obtains a work order signed by the Contractor's superintendent or project manager, prior to beginning the

---



work in question. No back charges or invoices from Subcontractor will be honored in the absence of a properly signed work order authorization.

- Submits to Contractor's accounting department for payment within 15 days of the signature date on the work order, or with the first draw request after incurring cost whichever is earlier. A duplicate of the back charge work order shall be submitted with the monthly payment application after the work is complete.
- Completes the work in its entirety to the Contractor's and Owner's satisfaction.

o Authorization to Sign: Subcontractor/supplier shall, with the return of this Subcontractor Agreement, submit to Contractor the names of all employees of Subcontractor who are authorized to sign change orders and release of lien waivers.



**Exhibit F**
**Requisition Requirements for the Subcontract Agreement**

Requisitions are paid once a month, upon receipt of the Owner payment (refer to item 2.A of the Subcontract Agreement).

All Subcontractors are required to provide an executed and notarized original Subcontractor Requisition for Payment form (AIA G702-3). This form is due in the Contractor's office by the 20th of the month, projecting the value of work complete through the end of the month. Faxed copies of invoices will be processed for payment, however original copies must be received by the Contractor before any payment(s) will be made.

All requisitions should be sent to:

**WINMAR CONSTRUCTION INC.**
**1010 Wisconsin Ave, NW Suite 150**
**Washington, DC 20007**
**FAX #202-464-8755**

All extras and Change Orders must be included on the requisition form. Payment on Owner Changes requires Owner approval and payment before payment by the Contractor Insurance and Bond invoices must be attached to the requisition to be processed for reimbursement (refer to item 10 of the Subcontract Agreement, if applicable).

**INSURANCE CERTIFICATE REQUIREMENTS**
Insurance certificates including complete coverage must be received by WINMAR, INC. before the first requisition will be paid (refer to item 8 of the Subcontract Agreement).

**AFFIDAVIT AND WAIVER REQUIREMENTS**
Subcontractor shall furnish the Affidavits and Claim Waivers as set forth in the Prime Contract as a condition precedent to any payment hereunder. A failure of the Contractor to enforce such waivers shall not be deemed a waiver of the Contractor's right to enforce them subsequently.

# wm winmar

### Exhibit G
### Submittal Log / Material  Tracking Schedule

EXH



23

**Exhibit H – Safety Requirements**

JOBSITE SAFETY REGULATIONS

- There is to be absolutely no consumption of alcoholic beverages on the job or property.

- Hard Hats are to be worn at all times applicable on construction jobsites.

- Safety glasses or other eye protection are to be worn when operating saws, chipping gun, jackhammer or power actuated tools.

- Do not wear loose clothing around table saws, drills or other machinery.  Make sure all safety guards are properly affixed and in good working condition on all power equipment.

- Do not add gasoline to machines or portable generators while running.

- Check to see that all electrical cords and connections are in proper working order.

- First aid kits should be available in all gang boxes.

- Insure that all crews adhere to safety rules and report injuries of any kind to the Superintendent and Project Manager

HOUSEKEEPING

Good housekeeping is an important and essential part of WINMAR's Injury Prevention Program.
IT IS THE RESPONSIBILITY OF ALL PERSONNEL—SUPERVISORS AND CRAFTMEN ALIKE—TO PRACTICE GOOD HOUSEKEEPING AT ALL TIMES.

- Scrap materials and rubbish are fire and accident hazards.  If an excess of these materials exists in your work area, ask your supervisor to arrange for the removal before beginning work.

- You must use the trash barrels which are located throughout the jobsite.  If you need one in your immediate area, notify your supervisor.

- Return all surplus materials to the stockpile at the completion of your job.

- Do not leave tools and materials where they will create a hazard for others.  Put them in a gang box or return them to the tool room.

- Each employee must keep his work area reasonably free of the accumulation of scrap lumber, debris, and tripping hazards during the workday.  It is recommended that the work area be cleared after lunch and at the end of each day and/or shift.

- Place oily rags in approved metal containers only.

- Wipe up spilled liquids immediately.  If you cannot handle the problem, barricade the area and notify your supervisor so that they can arrange for the necessary cleanup.

- Keep change areas clean.  Do not let soiled clothes, food scraps, and soft drink bottles or cans accumulate.  If drinking cups are used, deposit them in the containers provided.  Also, place sandwich wrappers, paper bags, and other trash in approved containers.

PERSONAL PROTECTIVE EQUIPMENT

## wm winmar

Your failure or refusal to use the personal protective equipment appropriate for work may be cause for removal from the project.

- All employees, visitors and vendors must wear hard hats as well as other required personal protective equipment every designated area.

- You must wear clothing suitable for the work you are doing. The minimum attire is long pants and a shirt.

- Wear sturdy work shoes. Safety shoes are desired. Shoes with badly worn or thin soles, sneakers and sandals are not permitted.

- You must wear proper eye protection when you are exposed to flying particles, dust, objects, chemicals, or harmful light.

- Respiratory equipment may be required in areas where health hazards exist due to accumulations of harmful dust, fumes, mists or vapors.

- Safety belts and lifelines must be worn when other safeguards such as nets, planking, scaffolding or guardrails cannot be used. Be sure safety lines are independent of other rigging.

- Wear gloves when handling objects or other substances which could cut, tear or burn the hands.

- Hair nets may be required for employees whose hair is a potential source of injury.

- Electricians using insulated gloves must test their gloves for defects daily.

HAND AND PORTABLE POWER TOOLS

Only tools in a safe working condition will be permitted. You must comply with all manufacturer's instructions for the use and handling of tools. In addition observe the following safety practices:

- Inspect your tools daily to insure that they are in proper working order. Damaged or defective tools must be tagged for repair.

- Power saws, grinders and other power tools must have proper guards in place at all times. Removing guards or rendering them inoperable is not permitted.

- Power tools shall be hoisted and lowered by a hand line never by the cord or hose.

- Chords and hoses must be kept out of walkways and off of stairs, scaffolds and ladders. They must not be placed so as to create a tripping hazard for employees or where they may be subjected to damage from equipment or materials.

- Do not push wheelbarrow with handles in an upright position. Do not overfill a wheelbarrow. If a ramp or cross-over is necessary, the minimum width must be 4 feet, reinforced to minimize deflection, and sloped no more than 2-foot in 10-feet.

Electrical Tools

- All portable electric tools must be grounded (except "UL" or "FM" Approved, Double-insulated Tools)

- All electrical cords and cables must be covered or elevated, when appropriate to protect them from damage and to eliminate tripping hazards.

Pneumatic Tools

- All pneumatic hose connections must be securely fastened.

- An approved safety check valve must be installed at the manifold outlet of each supply line for hand held pneumatic tools.

EXH

**wm winmar**

- Safety clips or retainers must be installed on all pneumatic tools to prevent the accidental expulsion of the tool from the barrel.

- No one shall be permitted to work within 10 feet of pneumatic nailers and staplers and the operator must use appropriate eye protection.

- Air hoses must not be disconnected at the compressor until hose lines have been bled.

Power-Actuated Tools
- Only those who possess valid credentials are permitted to use power-actuated tools.

- All power-actuated tools must be kept under lock and key when not actually in use and appropriate warnings must be posted before their actual use.

- Every qualified operator of a power-actuated tool must have read and be knowledgeable of all requirements found therein.

Fuel Powered Tools
- All fuel-powered equipment must be shut off before being refueled.

- Smoking is prohibited during refueling operations.  Other nearby sources of ignition, such as burning and welding operations, also must be halted during refueling operations.

- Make sure that appropriate warning signs are posted and that fire protection equipment is readily available during refueling operations.

LADDERS
There is NO excuse for using a makeshift or defective ladder as a means of access to any work area or working platform.
- Job-built ladders must be constructed to conform to the established safety requirements and rungs must be 12 inches on-centers with filler blocks installed.  Lumber graded "select" must be used.

- Industrial-type or heavy duty-grade manufactured ladders will be used on the jobsite, except for 'gang ladders' and special purpose job-built ladders.

- Ladders with broken or missing side rails or rungs must not be used.  Repair or destroy them immediately.  All ladders to be repaired must be tagged "do Not Use" and positively removed from service.

- Do not splice together short ladders to make a longer ladder.

- All straight ladders must be tied off at the top and rigidly secured at the bottom.

- Ladders shall not be placed against movable objects.

- The base of straight ladders must be set back a safe distance from vertical - approximately one-forth (1/4) of the working length of the ladder.

- Ladders used as access to a floor or platform must extend at least 3 feet above the landing.

- The areas around the top and base of ladders must be free of tripping hazards such as loose materials, trash, lumber, pipes, electrical cords etc.

1010 Wisconsin Ave, NW, Suite 150 Washington, DC 20007      o 202-464-8750   f 202-464-8755
www.winmarconstruction.com



- Ladders which project into passageways or doorways where personnel, moving equipment or materials being handled, could strike them must be protected by barricades and/or guards.

- You must face the ladder at all times while ascending or descending.

- Be sure that your shoes are free of mud, grease or other substances which could cause a slip or fall.

- Do not carry any materials in your hands while using any ladder. Use a hand-line to lift materials or tools.

- Always move the ladder to avoid overreaching. A scaffold must be used for all work which cannot be done safely from a ladder.

- Stepladders must be fully opened to permit the spreader to lock. Never use a stepladder leaning against a wall or form.

- You are PROHIBITED from standing or working from the top three rungs or cleats of any ladder unless you are firmly secured to the structure with a safety harness.

- Ladders must not be used near floor openings or edges where the worker could possibly fall over the guardrail protection.

- The use of metal ladders is restricted to special applications where heavier wooden ladders are not considered practical.

- Metal ladders must not be used for electrical work or within 4 feet of open electrical apparatus, wiring, or other live electrical equipment. An adequate warning sign must be posted on all metal ladders warning of these safeguards, which states " Caution- Do Not Use Around Electrical Equipment".

SCAFFOLDING
Each scaffold MUST be inspected prior to initial use and after any alteration, repair or moving.
General Rules

- There is no such thing as a temporary scaffold. All scaffolding must be erected and maintained to conform to all established requirements.

- All scaffolds must be designed to support all dead, live and wind loads to which they will be subjected.

- Gaurdrails and midrails must be installed on all open sides and ends on any scaffold more than seven (7) feet in height above the working surface or adjacent to floor wall openings.

- Toeboards must be provided on scaffolds at locations where persons are required to work or pass under the scaffold.

- Guardrails, midrails and toeboards should be constructed from components furnished by the manufacturer. When this is not possible lumber graded "select", which is sound and free of defects, must be used. Always use 2 x 4 inch lumber for guardrails and 1 x 4 inch lumber for toeboards.

- Scaffold planks must be at least 2 x 10 inch, scaffold grade ("Select Structural") lumber or equivalent, and span not more than one foot for each one inch of the plank width between the end supports.

- Scaffold planks should be cleated and must extend beyond the end supports at least six (6) inches—but not more than twelve (12) inches.

EXH

# winmar

- All scaffolds MUST be at least two planks wide regardless of height. The planks should cover the entire space between the uprights—but in no case be further than eight (8) inches from the outside guardrail and 14 inches from the building or structure. NO EMPLOYEE SHALL WORK FROM A SINGLE PLANK.

- Scaffold planks must be visually inspected before each use. Defective or damaged planks must be destroyed immediately.

- Access ladders must be provided for every scaffold five (5) feet or more in height and must provide a safe and unobstructed means of access. Climbing any portion of a scaffold frame is prohibited unless their design incorporates an unobstructed and safe means of access with rungs 12 inches on-centers.

- Adequate mud sills or other rigid footing, capable of withstanding the maximum intended load, must be provided.

- When a screw jack is used, it must extend into the leg tube at least one-third (1/3) its length, but in no case can the exposed thread exceed 12 inches.

- Scaffolding must be tied to the building or structure at intervals that do not exceed 20 feet horizontally and vertically. At least one row of ties is required, regardless of the scaffold height.

- Do not overload any scaffold. Materials should be brought up as needed and not exceed 75 pounds. A scaffold must not be loaded in excess of one-forth (1/4) of its rated capacity.

- Makeshift scaffolds, barrels, boxes, kegs and similar unstable objects must never be used as work platforms or to support scaffolds or platforms. Their use will result in immediate discharge.

- A scaffold permit must be posted on the jobsite for any scaffold over three (3) stories or 36 feet in height. This must be obtained before scaffolding can be erected.

- Where workers are required to enter the structure by passing underneath a scaffold, a screen of 18-gauge 1 x 1 inch standard wire mesh or equivalent material must be installed between the toeboard and the top rail.

- Overhead protection id required if employees working on a scaffold are exposed to overhead falling hazards. Such protection must be 2-inch planking or equivalent.

- Ladders or other unstable objects must not be placed on top of scaffold platforms to gain greater height.

- Whenever the scaffolding is erected or used within six (6) feet of outside overhead electrical wiring less than 750 volts, positive insulation barriers and safeguards must be provided.

- Any damage to scaffolds, framework or other supporting structures must be repaired immediately and/or promptly taken out of service and clearly marked as such.

Bracket Scaffolds
- All bracket scaffolds shall be designed and erected with a minimum safety factor of 4, computed by using maximum rated loads, including working loads, and such other loads as may be reasonably anticipated.

- If brackets are secured to walers held by snap ties or she-bolts, they must be extended through both wall forms and be properly secured before attaching bracket.

# winmar

- Metal brackets must be spaced not more than 10 feet apart.

- Wooden brackets must be an integral part of the form panel and not be used to support loads exceeding 25 pounds per square foot. Ledgers of 2 x 6 material, not projecting more than 3 feet 6 inches from the form panel and spaced not more than eight (8) feet apart, must have connections rigidly secured by 5/8-inch diameter bolts. All planks must be nailed, wired or bolted to the ledgers.

- No more than two employees shall occupy any given 10 feet of a bracket scaffold at any one time.

- All bracket platforms must consist of at least two 2 x 10 planks extending not more than 18 inches or less than 6 inches beyond each end support.

- A ladder securely attached to the form panel must be provided as access to all bracket scaffold platforms. Omit only the midrail at the ladder end of the platform to provide access while providing sufficient guardrailing.

- Climbing or working from walers is not permitted at any time.

Rolling/Tower Scaffolds

- The platform must cover the entire space between uprights and must be cleated with at least one-inch material at each end. A 1 x 6 toeboard must be attached to sides and end of the platform.

- At least 2 of the 4 casters must be swivel type, and the casters must be locked before anyone is permitted to climb or work aloft on any rolling scaffold.

- Lock pins, bolts or equivalent means of a positive type, including caster joints, must connect all joints.

- The height of a rolling scaffold must not exceed three (3) times the width of the scaffold base unless substantial outriggers are provided on both sides of the scaffold. Every rolling/tower scaffold must be rigid, square, plumb and self-supporting.

- No one person is permitted to move a rolling tower scaffold while persons are standing or working aloft.

- Guardrails, toeboards and access ladders must be provided on all rolling and tower scaffolds.

WELDING AND BURNING OPERATIONS
Welding and burning operations have a high potential for personal injuries and fires. When doing either you must follow these precautions:
General

- Before starting to burn or weld you must inspect you work area to ensure that sparks or molten metal will not fall on combustible materials or workmen. If you cannot provide the necessary safeguards, do not proceed.

- You must not weld or burn in a hazardous or "Hot Work" area without obtaining written authorization from the responsible authority including permits.

- You must be sure that suitable fire extinguishing equipment is readily available in your work area.

- You are responsible for maintaining your burning or welding equipment in a safe condition. If you have any reason to believe that the equipment is defective or unsafe, do not use it.

- When burning or welding you must wear appropriate eye and face protection with suitable filter lenses.

EXH



29

- Keep all welding leads and burning hoses up off walkways, passageways, stairs and any other location where they may create a tripping hazard or are exposed to physical damage.

- Never weld or burn on barrels, tanks, piping or other systems that MAY have contained either combustible or unknown products without first obtaining approval.

Welding
- If your eyes may be exposed to flying objects from chipping slag or other weld-cleaning activities, you must wear approved eye protection.

- When you are arc welding near other workmen, they must be protected, if practical, from the arc rays by non-combustible screens or must wear adequate eye and face protection.

- The frames of all welding machines must be grounded.

Burning
- Do not use matches to light torches.  Spark igniters must be used.  Torches must not be used to light smoking materials.

- When a crescent or 'special' wrench is required to operate the acetylene cylinder valve, the wrench must be kept in position on the valve while in use.

- You must wear appropriate gloves, body and eye protection.

Storage and Handling of Cylinders
- The protective caps must be kept on all cylinders whenever they are not in actual use.

- All cylinders must be properly secured in the upright vertical position to prevent tipping.  Do not store or use them on their sides or adjacent to any floor/wall openings.

- Oxygen and acetylene cylinders, as well as other fuel gasses in storage, must be separated from each type by 20 feet or by a 5-foot high barrier that has a one-hour fire rating.

- Cylinders must never be taken into any confined space.

Ventilation and Protection
- Welding, burning and heating performed in various types of confined spaces may require general local or mechanical exhaust ventilation to reduce the concentrations of smoke and fumes above the acceptable levels. If adequate ventilation cannot be provided, employees must be provided with and are required to use air supplied breathing apparatus.

- In the open air, when cutting, heating or welding metals having toxic significance, such as zinc, lead, cadmium, chromium-bearing metals, or other similar protective coatings, you must wear filter type respirators and/or mechanical blowers must be used.

EXCAVATIONS AND TRENCHES
All excavations, trenching operations and work done in excavations and trenches MUST conform to all established safety requirements. At no time can these minimum safety requirements be violated regardless of contrary orders by any supervisor except in rescue operations when time would not safely permit.  The Subcontractor must obtain a trench and excavation permit whenever a trench or excavation is over five (5) feet in depth and employees will be required or permitted to enter either.

EXH                                                                                          30

**wm winmar**

- All excavations must be sloped to an angle of at least ¾ to 1 or greater. The slope must start at the bottom and continue at ¾ to 1 to the top.

- Materials must be placed two (2) feet or more from the edge of the excavation. Precautions must be taken to prevent such materials from falling into the excavation.

- All trenches five (5) feet or more in depth must be shored or sloped ¾ to 1 to the bottom of the trench. Trenches 5 feet to 10 feet in depth must be shored from 4 to 6 foot centers.

- If the soil conditions are determined to not be stable and totally self-supporting, shoring must be installed at closer centers, or sloping done at a greater angle, for property safety.

- Every wall of an excavation must be inspected daily by the responsible supervisor. Your responsible supervisor must be in the near proximity of any excavation where employees are working. If evidence of cave-ins or slides is apparent, all work in the excavation must cease until necessary safety precautions have been taken to safeguard employees.

- Where vehicles or equipment operate near excavations or trenches, the sides of the excavation must be shored or braced as necessary to withstand the forces exerted by the superimposed loads. Also, stop logs or other substantial barricades must be installed at the edge of such excavations.

- Materials used for sheathing, shoring or bracing must be in good condition. Timbers must be sound, free of large or loose knots, and of adequate dimension.

- A substantial casing, which extends the full depth of the shaft, must protect employees working in bell-bottom pier holes. When working in such holes you must wear a shoulder harness secured to a lifeline that is tended full time by workmen above.

- Safe access must be provided into all excavations by means ladders, stairs or ramps within 25 feet of lateral travel distance. If ladders are used, they must extend at least three (3) feet above grade level.

- Walkways or bridges with standard guardrails must be provided where employees or equipment are required or permitted to cross over excavations or trenches.

- Always examine the trench or excavation before backfilling, so as to be positive no one is in it.

- In locations where oxygen deficiencies or concentrations of hazardous or explosive gasses or dust are possible, the atmosphere in the excavation must be tested by an independent lab prior to the start of work and at frequent intervals, and records of same must be maintained at the jobsite.

# EXHIBIT 3

ERIKA M. FISHER
EFISHER@GRSM.COM
DIRECT DIAL: (502) 371-1268

## GORDON&REES
### SCULLY MANSUKHANI
**YOUR 50 STATE PARTNER**

ATTORNEYS AT LAW
325 W. MAIN STREET
WATERFRONT PLAZA
SUITE 2300
LOUISVILLE, KY 40202
WWW.GRSM.COM

February 26, 2024

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

1320 Penelope, LLC
4619 41st Street NW, 2nd Floor
Washington DC 20016

William Lansing
Registered Agent for
1320 Penelope, LLC
1101 Connecticut Ave NW, Suite 450
Washington, DC 20036

> Re:   **Statement of Mechanics' Lien**
>       **Amount Due:**      **$448,402.00**
>       **Claimant:**        **Iron Kingdom, Inc.**
>       **Owner:**           **1320 Penelope, LLC**
>       **Project Name:**    **60 DC Hotel**

Dear Sir or Madam:

You are hereby notified that on February 23, 2024, Iron Kingdom, Inc., ("Iron Kingdom") recorded a Mechanic's Lien against real property located in Washington, DC owned by 1320 Penelope, LLC. This Mechanic's Lien was recorded because Iron Kingdom has not been paid for labor and material provided to the property in the amount of $448,402.00. A copy of the Mechanic's Lien statement is enclosed.

Should you desire to resolve this lack of payment without the necessity of further proceedings, please contact Angela Richie or myself at 502-371-1251 or 502-371-1268.

**THIS COMMUNICATION IS FROM A DEBT COLLECTOR. UNLESS YOU, WITHIN THIRTY DAYS AFTER RECEIPT OF THIS DOCUMENT, DISPUTE THE VALIDITY OF THE DEBT OR ANY PORTION THEREOF SHOWN ABOVE, I WILL ASSUME THIS DEBT TO BE VALID. IF YOU NOTIFY ME IN WRITING WITHIN THE THIRTY-DAY PERIOD THAT THE DEBT OR ANY PORTION THEREOF IS**

February 26, 2024
Page 2

DISPUTED, I WILL OBTAIN VERIFICATION OF THE DEBT OR A COPY OF THE JUDGMENT AGAINST YOU, AND A COPY OF SUCH VERIFICATION OR JUDGMENT WILL BE MAILED TO YOU WITHIN THIRTY (30) DAYS OF THE RECEIPT OF YOUR WRITTEN NOTICE. IF THE NAME AND ADDRESS OF THE ORIGINAL CREDITOR IS DIFFERENT FROM YOUR CURRENT CREDITOR AS SHOWN ABOVE, I WILL ALSO SATISFY A WRITTEN REQUEST FOR THAT INFORMATION WITHIN THE THIRTY-DAY RESPONSE PERIOD.

THIS IS AN ATTEMPT TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED TO COLLECT THOSE FUNDS.

Best regards,

Erika M. Fisher

cc:    Iron Kingdon, Inc.

Winmar Construction, Inc.
2100 Reston Parkway, Suite 104
Reston, VA 20191
Enclosures

# NOTICE OF MECHANIC'S LIEN

02/23/2024 11:42 AM

Date of Notice: mm/dd/yyyy 2/19/2024

The Project [1] is:  [X] Ongoing  /  ☐ Completed  /  ☐ Termination

If the Project has been Completed or Terminated,

please provide date of Completion or Termination: mm/dd/yyyy _____

**Contractor**

Name: Iron Kingdom Inc.

*and*

**Contractor's Registered Agent (if applicable)**

Name: CSC - Lawyers Incorporating Service Company

Contractor's or Contractor's Registered Agent's Mailing Address (please specify which)

Contractor's Mailing Address -9220 Edgeworth Drive

City/State/Zip: Capital Heights, Maryland 20743

**Party Against Whose Interest a Lien Is Claimed (herein "Owner"):**

Name: 1320 Penelope, LLC

*and*

**Owner's Registered Agent (if applicable):**

Name: William Lansing

Owner's or Owner's Registered Agent's Mailing Address (please specify which)

Owner's address - 4619 41st Street NW, 2nd Floor

City/State/Zip: Washington, DC 20016

---

[1] Project means any work or materials provided by a contractor for the erection, construction, improvement, repair of, or addition to any real property at the direction of an owner, or an owner's authorized agent, or the placing of any engine, machinery or other thing therein or in connection therewith so as to become a fixture, though capable of being detached. DC Code Section 40-301.03

**Property:** Square __0137__    Suffix _____    Lot(s) __7000__

Address: __1337 Connecticut Avenue N.W.__

Washington, DC   20036

**Notice:** Notice is hereby given that Contractor indicated above intends to hold a Mechanic's Lien against the interest of the Owner of the Property for the sum of $448,402.00    ("Amount Claimed") after taking into account any credit for payments through the date hereof. This claim is pursuant to a contract for work or materials in the Project:

☐ between Owner and the Contractor
☒ between a General Contractor and Contractor which acted as a sub-contractor

**Description of the work Done and /or materials Furnished to the Property:**
Contractor supplied and/or performed the following (include specific dates of when: 1) work was commenced and completed; and/or 2) materials were furnished, including first and last delivered dates):

Iron Kingdom Inc. provided structural and misc. metals and related work at 60 DC Hotel

Project pursuant to its written subcontract with Winmar Construction, Inc., the Project's

General Contractor, and the directions and instructions provided by it. Iron Kingdom

commenced its work on October 14, 2022, and last worked at the Project on

October 20, 2023.

**Certification:** The undersigned hereby certifies:

Contractor is:   ☐ an individual
☒ organized and existing under the laws of the District of Columbia.
☐ organized and existing under the laws of the State of Maryland
   and doing business in the District of Columbia.
☐ organized and existing under the laws of the State of _____
   and not doing business in the District of Columbia.

**Delivery of a Copy of Notice:** A copy of this notice will be served within five (5) business days of recordation upon the Owner or the agent of the Owner of the Property by certified mail to the Owner's current address (or, if not available in the public records, to the last known address). I further certify that if the certified mail is returned as unclaimed or undelivered, a copy of this notice will be posted at or on the affected real property at a location generally visible from some entry point to the real property.

**Timing of Notice:** This notice is being filed during the construction or within 90 days after the earlier of the completion or termination of the Project. I further certify that I understand that I must commence suit to enforce this lien within 180 days from the date of recordation of this notice and that a notice of lis pendens will need to be recorded timely and pursuant to applicable law.

**Verification by Contractor, Contractor's Authorized Representative, or Attorney:**

I, _____Joseph Philip_____, hereby affirm under penalty of perjury and upon my personal knowledge that the contents of this notice are true and correct to the best of my information and belief, that Contractor has the right to recover the Amount Claimed, and that I am:

[X] the Contractor

[ ] an authorized representative of the Contractor and evidence of my authority to execute this notice on behalf of the contractor is appended hereto.

[ ] an attorney representing Contractor and evidence of my authority to execute this notice on behalf of the contractor is appended hereto.

Signature: _____

Printed Name: __Joseph Philip_____

Address: __9220 Edgeworth Dr._____

City/State/Zipcode: __Capitol Heights, MD, 20743__

Telephone: __301-699-3448__

State of: _Maryland_____

County of: _Prince George's_____ ; ss

This instrument was acknowledged before me on this ____20____ day of _February_, 20_24_

by _Joseph Philip_____ as _President_____ of
　(Name)　　　　　　　　　　　　　　　　　　(Title)

_Iron Kingdom_____
(Name of Contractor)

Notary Public: _____

My commission expires: _08/03/2025_____



**Required documents that must be included in this notice:**

| | |
|---|---|
| If Contractor is an entity organized under the laws of the District of Columbia, or is doing business in the District: | Photocopy of current license to do business issued by the D.C. Department of Consumer and Regulatory Affairs<br><br>Certificate of Good Standing issued within 180 days prior to the date of filing of this notice issued by the D.C. Department of Consumer and Regulatory Affairs.<br><br>If Project is provided under a home improvement contract, a copy thereof. |
| If Contractor is an individual or an entity organized under the laws OTHER than the District of Columbia, and is not doing business in the District: | Photocopy of current license to do business in foreign jurisdiction<br><br>Certificate of Good Standing issued within 180 days prior to the date of filing of this notice issued by the foreign jurisdiction<br><br>If Project is provided under a home improvement contract, a copy of thereof. |
| If Authorized Representative of Contractor or Attorney is filing this Notice | Letter of Authorization from Contractor |

After recording, return to:

Angela Richie

325 W. Main Street

Waterfront Plaza Suite 2300
Louisville, KY 40202

```
Doc #: 2024016776
Filed & Recorded
02/23/2024 11:42 AM
IDA WILLIAMS
RECORDER OF DEEDS
WASH DC RECORDER OF DEEDS
   RECORDING FEES          $25.00
   SURCHARGE               $6.50
TOTAL:                     $31.50
```

Doc #: 2024016776
02/23/2024 11:42 AM

Initial File #: 230793
Entity Type: For-ProfitCorporation

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## DEPARTMENT OF LICENSING AND CONSUMER PROTECTION
### CORPORATIONS DIVISION



# CERTIFICATE

**THIS IS TO CERTIFY** that all applicable provisions of the District of Columbia Business Organizations Code (Title 29) have been complied with and accordingly, this ***CERTIFICATE OF GOOD STANDING*** is hereby issued to

IRON KINGDOM Inc.

**WE FURTHER CERTIFY** that the foreign entity is registered to do business in the District on 03/06/2003 ; that all fees, and penalties owed to the District for entity filings collected through the Mayor have been paid and Payment is reflected in the records of the Mayor; The entity's most recent biennial report required by § 29-102.11 has been delivered for filing to the Mayor; and the entry's registration has not been terminated. This office does not have any information about the entity's business practices and financial standing and this certificate shall not be construed as the entity's endorsement.

**IN TESTIMONY WHEREOF I** have hereunto set my hand and caused the seal of this office to be affixed as of 12/28/2023 1:36 PM

Business and Professional Licensing Administration



*Rebecca Janovich*

REBECCA JANOVICH
Superintendent of Corporations,
Corporations Division

Muriel Bowser
Mayor

Tracking #: uDg5f82X



**GOVERNMENT OF THE DISTRICT OF COLUMBIA Muriel Bowser, Mayor**

# Department of Licensing and Consumer Protection

**Business Licensing Division**
**1100 4th Street S.W.**
**Washington DC 20024**

Date Issued : 02/09/2022
Category : 4202
License# : 53001037
License Period : 01/01/2024 - 12/31/2026

BASIC BUSINESS LICENSE

**Billing Name and Address :**

Iron Kingdom Inc.

4904 Lawrence StreET
Hyattsville MD 20781

**Premise/Application's Name and Address :**

Iron Kingdom Inc.

4904 LAWRENCE ST -, HYATTSVILLE, MD 20781

**Registered Agent's Name and Address :**

Corporation Service Company

1090 Vermont Avenue N.W.
Washington DC 20005

Owner's Name :

Corp. Name : Iron Kingdom Inc.

Trade Name :

| CofO/HOP# : | | SSL : NA | Zone : | Ward : | ANC : | PERM NO. : |
|---|---|---|---|---|---|---|
| | | UNITS : 1 | | | | |

General Service and Repair - Home Improvement Contractor

**--THE LAW REQUIRES THIS LICENSE TO BE POSTED IN A CONSPICUOUS PLACE ON THE PREMISES--**

*License Effective from the later of Issued or Start of License-Period Date

Acting Director :
Tiffany Crowe

Doc #: 2024016776
Filed & Recorded
02/23/2024 11:42 AM
IDA WILLIAMS
RECORDER OF DEEDS
WASH DC RECORDER OF DEEDS

# EXHIBIT 4

ERIKA M. FISHER
EFISHER@GRSM.COM
DIRECT DIAL: (502) 371-1268

**GORDON&REES**
SCULLY MANSUKHANI
YOUR 50 STATE PARTNER

ATTORNEYS AT LAW
325 W. MAIN STREET
WATERFRONT PLAZA
SUITE 2300
LOUISVILLE, KY 40202
WWW.GRSM.COM

February 26, 2024

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

American Express TRS CO INC.
World Financial Center
200 Vesey Street
New York, New York 10285

Matthew Reeves
Registered Agent
18850 N 56th Street
Phoenix, AZ 85054-4500

       Re:    **Statement of Mechanics' Lien**
               **Amount Due:**    **$113,662.11**
               **Claimant:**    **Iron Kingdom, Inc.**
               **Owner:**    **American Express TRS CO Inc.**
               **Project Name:**    **AMEX Centurion Airport Lounge**

Dear Sir or Madam:

       You are hereby notified that on February 23, 2024, Iron Kingdom, Inc., ("Iron Kingdom") recorded a Mechanic's Lien against the leasehold interest held by American Express TRS CO Inc.'s for the AMEX Centurion Airport Lounge located at the Ronald Reagan National Airport. This Mechanic's Lien was recorded because Iron Kingdom has not been paid for labor and material provided to the property in the amount of $113,662.11. A copy of the Mechanic's Lien statement is enclosed.

       Should you desire to resolve this lack of payment without the necessity of further proceedings, please contact Angela Richie or myself at 502-371-1251 or 502-371-1268.

       **THIS COMMUNICATION IS FROM A DEBT COLLECTOR. UNLESS YOU, WITHIN THIRTY DAYS AFTER RECEIPT OF THIS DOCUMENT, DISPUTE THE VALIDITY OF THE DEBT OR ANY PORTION THEREOF SHOWN ABOVE, I WILL ASSUME THIS DEBT TO BE VALID. IF YOU NOTIFY ME IN WRITING WITHIN THE**

2024-02-26 - IRONK - AMEX Notice to Owner of Lien - 2/26/2024 3:41 PM

February 26, 2024
Page 2

**THIRTY-DAY PERIOD THAT THE DEBT OR ANY PORTION THEREOF IS DISPUTED, I WILL OBTAIN VERIFICATION OF THE DEBT OR A COPY OF THE JUDGMENT AGAINST YOU, AND A COPY OF SUCH VERIFICATION OR JUDGMENT WILL BE MAILED TO YOU WITHIN THIRTY (30) DAYS OF THE RECEIPT OF YOUR WRITTEN NOTICE. IF THE NAME AND ADDRESS OF THE ORIGINAL CREDITOR IS DIFFERENT FROM YOUR CURRENT CREDITOR AS SHOWN ABOVE, I WILL ALSO SATISFY A WRITTEN REQUEST FOR THAT INFORMATION WITHIN THE THIRTY-DAY RESPONSE PERIOD.**

**THIS IS AN ATTEMPT TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED TO COLLECT THOSE FUNDS.**

Best regards,

*Erika M. Fisher*

Erika M. Fisher

cc:     Iron Kingdom, Inc.

Winmar Construction, Inc.
2100 Reston Parkway, Suite 104
Reston, VA 20191

Enclosures

2024-02-26 - IRONK - AMEX Notice to Owner of Lien - 2/26/2024 3:41 PM

## MEMORANDUM FOR MECHANIC'S LIEN CLAIMED BY SUBCONTRACTOR

### (Va. Code § 43-8)

Name of owner: American Express TRS CO INC.

Address of owner: 200 Vesey Street New York, New York 10285

Name of general contractor (if any): Winmar Construction INC.

Name of claimant: Iron Kingdom, Inc.

Address of claimant: 9220 Edgeworth Drive Capital Heights, Maryland 20743

Contractor license or certificate number of claimant (if applicable): 2705148877

Issuance date of license or certificate (if applicable):
Expiration date of license or certificate (if applicable): 10-31-2024

20240100001872  Pg. 1 OF 3
02/23/2024 01:10:50 PM
Doc Type: ELRMECH;
Paul Ferguson, Clerk
Arlington County Clerk
Grantor Tax:  $.00
State Tax:  $.00
Recording Fee:$26.00

If no contractor license or certificate number is included, the claimant certifies that such a valid license or certificate is not required by law for the work done for which the benefit of a lien is claimed.

1. Type of materials or services furnished: Fabricate and install steel beams, angles, sill angle, flat embed plate with studs, welded and bolted connections, and other necessary pieces.

2. Amount claimed: $113,662.11

   If any part of the Amount claimed is not due as of the date of this mechanic's lien, identify the date or event upon which it will be due and the sum(s) to which the due date(s) or event(s) apply: December 26, 2023

3. Type of structure on which work done or materials furnished:  AMEX Centurion Airport Lounge

4. Brief description and location of real property: Ronald Reagan National Airport Arlington Virginia

5. Date from which interest on the above amount is claimed: 8/21/2023

It is the intent of the claimant to claim the benefit of a lien.

Dated: 12.28.2023

Iron Kingdom

By: _____

Joseph Philip, President

### Affidavit

State of Maryland,

County of Prince George's, to wit:

I, ASEM (notary or other officer) for the county (or city) aforesaid, do certify Iron Kingdom, Inc., claimant, this day made oath before me in my county (or city) aforesaid that American Express TRS CO INC, (the owner) is justly indebted to claimant in the sum of $113,662.11 dollars, for the consideration stated in the foregoing memorandum, and that the same is payable as therein stated.

Given under my hand this the 28TH day of DEC, 2023.

_____
(Notary Public or Magistrate, et cetera)

AMA A ASEM
Notary Public-Maryland
Prince George's County
My Commission Expires
August 02, 2025

## Addendum to Memorandum for Mechanic's Lien Claimed by Subcontractor

(Va. Code 43-8)

The Mechanic's Lien being filed by Iron Kingdom **is only to the extent of the leasehold interest held by American Express TRS CO INC.'s for the AMEX Centurion Airport Lounge.** The Mechanic's lien is not against the actual physical property of the Ronald Reagan National Airport. Iron Kingdom is only attempting to lien to the extent of American Express TRS CO INC.'s leasehold interest at the Ronald Reagan National Airport AMEX Centurion Lounge, located in Arlington, Virginia.

**NOTICE**

**Of Subcontractor Mechanic's Lien**

To American Express TRS CO INC

You are hereby notified that Winmar Construction INC. is indebted to me in the sum of $ $113,662.11 with interest thereon from the 21st day of August,2023, for work done (or materials furnished, as the case may be,) in and about the construction (or removal, etc.,) of a AMEX Centurion Airport Lounge_(description of structure which he has contracted to construct (or remove, etc.,) for you or on property owned by you in the county (or city) of Arlington, Virginia, and that I have duly recorded a mechanic's lien for the same.

Given under my hand this the 28th day of Dec, 2023.

Iron Kingdom

By: _____

Joseph Philip, President